Matthew M. Boley (8536)
Adam Reiser (13339)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:  (801) 363-4300
Facsimile:   (801) 363-4378
E-mail:  mboley@ck.law
         areiser@cohnekinghorn.com
         jtrousdale@cohnekinghorn.com

*Attorneys for* debtor-in-possession
MOUNTAIN CRANE SERVICE, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**MOUNTAIN CRANE SERVICE, LLC,**<br><br>Debtor. | Bankruptcy No. 18-20225 JTM<br><br>Chapter 11<br><br>Honorable Joel T. Marker |

## DISCLOSURE STATEMENT WITH RESPECT TO
## DEBTOR'S PLAN OF REORGANIZATION

**MOUNTAIN CRANE SERVICE, LLC (THE "DEBTOR") HAS PREPARED AND PROPOSES THE PLAN FOR CONFIRMATION WITH THE DUAL HOPES OF (A) REORGANIZING ITS FINANCIAL AFFAIRS, AND (B) PROVIDING A FAIR AND MEANINGFUL RETURN TO CREDITORS. THE DEBTOR STRONGLY URGES CREDITORS TO TIMELY COMPLETE, SIGN AND RETURN BALLOTS THAT ACCEPT THE PLAN.**

**IN THE DEBTOR'S VIEW, THERE ARE AT LEAST THIRTEEN REASONS FOR CREDITORS TO ACCEPT THE PLAN:**

1. **THE PLAN (AND SPECIFICALLY ITS TREATMENT OF UNSECURED CLAIMS) HAS BEEN REVIEWED, COMMENTED ON, AND APPROVED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE CASE;**

2. **BOTH THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS BELIEVE THAT THE PLAN SHOULD RESULT IN SUBSTANTIALLY GREATER REPAYMENT OF UNSECURED CLAIMS THAN A LIQUIDATION;**

3. **THE DEBTOR PROJECTS THAT NON-PRIORITY UNSECURED CREDITORS MAY BE PAID UP TO APPROXIMATELY 73% OF THEIR CLAIMS UNDER THE PLAN COMPARED TO ONLY 13.7% TO 32.9% ESTIMATED TO BE PAID IN A CHAPTER 7 LIQUIDATION;**

4. **IN ADDITION TO AMOUNTS THAT WILL BE PAID TO SECURED CREDITORS, THE DEBTOR IS REQUIRED TO COMMIT $8,000,000 FOR THE REPAYMENT OF UNSECURED CLAIMS AND ADMINISTRATIVE EXPENSES;**

5. **CONFIRMATION OF THE PLAN WILL PERMIT THE DEBTOR TO REMAIN IN BUSINESS AND TO GENERATE BUSINESS REVENUES, WHICH ARE ANTICIPATED TO FUND THE $8,000,000 DISTRIBUTION FUND;**

6. **CREDITORS HOLDING ONE OR MORE CLAIMS AGGREGATING $1,000 OR LESS (AS WELL AS CREDITORS HOLDING CLAIMS IN A LARGER AMOUNT BUT THAT ELECT VOLUNTARILY TO REDUCE THEIR CLAIM(S) TO $1,000 IN THE AGGREGATE) WILL BE PART OF A "CONVENIENCE CLASS," AND ALLOWED CONVENIENCE CLAIMS WILL BE PAID IN FULL WITHIN 60 DAYS AFTER THE EFFECTIVE DATE;**

7. **THE DEBTOR EMPLOYS HUNDREDS OF PEOPLE AND IS INVOLVED IN HUNDREDS OF ONGOING PROJECTS—ALLOWING THE DEBTOR TO CONTINUE ITS BUSINESS OPERATIONS UNDER THE PLAN WILL ALLOW EMPLOYEES TO KEEP THEIR JOBS, AND WILL PERMIT THE DEBTOR TO SATISFY ITS OBLIGATIONS ON PENDING**

**AND AWARDED CONTRACTS WITHOUT POTENTIALLY DISASTROUS DEFAULTS;**

8. **IN A CHAPTER 7 CASE, IT IS UNLIKELY THAT THE DEBTOR WOULD CONTINUE DOING BUSINESS AND, AS SUCH, POST-CONFIRMATION EARNINGS LIKELY WOULD NOT BE A SOURCE OF RECOVERY TO PAY CREDITOR CLAIMS;**

9. **UNDER THE PLAN, <u>MANY OF THE DEBTOR'S SECURED CREDITORS HAVE AGREED TO DISCOUNT THEIR CLAIMS AND/OR THEY HAVE AGREED TO REPAYMENT TERMS THAT ARE MORE FAVORABLE TO THE DEBTOR THAN THE TERMS SPECIFIED IN THEIR RESPECTIVE LOAN DOCUMENTS</u>, WHICH IS ANTICIPATED TO IMPROVE THE DEBTOR'S CASH FLOWS, AND IS PROJECTED TO PERMIT THE DEBTOR A BETTER OPPORTUNITY TO REPAY UNSECURED CREDITORS;**

10. **SECURED CREDITORS' AGREEMENTS TO REDUCE THEIR CLAIMS IN THIS CASE, AND TO MORE FAVORABLE PAYMENT TERMS, APPLY ONLY UNDER THE DEBTOR'S PROPOSED PLAN IN THIS CHAPTER 11 CASE, AND MAY NOT APPLY IF THE BANKRUPTCY CASE IS CONVERTED TO CHAPTER 7 OR DISMISSED;**

11. **<u>IF THE PLAN IS NOT CONFIRMED, SOME OR ALL OF THE DEBTOR'S SECURED CREDITORS MAY HAVE THE RIGHT TO FORECLOSE</u> UPON AND LIQUIDATE THE DEBTOR'S ASSETS, LIKELY <u>LEAVING LITTLE OR NOTHING FOR OTHER CREDITORS</u>;**

12. **THE DEBTOR BELIEVES THAT, IF THE CASE IS CONVERTED TO CHAPTER 7 OR THE CASE IS DISMISSED AND THE DEBTOR'S ASSETS BECOME SUBJECT TO COLLECTION PROCEEDINGS BY SECURED CREDITORS, THE GOING CONCERN VALUE OF THE DEBTOR'S BUSINESS WILL BE LOST AND THAT, IN SUCH AN EVENT, IT IS LIKELY THAT (A) RECOVERIES BY SECURED CREDITORS WILL BE LIMITED TO THE FORCED LIQUIDATION VALUE OF THEIR COLLATERAL, AND (B) UNSECURED CREDITORS WILL RECEIVE LITTLE OR NO REPAYMENT; AND**

13. **UNDER THE PLAN, THE DEBTOR IS WAIVING PREFERENCE CLAIMS AGAINST CREDITORS THAT "ACCEPT," AND <u>THE PLAN PROTECTS CREDITORS THAT ACCEPT THE PLAN FROM BEING SUED TO RECOVER "PREFERENCE PAYMENTS" RECEIVED IN THE 90 DAYS BEFORE THE CASE WAS FILED</u>; WHEREAS, IF THE CASE IS CONVERTED TO CHAPTER 7, THE APPOINTED TRUSTEE MAY SUE SOME OR ALL OF THE CREDITORS THAT RECEIVED PAYMENTS WITHIN NINETY DAYS BEFORE THIS CASE WAS FILED, TO RECOVER THOSE PAYMENTS.**

## IMPORTANT

THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF MOUNTAIN CRANE SERVICE, LLC ENTITLED TO VOTE ON THE PLAN HEREIN DESCRIBED, AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE PROPOSED PLAN.  ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

SOLICITATION OF ACCEPTANCE OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT 1, IS BEING SOUGHT FROM THE HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED UNDER THE PLAN.  CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT IN THE ENVELOPE PROVIDED.

## ARTICLE 1
## PRELIMINARY STATEMENT

### 1.1    General Information Concerning Disclosure Statement and Plan

Mountain Crane Service, LLC (the "Debtor"), submits this Disclosure Statement under section 1125 of the Bankruptcy Code and Bankruptcy Rules 3016, 3017(d) and 3017.1. The purpose of this Disclosure Statement is to disclose information adequate to enable creditors who are entitled to vote to arrive at a reasonably informed decision in exercising their rights to vote on the *Debtor's Plan of Reorganization dated August 13, 2018* (the "Plan").  A copy of the Plan is attached as **Exhibit 1**. Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in Article I of the Plan, or in the Bankruptcy Code and Bankruptcy Rules.  All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtor has promulgated the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to provide a meaningful recovery to each Class of Claims, considering the assets and anticipated funds available for distribution to creditors.  The Debtor believes that the Plan permits a substantial and meaningful recovery for all Classes of Claims.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims under the Plan.  It is submitted as an aid and supplement to your review of the Plan.  To the extent the terms of the Plan are not self-explanatory, reasonable effort has been made to explain aspects of the Plan as they affect creditors and/or to provide information relevant to creditors' decision whether to vote to accept the Plan.  Neither the Plan nor this Disclosure Statement is intended to provide you with legal, tax or other advice. The Debtor urges you to retain an attorney, tax advisor or another relevant professional to advise you.

### 1.2 Disclaimers

**NO SOLICITATION OF VOTES MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE, AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED**

IN THIS DISCLOSURE STATEMENT.  CREDITORS SHOULD NOT RELY ON ANY INFORMATION OTHER THAN THAT CONTAINED IN THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATION CONCERNING THE DEBTOR, ITS ASSETS, PAST OPERATIONS, OR CONCERNING THE PLAN IS AUTHORIZED.  SUCH REPRESENTATIONS SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

WHILE THE INFORMATION PROVIDED HEREIN IS BELIEVED RELIABLE, NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL HAVE UNDERTAKEN TO VERIFY OR INVESTIGATE SUCH INFORMATION AND NO REPRESENTATION IS MADE OR INTENDED AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, BY THE DEBTOR OR ITS PROFESSIONAL CONSULTANTS THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE RESTRUCTURING OF THE DEBTOR'S OBLIGATIONS OR THAT THE OBLIGATIONS OF THE DEBTOR AS RESTRUCTURED BY THE PLAN WILL BE FULLY PERFORMED IN THE FUTURE WITHOUT RISK OF FURTHER DEFAULT.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE PLAN ATTACHED SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.

## ARTICLE 2
## INTRODUCTION AND BACKGROUND

The Debtor was formed on or about June 4, 2004 to operate a "full-service" crane business. It is located in Salt Lake City, Utah. The Debtor provides a variety of crane services across the nation, and particularly in the Intermountain West, including plant maintenance, steel erection, pre-cast tilt ups, wind farm erection and

maintenance, transformers, and bridge girders. The Debtor directly employs approximately 150 to 225 individuals at any given time, including approximately 125 to 190 in Utah alone.

With a fleet of over 80 cranes, and hundreds of other pieces of equipment, the Debtor aims to have the right crane and the right personnel to complete almost any project. The Debtor has the largest dedicated engineering department in the Intermountain West, which works with the Debtor's sales team to provide critical lift plans and drawings specially designed to meet site requirements and to assist its customers determine what crane is the best fit for their unique project. The Debtor has been awarded top safety and excellence awards year after year for its ongoing commitment to excellence. The Debtor is the market leader in the Intermountain West for Operations and Maintenance (O&M) and Full-Service Rental work. Its competitive advantage stems from the diversity of equipment offered, the expertise of its employees, and the unique engineering services it provides. Its 12-acre yard in Salt Lake City serves as the base of operations for its fleet of cranes, including a primary maintenance facility, truck shop, administrative offices, a rail spur, and engineering team. The Debtor also has dedicated leadership and engineering staff based in Montana, Wyoming, Oregon, and Texas.

The Debtor was handling over 45 active construction jobs the week of the Petition Date. Some of the Debtor's recent, local projects include: (i) "tilt-up" work at Amazon's new distribution facility in North Salt Lake, Utah and at the new practice facility for Real Salt Lake in Herriman, Utah; (ii) tower assembly at University of Utah's new ambulatory care center; (iii) renovations at the Vivint Arena in Salt Lake City, Utah; (iv) major expansion at the Salt Lake City Airport; (v) tilt-ups at the IKEA store in Utah; (vi) expansion of the Living Planet Aquarium, in Draper, Utah and (vi) truss placement and tilt-ups at a new high school being constructed in Herriman, Utah. A short drive around the Salt Lake Valley and Utah Valley would reveal many other projects on which the Debtor's cranes are involved. Since the Petition Date, the Debtor has bid on approximately 560 new projects, with over 320 awarded and approximately 100 bids still pending. As of the date of this Disclosure Statement, the Debtor has worked on more than 300 jobs since Petition Date.

The Debtor specializes in oil refinery turnarounds. It has cranes and full-time staff dedicated to refineries in Utah, Montana, and Wyoming. Its project management and engineering staff provide project planning and lift-planning that dramatically increase operational efficiency and safety during turnaround work. The Debtor has been performing refinery work since 2006. The Debtor has completed contracts with Tesoro, Chevron, Phillips 66, Sinclair, and others. It has an ongoing master services agreement (MSA) with Tesoro for turnaround and capital construction work, and has been the primary crane provider for Sinclair since 2013. In the spring of 2017, the Debtor was selected for, and participated in, the major turnaround at the Billings, Montana Phillips 66 refinery. The Debtor has established a branch in Billings, MT led by the same staff that successfully executed this high-profile turnaround. As oil prices continue to rise, the Debtor anticipates future participation in oil refinery turnarounds.

The Debtor is also a leader in installing, erecting, and maintaining modern wind turbines. Its fleet of cranes and its staff of engineers is uniquely capable of handling every aspect of wind turbine installation, erection and maintenance. It has established itself as a specialist in this still growing market. The Debtor is particularly focused on growing its wind-maintenance business, because of its potential for ongoing work and "repeat customers," given that most wind-turbines require consistent, ongoing maintenance work.

The Debtor's revenues are generated primarily from crane services and "full service" crane rentals. The Debtor's crane services are provided on an hourly basis, where the Debtor generally utilizes the cranes for construction projects (*i.e.*, as a subcontractor) or provides the crane operator, fuel, and all expenses relating to the crane service for a particular project. As stated above, the Debtor's biggest competitive advantage is its large and experienced engineering department, which is unusual in the crane industry. The Debtor's revenues are seasonal, with the need for its services and equipment being significantly reduced during winter months when construction, maintenance, and other outdoor activities are reduced due to weather.  For example, quarterly gross revenues during

2017 were as follows: Q1 2017, $12,331,584; Q2 2017, $15,812,526; Q3 2017, $14,598,698; and Q4 2017, $9,473,025. As alluded to above, a significant portion of the Debtor's revenues come from oil refinery turnarounds—about 45%—and a significant portion of its revenues comes from wind turbine work—about 30%, which is a mix between erection/installation and ongoing maintenance of wind turbines. Approximately 25% of the Debtor's ongoing revenues comes from general commercial construction. The Debtor submits that its revenue streams are well-balanced and sufficiently diverse to survive any future economic downturn. Indeed, the Debtor thrived and even grew during the most recent economic recession.

The Debtor is generally profitable on an operating basis and was profitable on a net-income basis until 2016. Three events occurred in late 2015 and early 2016 that negatively affected the Debtor's cash flow and profitability, and those are among the primary events that caused the Debtor's need to file its Chapter 11 case to reorganize its business. Those events, the "Acquisition," the "Construction Accident," and the "Aircraft Transaction" are described herein. Additionally, the "breathing room" that a Chapter 11 bankruptcy provides, and the ability to restructure the Debtor's secured debt obligations, were significant reasons for the filing of this Bankruptcy Case.

As discussed below, the Auction Order, the Lease Rejection Order, the CIT Abandonment Order and the Aircraft Stipulation Order (each as defined below) have allowed the Debtor to solve some of the problems that required it to file this Chapter 11 Case – by relieving the Debtor of debt service obligations related to certain surplus and unnecessary equipment.  This together with the additional debt restructuring proposed under the Plan should give the Debtor breathing room and flexibility it needs to successfully operate its business in the years ahead. With a "right sized" fleet—and without the burden of the Aircraft Lease—the Debtor believes that its Plan is feasible, and that all the payments required under the Plan can be funded via the Debtor's ongoing business operations.

The Debtor has been a successful crane company since 2004. It survived the Great Recession, it continues to generate substantial business revenues, and it continues to be an industry leader in the Intermountain West. The Debtor seeks an opportunity to reorganize and continue to operate as a successful company in the years ahead.

A.      **The Business Acquisition**

In late 2015, the Debtor purchased approximately $12 million of cranes and related equipment (the "Acquisition") from the Salt Lake City division of a large national crane company and assumed a similarly large amount of related liabilities. All of the cranes that the Debtor acquired in the Acquisition were "rough terrain" cranes, which are "high-volume, low-margin" type cranes that are more commonly used in the "bare rental" market. The Debtor's specialty, described above, is in providing highly engineered, highly technical crane services.  The Debtor anticipated that in completing the Acquisition, it would realize a commensurate increase in revenues to be derived from the customers and jobs that the assets acquired in the Acquisition had been servicing. The Debtor also anticipated that increasing the diversity of its services would result in increased revenues and work opportunities. Unfortunately, however, the increased work and revenues did not materialize to match the increased debt and debt service expenses, and the Debtor found itself with excess cranes and equipment that it could not profitably utilize. One of the main purposes of the Chapter 11 case was to reject certain crane leases and/or liquidate the excess equipment, with the net proceeds to be paid to the corresponding secured lenders (or lessors), so that the Debtor could "right size" its fleet of cranes and related equipment and return to profitability.

Accordingly, early in the Chapter 11 case, the Debtor filed its *Motion for Entry of an Order Authorizing the Debtor to Sell Certain Cranes "Free and Clear" of Liens, Claims, and Encumbrances* [Docket No. 11] (the "Auction Motion") and its *Motion to Reject Equipment Leases and Associated Service Contracts* [Docket No. 46] (the "Lease Rejection Motion"), whereby the Debtor sought approval to liquidate certain cranes at auction and reject certain crane leases, respectively. On February 6, 2018, the Court entered its *Stipulated Order (A) Authorizing the*

*Sale of Certain Cranes Free and Clear of Liens, Claims, and Encumbrances, (B) Waiving the 14-Day Stay Period and (C) Granting Related Relief* [Docket No. 120] (the "Auction Order"). Pursuant to the Auction Order, the Debtor sold 14 cranes at auction, all but one of which were "rough terrain" cranes (one "crawler" type crane also was sold). On February 23, 2018, the Court entered its *Order Approving the Debtor's Rejection of Three Equipment Leases with Counterparty Wells Fargo Equipment Finance, Inc., and Otherwise Continuing Motion Without Date* [Docket No. 191] (the "Lease Rejection Order"). Pursuant to the Lease Rejection Order, the Debtor rejected 3 leases with Wells Fargo Equipment Finance, Inc., and continued without date the Lease Rejection Motion as to the additional relief sought.  On June 5, 2018, the Court entered its *Order Granting Motion to Approve Stipulation and Agreement (I) Granting Relief from the Automatic Stay, (II) Resolving Claims of CIT Bank, N.A., and (III) Authorizing Abandonment of Equipment* [Docket No. 345] (the "CIT Abandonment Order").  Pursuant to the CIT Abandonment Order, the Debtor abandoned six cranes to CIT Bank, N.A. in full satisfaction and release of that creditor's claims against the Debtor, including potential deficiency claims.

**B.      The Construction Accident**

On January 26, 2016, one of the Debtor's cranes was involved in a significant construction accident (the "Construction Accident") that resulted in the death of a construction worker. The Construction Accident was a tragedy, primarily for that worker's family and loved ones and also for the Debtor and its staff. The Construction Accident also resulted in negative publicity for the Debtor, increased insurance premiums, and a short-term downturn in business for the Debtor.

**C.      The Aircraft Transaction**

In early 2016, the Debtor's then-chief procurement officer, Garrett Blood, persuaded the Debtor and its management to purchase a used 1981 Beechcraft King Air B200 aircraft, SN BB-918, Registration Number N918TC (the "Aircraft") for approximately $755,000, and to finance the purchase through a sale/leaseback transaction.  The Debtor believes that it may have been misled regarding the value, condition and usefulness of the Aircraft. Varilease is the entity that provided the financing for the Aircraft in the sale/leaseback transaction, and then assigned its rights under the lease to Bank of Ann Arbor.  The Aircraft did not function in the Debtor's business as intended, and beginning in late 2017 the Debtor stopped making monthly payments to Bank of Ann Arbor.  The Aircraft was seized prepetition by Varilease.

On February 14, 2018, the Debtor filed its *Stipulation and Joint Motion for Entry of an Order (A) Authorizing Rejection of Aircraft Lease, (B) Authorizing the Debtor to Abandon and Surrender the Aircraft, (C) Terminating the Automatic Stay with Respect to the Aircraft to Permit its Immediate Sale, (D) Fixing the Deadline for Aircraft Lessor to File a Proof of Claim, and (E) Granting Related Relief* [Docket No. 165] (the "Aircraft Stipulation Motion"). On March 12, 2018, the Court entered its *Order approving the Aircraft Stipulation Motion* [Docket No. 225] (the "Aircraft Stipulation Order"), pursuant to which (i) the Debtor rejected its lease of the Aircraft; (ii) the Debtor abandon any interest in the Aircraft; (iii) the deficiency and rejection damages claims of Bank of Ann Arbor and Varilease were "capped"; and (iv) any potential administrative expenses claims by Bank of Ann Arbor and/or Varilease were waived and barred.

**D.      The Subsidiary Entities.**

The Debtor owns ten (10) Subsidiary Entities. The Subsidiary Entities are described in more detail in section 4.3.3 of this Disclosure Statement. The Subsidiary Entities were created for very specific purposes within the Debtor's overall business operations, such as own and hold the real property on which the Debtor is headquartered.

Only one of the Subsidiary Entities, Mountain Heavy, had income from ongoing business operations as of the Petition Date.

The Plan provided for the "plan consolidation" of the "Consolidated Subsidiary Entities," on terms and conditions that are specifically described and discussed in section 5.8 of the Plan. The Consolidated Subsidiary Entities have always been operated and treated by the Debtor, in whole or in part, as "alter egos" of the Debtor, in that the Debtor and the Consolidated Subsidiary Entities have observed few "corporate formalities." Among other things, the Debtor historically has paid some or all of the Consolidated Subsidiary Entities' ongoing liabilities. The Debtor and Consolidated Subsidiary Entities share the same business location, which has been paid for substantially if not entirely by the Debtor. The Debtor and Consolidated Subsidiary Entities have shared and commingled employees, cash and other assets. The Debtor's management team and its accounting staff oversee the operations and financial affairs of the Consolidated Subsidiary Entities. Further, the Debtor is a guarantor on substantially all the Consolidated Subsidiary Entities' secured obligations, and vice versa.

The proposed consolidation of the Consolidated Subsidiary Entities with the Debtor formally recognizes the reality of the Debtor's and the Consolidated Subsidiary Entities' past business dealings with their creditors—*i.e.*, they have been treated as "one business." Accordingly, the Plan treats the Debtor and the Consolidated Subsidiary Entities as one business for the collective benefit of its creditors.

The Debtor believes that consolidation of the Consolidated Subsidiary Entities with the Debtor is in the best interests of the Debtor's creditors. Thus, the Debtor has proposed a "plan consolidation" of the Consolidated Subsidiary Entities with the Debtor pursuant to § 1123(a)(5)(C) of the Bankruptcy Code, solely for the treatment of their assets and liabilities under the Plan. As more particularly described in section 5.8 of the Plan, confirmation of the Plan will result in the consolidation of the liabilities of the Consolidated Subsidiary Entities with the Debtor, eliminate intercompany debts, and allow the Reorganized Debtor to treat the assets and creditors of the Consolidated Subsidiary Entities as its own. Further, consolidation will limit creditors to a single claim against the Reorganized Debtor (*i.e.*, the Debtor and the Consolidated Subsidiary Entities collectively).

### E.      Ongoing Revenues from Business Operations.

As described above, the Debtor's ongoing business is generally profitable. The Debtor intends to continue its business operations as usual, but free of the obligations created by the Acquisition and the Aircraft Transaction and with the restructured debt servicing provided for in the Plan. Historically, the Debtor's operating "sweet spot" with respect to net revenues, crane usage, and efficiency is when it reaches annual revenues of approximately $50 million. The right-sizing implemented by the Debtor to date, and as further anticipated under the Plan, should allow the Debtor to operate in its "sweet spot."

The Debtor expects to derive the majority of its revenues during the Plan Period from its normal business operations, including both ongoing customer payments and collections on past due accounts receivable. The Debtor's ongoing operations are generally thriving, and the Debtor anticipates that it will continue to generate substantial revenue over the Plan Period.

The gross revenues from the Debtor's ongoing business operations are projected to exceed the Debtor's basic operating expenses together with its restructured debt service under the Plan, including (a) employee expenses, (b) the costs of construction projects, (c) lease and secured debt payments, (d) maintenance of cranes and equipment, and (e) other general business expenses. The Debtor has attempted to increase its positive cash flow by, among other things, (i) streamlining and "leaning" its operations to eliminate unnecessary operating expenses, (ii) disposing of surplus equipment and eliminating the related debt service, (iii) negotiating reduced monthly payments to secured creditors under the Plan, and (iv) engaging in a more "cautious" approach with respect to incurring new debt.

Attached hereto as **Exhibit 2** is a forecast or projection of the Debtor's anticipated cash flow, income statement, and balance sheet during the Plan Period. As reflected on Exhibit 2, the Debtor's budgets and forecasts anticipate net revenues from business operations sufficient to meet the Debtor's payment obligations under the Plan. The forecasts demonstrate that the Plan is feasible.

## ARTICLE 3
## SUMMARY OF PLAN

This summary of the Plan is qualified in its entirety by reference to the Plan, a copy of which is attached as **Exhibit 1** to this Disclosure Statement.

### 3.1    Effective Date

If the Court confirms the Plan, the order of confirmation is not stayed, and all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date—*i.e.*, the later of: (a) the first Business Day on which the Confirmation Order is no longer subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e) or otherwise; (b) 30 days after the Confirmation Date, unless such 30 day period is waived by the Debtor, or (c) the day on which all conditions to consummation of the Plan as set forth in Article 9 of the Plan have been satisfied or waived.

### 3.2    Treatment of Claims

*Administrative Claims.* Administrative Expense Claims generally are paid in full in Cash on the later of (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms, or (ii) the Effective Date. Holders of Administrative Expense Claims may agree to a different treatment, and may agree to defer payment beyond the Effective Date. If the Debtor disputes any portion of an Administrative Expense Claim, the Debtor shall pay such Claim within 30 days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim. Administrative Expense Claims will be paid from the Distribution Fund.

*Priority Tax Claims.* As more particularly described in sections 2.3.2 and 2.3.3 of the Plan, Allowed Priority Tax Claim are anticipated to be paid from the eight-million dollar Distribution Fund. If not paid earlier from the Distribution Fund, Allowed Priority Tax Claims shall be paid in full on or before the fifth anniversary of the Petition Date in installment payments.

*Priority Claims – Class 1.* Section 4.1 of the Plan specifies the treatment of Priority Claims. Allowed Priority Claims will be paid in full via pro rata distributions from the eight-million dollar Distribution Fund. Distributions will be made on each Distribution Date of the funds then available in (thus far contributed to) the Distribution Fund. As described in sections 5.5 and 5.6 of the Plan, the Distribution Fund will be paid and distributed to the holders of Allowed Administrative Expense Claims (and potentially to the holders of Convenience Claims) before pro rata distribution to the holders of Priority Claims.

*General Unsecured Claims – Class 2.* Section 4.2 of the Plan specifies the treatment of General Unsecured Claims. The holders of Allowed Class 2 Claims shall be paid pro rata from the eight-million dollar Distribution Fund. As described in section 5.5 of the Plan, the Debtor will fund a total Distribution Fund Amount of eight million dollars ($8,000,000) over ten years (or an average of $200,000 per Quarter over forty Quarters). Deposits into the Distribution Account will be made Quarterly in the amount of $200,000. The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution. Specifically, the holders of Allowed Class 2 Claims will not receive distributions until the holders of claims with higher priority (listed under sections 5.6.1 through 5.6.6 of the Plan) have been paid or reserved in full. Once the holders of Claims

with greater priority in right of payment have been satisfied (i.e., subject to the limitations and priorities described in section 5.6), the holders of Allowed Class 2 Claims shall be paid, pro rata, their share of the funds on deposit in the Distribution Account on each of the Distribution Dates.

**The projections attached hereto as Exhibit 4 estimate that the holders of Allowed Class 2 Claims may receive total repayment as high as seventy-three percent (73%) over the ten-year Plan Period. It is not anticipated that nonpriority unsecured claims will receive full repayment under any circumstances.** Please note, however, that the estimated percentage return projected on Exhibit 4 will be affected (and could be reduced) by a number of factors, including (a) whether the Debtor or Plan Administrator are successful in objecting to certain disputed claims, and (b) whether certain insiders agree voluntarily to subordinate their claims in right of payment.

_Ally Financial Claim – Class 3._  Section 4.3 of the Plan specifies the treatment of the Ally Financial Secured Claim. To the extent that its Claim is an Allowed Secured Claim, Ally Financial shall be paid in monthly installments calculated on a two-year amortization, with interest accruing on the unpaid principal balance of the Ally Financial Loan at four and ninety-nine hundredths percent (4.99%).

The Reorganized Debtor shall have the option to sell or abandon the Ally Financial Collateral, subject to the terms and conditions described in the Plan. The Debtor may sell the Ally Financial Collateral free and clear of Lien(s) only if Ally Financial consents in writing to the sale, or the proceeds to be realized from the sale of the Ally Financial Collateral are sufficient to pay in full the Allowed Class 3 Claim. If the Debtor abandons the Ally Financial Collateral, that abandonment shall be in complete and full settlement and satisfaction of the Allowed Class 3 Claim. Ally Financial will retain its Lien upon the Ally Financial Collateral until its Allowed Claim is paid in full.

_Amur Claim – Class 4._  Section 4.4 of the Plan specifies the treatment of the Amur Secured Claim. Amur's Claim shall be treated as a secured claim, and not a true lease. To the extent that its Claim is an Allowed Secured Claim, Amur shall be paid in monthly installments calculated on a five-year amortization, with interest accruing on the unpaid principal balance of the Amur Loan at the lesser of (i) five and one-half percent (5.5%) per annum, or (ii) the non-default rate specified under the Amur Loan Documents.

 The Reorganized Debtor shall have the option to sell or abandon the Amur Collateral, subject to the terms and conditions described in the Plan. Absent an order by the Bankruptcy Court, the Debtor may sell the Amur Collateral free and clear of Lien(s) only if (i) Amur consents in writing to the sale, or (ii) the proceeds to be realized from the sale of any item(s) of Amur Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. Except for Collateral that is sold free and clear of its Lien(s) under the Plan, Amur will retain its Lien(s) upon the Amur Collateral until its Allowed Secured Claim is paid in full.

_BBVA Compass Claim – Class 5._  Section 4.5 of the Plan specifies the treatment of the BBVA Compass Secured Claim. Provided that the holder of the Class 5 Claim accepts the Plan and does not object to the Plan, the BBVA Compass Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain _Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of BBVA Compass Financial Corporation, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization_, filed on June 22, 2018 [Docket No. 356]. In the event that the holder of the Class 5 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the BBVA Stipulation), then the Debtor shall have the rights and remedies set forth in the BBVA Stipulation, including the right to modify the Plan to provide treatment of the Class 5 Claim consistent with the treatment specified for Class 32.

_CCG Claim – Class 6._  Section 4.6 of the Plan specifies the treatment of the CCG Secured Claim. Provided that the holder of the Class 6 Claim accepts the Plan and does not object to the Plan, the CCG Allowed Secured

Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Creditor Commercial Credit Group, and Resolving Secured Creditor's Actual and Potential Objections to the Debtor's Plan of Reorganization*, filed on June 7, 2018 [Docket No. 346]. In the event that the holder of the Class 6 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the CCG Stipulation), then the Debtor shall have the rights and remedies set forth in the CCG Stipulation, including the right to modify the Plan to provide treatment of the Class 6 Claim consistent with the treatment specified for Class 32.

      *Chapman Claim – Class 7.*  Section 4.7 of the Plan specifies the treatment of the Chapman Secured Claim. Provided that the holder of the Class 7 Claim accepts the Plan and does not object to the Plan, the Chapman Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Todd Chapman and Julie Chapman and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on April 30, 2018 [Docket No. 301]. In the event that the holder of the Class 7 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Chapman Stipulation), then the Debtor shall have the rights and remedies set forth in the Chapman Stipulation, including the right to modify the Plan to provide treatment of the Class 7 Claim consistent with the treatment specified for Class 32.

      *Cheuck Yick Claim – Class 8.*  Section 4.8 of the Plan specifies the treatment of the Cheuck Yick Secured Claim. Provided that the holder of the Class 8 Claim accepts the Plan and does not object to the Plan, the Cheuck Yick Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Cheuck Yick Industrial, Ltd., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on May 9, 2018 [Docket No. 308]. In the event that the holder of the Class 8 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Cheuck Yick Stipulation), then the Debtor shall have the rights and remedies set forth in the Cheuck Yick Stipulation, including the right to modify the Plan to provide treatment of the Class 8 Claim consistent with the treatment specified for Class 32.

      *Chrysler Capital Claim – Class 9.*  Section 4.9 of the Plan specifies the treatment of the Chrysler Capital Secured Claim. To the extent that its Claim is an Allowed Secured Claim, Chrysler Capital shall be paid in full from the proceeds of the sale of the Chrysler Capital Collateral, as permitted under that certain order authorizing the Debtor to sell Chrysler Capital's collateral free and clear of liens [Docket No. 365].

      *CIT Bank Claim – Class 10.*  Section 4.10 of the Plan specifies the treatment of the CIT Bank Secured Claim. Specifically, the CIT Bank Secured Claim has been satisfied in full via the Debtor's abandonment of CIT Bank's Collateral, as provided in the CIT Abandonment Order.

      *Continental Bank Claim – Class 11.*  Section 4.11 of the Plan specifies the treatment of the Continental Bank Secured Claim. Provided that the holder of the Class 11 Claim accepts the Plan and does not object to the Plan, the Continental Bank Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Continental Bank, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on June 19, 2018 [Docket No. 352]. In the event that the holder of the Class 11 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Continental Bank Stipulation), then the Debtor shall have the

rights and remedies set forth in the Continental Bank Stipulation, including the right to modify the Plan to provide treatment of the Class 11 Claim consistent with the treatment specified for Class 32.

*De Lage Landen Claim – Class 12*.  Section 4.12 of the Plan specifies the treatment of the De Lage Landen Secured Claim. Provided that the holder of the Class 12 Claim accepts the Plan and does not object to the Plan, the De Lage Landen Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of De Lage Landen Financial Services, Inc., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on May 16, 2018 [Docket No. 321]. In the event that the holder of the Class 12 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the De Lage Landen Stipulation), then the Debtor shall have the rights and remedies set forth in the De Lage Landen Stipulation, including the right to modify the Plan to provide treatment of the Class 12 Claim consistent with the treatment specified for Class 32.

*Direct Capital Claim – Class 13*.  Section 4.13 of the Plan specifies the treatment of the Direct Capital Secured Claim. Provided that the holder of the Class 13 Claim accepts the Plan and does not object to the Plan, the Direct Capital Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Direct Capital Corporation and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on May 25, 2018 [Docket No. 334]. In the event that the holder of the Class 13 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Direct Capital Stipulation), then the Debtor shall have the rights and remedies set forth in the Direct Capital Stipulation, including the right to modify the Plan to provide treatment of the Class 13 Claim consistent with the treatment specified for Class 32.

*Equify Claim – Class 14*.  Section 4.14 of the Plan specifies the treatment of the Equify Secured Claim. Provided that the holder of the Class 14 Claim accepts the Plan and does not object to the Plan, the Equify Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Equify Capital, LLC, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on June 19, 2018 [Docket No. 353]. In the event that the holder of the Class 14 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Equify Stipulation), then the Debtor shall have the rights and remedies set forth in the Equify Stipulation, including the right to modify the Plan to provide treatment of the Class 14 Claim consistent with the treatment specified for Class 32.

*Everbank Claim – Class 15*.  Section 4.15 of the Plan specifies the treatment of the Everbank Secured Claim. Provided that the holder of the Class 15 Claim accepts the Plan and does not object to the Plan, the Everbank Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of TIAA Commercial Finance, Inc. F/K/A Everbank Commercial Finance, Inc., Resolving Potential Claim Disputes, and Resolving  Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on July 18, 2018 [Docket No. 377]. In the event that the holder of the Class 15 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Everbank Stipulation), then the Debtor shall have the rights and remedies set forth in the Everbank Stipulation, including the right to modify the Plan to provide treatment of the Class 15 Claim consistent with the treatment specified for Class 32.

*FNB Layton Claim – Class 16*.  Section 4.16 of the Plan specifies the treatment of the FNB Layton Secured Claim. Provided that the holder of the Class 16 Claim accepts the Plan and does not object to the Plan, the FNB Layton Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of First National Bank of Layton and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on March 30, 2018 [Docket No. 243]. In the event that the holder of the Class 16 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the FNB Layton Stipulation), then the Debtor shall have the rights and remedies set forth in the FNB Layton Stipulation, including the right to modify the Plan to provide treatment of the Class 16 Claim consistent with the treatment specified for Class 32.

*Galena Claim – Class 17*.  Section 4.17 of the Plan specifies the treatment of the Galena Secured Claim. The Debtor and Committee have not yet reached a stipulation with Galena regarding the treatment of its claim. Absent such a stipulation, the Debtor and Committee believe that substantial grounds exist to challenge the validity, perfection and priority of Galena's Liens, and that Galena's claim may be largely, if not entirely, unsecured.

As provided in section 4.17.2.1 of the Plan, to the extent the Debtor and Committee hereafter reach a stipulation with Galena, the claim will be treated according to such a stipulation, unless Galena votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Galena Stipulation).

If the Debtor, the Committee and Galena do not reach a stipulation resolving potential objections to the Claim and Lien, and the treatment of Galena's Claim, then section 4.17.2.2 shall govern the treatment of Galena's Secured Claim.  Without limitation, the Debtor and Plan Administrator shall have the right to challenge and/or to seek to avoid Galena's Lien, and to bifurcate its claim under section 506(a) of the Bankruptcy Code.  To the extent, in light of such objections and challenges, any portion of Galena's Claim is properly to be treated as Secured, then the secured portion of the claim will be paid over an amortization period of ten years at the lesser of (a) 5.5% per annum, or (b) the nondefault rate of interest under Galena's Loan Documents.  Galena shall retain its Lien only to the extent the Lien is properly perfected (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code).

*Hincklease Claim – Class 18*.  Section 4.18 of the Plan specifies the treatment of the Hincklease Claim, which shall be treated as a secured claim, and not as a true lease. The Debtor and Committee have not yet reached a stipulation with Hincklease regarding the treatment of its claim.  Absent such a stipulation, the Debtor and Committee believe that grounds may exist to challenge the validity, perfection and priority of Hincklease's Liens, and that Hincklease's claim may be, at least partially, unsecured.

As provided in section 4.18.2.1 of the Plan, to the extent the Debtor and Committee hereafter reach a stipulation with Hincklease, the claim will be treated according to such a stipulation, unless Hincklease votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Hincklease Stipulation).

If the Debtor, the Committee and Hincklease do not reach a stipulation resolving potential objections to the Claim and Lien, and the treatment of Hincklease's Claim, then section 4.18.2.2 shall govern the treatment of Hincklease's Secured Claim.  Without limitation, the Debtor and Plan Administrator shall have the right to challenge and/or to seek to avoid Hincklease's Lien, and to bifurcate its claim under section 506(a) of the Bankruptcy Code.  To the extent, in light of such objections and challenges, any portion of Hincklease's Claim is properly to be treated as Secured, then the secured portion of the claim will be paid over an amortization period of ten years at the lesser of (a) 5.5% per annum, or (b) the nondefault rate of interest under Hincklease's Loan

Documents.  Hincklease shall retain its Lien only to the extent the Lien is properly perfected (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code).

*MACU Claim – Class 19*.  Section 4.19 of the Plan specifies the treatment of the MACU Secured Claim. Provided that the holder of the Class 19 Claim accepts the Plan and does not object to the Plan, the MACU Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Mountain America Federal Credit Union and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on April 16, 2018 [Docket No. 274]. In the event that the holder of the Class 19 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the MACU Stipulation), then the Debtor shall have the rights and remedies set forth in the MACU Stipulation, including the right to modify the Plan to provide treatment of the Class 19 Claim consistent with the treatment specified for Class 32.

*People's Capital Claim – Class 20*.  Section 4.20 of the Plan specifies the treatment of the People's Capital Secured Claim. Provided that the holder of the Class 20 Claim accepts the Plan and does not object to the Plan, the People's Capital Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of People's Capital and Leasing Corp. and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on June 19, 2018 [Docket No. 354]. In the event that the holder of the Class 20 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the People's Capital Stipulation), then the Debtor shall have the rights and remedies set forth in the People's Capital Stipulation, including the right to modify the Plan to provide treatment of the Class 20 Claim consistent with the treatment specified for Class 32.

*SBA Claim – Class 21*.  Section 4.21 of the Plan specifies the treatment of the SBA Secured Claim, which is comprised of Claims arising from both the Mountain West Loan and the Utah CDC Loan. Provided that the holder of the Class 21 Claim accepts the Plan and does not object to the Plan, the SBA Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Claim of U.S. Small Business Administration and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on May 9, 2018 [Docket No. 307]. In the event that the holder of the Class 21 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the SBA Stipulation), then the Debtor shall have the rights and remedies set forth in the SBA Stipulation, including the right to modify the Plan to provide different treatment of the Class 21 Claim.

*SG Equipment Finance Claim – Class 22*.  Section 4.22 of the Plan specifies the treatment of the SG Equipment Finance Secured Claim. Provided that the holder of the Class 22 Claim accepts the Plan and does not object to the Plan, the SG Equipment Finance Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Claim of SG Equipment Finance USA Corp. and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on June 27, 2018 [Docket No. 360]. In the event that the holder of the Class 22 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the SG Equipment Finance Stipulation), then the Debtor shall have the rights and remedies set forth in the SG Equipment Finance Stipulation, including the right to modify the Plan to provide treatment of the Class 22 Claim consistent with the treatment specified for Class 32.

*Siemens Claim – Class 23*.  Section 4.23 of the Plan specifies the treatment of the Siemens Secured Claim. Provided that the holder of the Class 23 Claim accepts the Plan and does not object to the Plan, the Siemens

Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Siemens Financial Services, Inc., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on August 10, 2018 [Docket No. 437]. In the event that the holder of the Class 23 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Siemens Stipulation), then the Debtor shall have the rights and remedies set forth in the Siemens Stipulation, including the right to modify the Plan to provide treatment of the Class 23 Claim consistent with the treatment specified for Class 32. Except to the extent otherwise stated therein, the Siemens Stipulation does not treat or relate to any unsecured claim(s) asserted by Siemens.

<u>Signature Financial Claim – Class 24</u>.  Section 4.24 of the Plan specifies the treatment of the Signature Financial Secured Claim. Provided that the holder of the Class 24 Claim accepts the Plan and does not object to the Plan, the Signature Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Signature Financial, LLC, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on June 19, 2018 [Docket No. 355]. In the event that the holder of the Class 24 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Signature Stipulation), then the Debtor shall have the rights and remedies set forth in the Signature Stipulation, including the right to modify the Plan to provide treatment of the Class 24 Claim consistent with the treatment specified for Class 32.

<u>Sterling Claim – Class 25</u>.  Section 4.25 of the Plan specifies the treatment of the Sterling Secured Claim. The Debtor and Committee have not yet reached a stipulation with Sterling regarding the treatment of its claim. Absent such a stipulation, the Debtor and Committee believe that grounds may exist to challenge the validity, perfection and priority of Sterling's Liens, and that Sterling's claim may be, at least partially, unsecured.

As provided in section 4.25.2.1 of the Plan, to the extent the Debtor and Committee hereafter reach a stipulation with Sterling, the claim will be treated according to such a stipulation, unless Sterling votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Sterling Stipulation).

If the Debtor, the Committee and Sterling do not reach a stipulation resolving potential objections to the Claim and Lien, and the treatment of Sterling's Claim, then section 4.25.2.2 shall govern the treatment of Sterling's Secured Claim.  Without limitation, the Debtor and Plan Administrator shall have the right to challenge and/or to seek to avoid Sterling's Lien, and to bifurcate its claim under section 506(a) of the Bankruptcy Code.  To the extent, in light of such objections and challenges, any portion of Sterling's Claim is properly to be treated as Secured, then the secured portion of the claim will be paid over an amortization period of ten years at the lesser of (a) 5.5% per annum, or (b) the nondefault rate of interest under Sterling's Loan Documents.  Sterling shall retain its Lien only to the extent the Lien is properly perfected (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code).

<u>TCF Claim – Class 26</u>.  Section 4.26 of the Plan specifies the treatment of the TCF Secured Claim. Provided that the holder of the Class 26 Claim accepts the Plan and does not object to the Plan, the TCF Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of TCF Equipment Finance and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on April 30, 2018 [Docket No. 302]. In the event that the holder of the Class 26 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the TCF Stipulation), then the Debtor shall have the rights and remedies set forth in the TCF Stipulation, including

the right to modify the Plan to provide treatment of the Class 26 Claim consistent with the treatment specified for Class 32.

*Terex Claim – Class 27.*  Section 4.27 of the Plan specifies the treatment of the Terex Secured Claim. The Terex Collateral was sold at auction on or about February 19, 2018, and shortly thereafter, Terex's secured claim was paid and satisfied in full from the net auction proceeds. Any deficiency Claim by Terex, if timely filed and Allowed, is anticipated to be treated as a Class 2 Unsecured Claim.

*Trans Lease Claim – Class 28.*  Section 4.28 of the Plan specifies the treatment of the Trans Lease Secured Claim. Provided that the holder of the Class 28 Claim accepts the Plan and does not object to the Plan, the Trans Lease Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Claim of Trans Lease, Inc., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization*, filed on May 24, 2018 [Docket No. 333]. In the event that the holder of the Class 28 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Trans Lease Stipulation), then the Debtor shall have the rights and remedies set forth in the Trans Lease Stipulation, including the right to modify the Plan to provide treatment of the Class 28 Claim consistent with the treatment specified for Class 32.

*Varilease Claim – Class 29.*  Section 4.29 of the Plan specifies the treatment of the Varilease Claim. The Varilease Lease is a true lease which has been rejected by order of the Bankruptcy Court, or, if not previously rejected, is rejected under the Plan. The Plan is not intended to, and shall not, modify or alter the terms and conditions of any previous stipulations or orders regarding the Varilease Lease or the Aircraft, and all such prior stipulations and orders are incorporated into the Plan by reference. The Debtor has abandoned, or will abandon under the Plan, any interest it has in the Aircraft. Varilease shall retain its Lien upon the Aircraft.

*Wells Fargo Claim – Class 30.*  Section 4.30 of the Plan specifies the treatment of the Wells Fargo Secured Claim. Provided that the holder of the Class 30 Claim accepts the Plan and does not object to the Plan, the Wells Fargo Allowed Secured Claim shall be treated and paid in accordance with the terms set forth in that *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Wells Fargo Bank, N.A., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization Relating to Treatment of the Secured Claim*, filed on May 15, 2018 [Docket No. 316]. In the event that the holder of the Class 30 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Wells Fargo Stipulation), then the Debtor shall have the rights and remedies set forth in the Wells Fargo Stipulation, including the right to modify the Plan to provide treatment of the Class 30 Claim consistent with the treatment specified for Class 32.

*Salt Lake County Claim – Class 31.*  The secured claim of Salt Lake County (consisting of unpaid property taxes, *if any*) will be paid in full, including all statutory interest and penalties, on or before (a) the second Interim Distribution Date, or (b) if applicable under nonbankruptcy law, such later date as the Reorganized Debtor may have the right to redeem the property of the Estate from tax sale.  Either way, the plan injunction shall cease to apply as to the county effective as of the second Interim Distribution Date.

*Miscellaneous Secured Claims – Class 32.*  Section 4.32 of the Plan specifies the treatment of Secured Claims that are not otherwise classified under the Plan.  To the extent that it is Allowed and Secured, interest on a Class 32 Claim shall continue to accrue on the unpaid principal balance of such holder's applicable loan at the lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the loan documents governing the holder's Class 32 Claim. Beginning on the first day of the month following the Effective Date, the

Debtor shall pay equal monthly installments to the holder of an Allowed and Secured Class 32 Claim, amortized over ten years at the applicable rate of interest.

The Reorganized Debtor shall have the option to sell or abandon the Collateral securing a Class 32 Claim, subject to the terms and conditions described in the Plan. The Debtor may sell the applicable Collateral free and clear of Lien(s) only if (i) the holder of the Class 32 Claim consents in writing to the sale, or (ii) the proceeds to be realized from the sale of the applicable Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. If the Debtor abandons the Collateral securing a Class 32 Claim, that abandonment shall be in complete and full settlement and satisfaction of the Allowed Class 32 Claim. The holder of a Class 32 Claim will retain its Lien(s) upon its Collateral until its Allowed Secured Claim is paid in full.

*Equity Interests – Class 33.* Existing Equity Interests will be cancelled under the Plan; *provided, however*, that Paul Belcher will retain his Equity Interest under the Plan subject to the conditions precedent and conditions subsequent set forth in Section 5.4.1 of the Plan.

*Convenience Claims – Class 34.* Section 4.34 of the Plan specifies the treatment of those Claims that qualify as Convenience Claims or that result from a Convenience Class Election under the Plan. The holders of Allowed Class 34 Claims shall be paid 100% of the Allowed amount of such Claims in full satisfaction of those Claims on or before sixty (60) days after the Effective Date.

As described in Section 1.72 of the Plan, the Class 34 Convenience Claims shall consist of all Allowed General Unsecured Claims of a single holder of a type that would otherwise be included in Class 2 (or any other Class if such holder makes a Convenience Class Election) which are either (i) $1,000 or less in the aggregate; or (ii) greater than $1,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce the claim to $1,000 by making a Convenience Class Election pursuant to section 6.4 of the Plan. The holder of any Claim that chooses to make a Convenience Class Election must make such election on or before the Voting Deadline for returning ballots either accepting or rejecting the Plan. Convenience Claims are impaired and, as such, are entitled to vote on the Plan.

*Subordinated Claims – Class 35.* Section 4.35 of the Plan specifies the treatment of Subordinated Claims. Subordinated Claims will be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution. Based upon the Debtor's current estimates and projections, no return is anticipated to the holders of Class 35 Claims.

*Subordinated § 510(b) Claims – Class 36.* Section 4.36 of the Plan specifies the treatment of Subordinated § 510(b) Claims. Subordinated § 510(b) Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution. Based upon the Debtor's current estimates and projections, no return is anticipated to the holders of Class 36 Claims.

### 3.2.3   Vesting of Property; Continuation of Business Operations; Employment of Paul Belcher

Except as otherwise provided in the Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the assets of the Estate, including but not limited to the assets of the Consolidated Subsidiary Entities, which will be consolidated as the Reorganized Debtor under the Plan.

From and after the Effective Date of the Plan, and subject to the terms of the Plan, the Reorganized Debtor is authorized to continue its normal business operations and enter into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

The Debtor anticipates that its ordinary business operations will generate sufficient revenues to permit the Debtor to meet all of its payment obligations under the Plan, including all payments due to the holders of Secured Claims, and the Quarterly contributions that the Debtor has committed to make to the Distribution Fund.

Paul Belcher, the Debtor's CEO since 2004, will continue to be employed by the Reorganized Debtor, and shall retain a 100% Equity Interest in the Reorganized Debtor, subject to certain conditions precedent and conditions subsequent set forth in the Section 5.4.1 of the Plan. Among the conditions precedent and conditions subsequent set for in the Plan: (i) Paul Belcher has agreed that he will not receive any distributions on account of his Equity Interest in the Reorganized Debtor for ten (10) years after the Effective Date; *provided, however*, that the Reorganized Debtor may make distributions to Paul Belcher solely to account for and offset taxes owed by Paul Belcher on account of his Equity Interest; (ii) Paul Belcher shall be paid an annual salary of $240,000, and he has agreed that he shall not be entitled to receive any raises in his salary for a period of five (5) years after the Effective Date; (iii) Paul Belcher has agreed to use his personal NOLs worth approximately $15 million to offset the income that the Debtor is projected to earn during the Plan Period, until those NOLs are extinguished, without which the Plan may not be feasible; (iv) Paul Belcher's retention of his Equity Interest is conditioned on his continued employment by the Reorganized Debtor for the full Plan Period, and the Reorganized Debtor's completion and performance of all of its obligations under the Plan; (v) Paul Belcher voluntarily will subordinate any Claim(s) he has against the Debtor, to be treated as Class 35 Claims; and (vi) Paul Belcher will be restricted from transferring his Equity Interest in the Debtor, voluntarily or involuntarily, for the duration of the ten year Plan Period.

Paul Belcher's management of, and ongoing employment by, the Debtor is crucial to the Debtor's ability to successfully reorganize. The Debtor believes that it is important that Paul Belcher retain his Equity Interest in the Reorganized Debtor to ensure that he is motivated to continue his leadership of and employment with the Reorganized Debtor. Perhaps equally important, Paul Belcher's $15 million of personal NOLs are critical to the success and feasibility of the Plan. Absent the NOLs, the Debtor could be required (under federal tax law) to make distributions to members in amounts sufficient to pay the taxes attributable to the Debtor's pass-through income. In short, absent Paul Belcher's NOLs, it would be difficult (if not unlikely) for the Debtor to make all of its projected Plan payments, including the Quarterly contributions to the Distribution Fund.

### 3.3     Means for Execution of the Plan

#### 3.3.3     Plan Consolidation

The Plan calls for the consolidation of the Consolidated Subsidiary Entities, as described more specifically in section 5.8 of the Plan (a detailed explanation of the background of each of the Consolidated Subsidiary Entities is set forth in section 4.3.3 of this Disclosure Statement). The Debtor believes that consolidating the Debtor and the Consolidated Subsidiary Entities recognizes the reality of the Debtor's and the Consolidated Subsidiary Entities' operations and ongoing business—*i.e.*, that the Debtor and the Consolidated Subsidiary Entities are operated as one company, treated by creditors as one company, and act as alter egos of each other. The Debtor and the Consolidated Subsidiary Entities, collectively, constitute the "Reorganized Debtor," as defined in the Plan.

Under the Plan, any one or more Claims against the Debtor and the Consolidated Subsidiary Entities shall be treated as a single Claim against the entire Reorganized Debtor. This means that duplicate Claims will be disallowed, and that unsecured Claims and Administrative Claims will be consolidated and paid from the combined

efforts and assets of the Reorganized Debtor. All intercompany claims by and between the Debtor and the Consolidated Subsidiary Entities will be canceled.

<u>The Debtor will provide notice of the Plan and this Disclosure Statement to all known creditors of Claim holders of the Consolidated Subsidiary Entities, and those creditors or Claim holders shall have until ninety (90) days after the Confirmation Date to file a proof of claim against the Reorganized Debtor.</u> The extended bar date for creditors of the Consolidated Subsidiary Entities shall not act to extend the bar date for Claims that would only constitute Claims against the Debtor absent the consolidation provided for under the Plan.

Unless otherwise modified or treated under the Plan (or in a stipulation filed in the Case), the Consolidated Subsidiary Entities shall continue to pay any obligations secured by property of the Consolidated Subsidiary Entities according to the terms of the loan documents among the Consolidated Subsidiary Entities and their respective secured creditors.

The Debtor has been paying its post-Petition Date operating expenses in the ordinary course of business, consistent with their actual or potential status as administrative claims. Likewise, the Consolidated Subsidiary Entities have been paying their operating expenses in the ordinary course of business. The Consolidated Subsidiary Entities (or Reorganized Debtor) may pay any of the Consolidated Subsidiary Entities' operating expenses in the ordinary course of business, and may pay any post-Petition Date obligations in full. Only unpaid obligations of the Consolidated Subsidiary Entities that pre-date the January 12, 2018 Petition Date will be treated as Claims to be paid under the Plan.

Unsecured Claims against the the Consolidated Subsidiary Entities which arose or existed prior to the Petition Date shall be paid from the Distribution Fund as a Class 1 or Class 2 Claim, as applicable, but only to the extent such Claim is or becomes an Allowed Claim. A claim against a Consolidated Subsidiary Entity may be Allowed only via compliance with the requirements of section 5.8.2 of the Plan, *i.e.*, the filing of a Consolidated Subsidiary Entities' Creditor Proof of Claim on or before ninety (90) days after the Confirmation Date. Claims against a Consolidated Subsidiary Entity also are subject to potential objections, as described under Article 6 of the Plan.

The Debtor and the Consolidated Subsidiary Entities shall continue to exist after the Effective Date as separate legal entities. However, the Reorganized Debtor may, but is not required to, file such documents or take such actions as are required to formalize the consolidation of the Debtor and the Consolidated Subsidiary Entities with applicable state and federal authorities (for example, through merger or dissolution of certain entities, and so forth). Except only as expressly provided in the Plan, the Debtor and each of the Consolidated Subsidiary Entities also shall continue to enjoy "limited liability" as permitted by applicable non-bankruptcy law. Neither the Debtor nor any Consolidated Subsidiary Entity shall be liable for the debts and obligations of any other except only as expressly and unambiguously provided in the Plan.

The Debtor's authority to consolidate the Consolidated Subsidiary Entities is expressly provided for under § 1123(a)(5)(C) of the Bankruptcy Code, which permits the consolidation or merger of a debtor with one or more persons pursuant to a chapter 11 plan. The Debtor submits that "plan consolidation" is different than "substantive consolidation," which is an equitable remedy that is authorized (primarily) under § 105(a) of the Bankruptcy Code. Unlike substantive consolidation, which may requires a balancing of equitable factors, "the only 'real requirement' for exercising [plan consolidation] should be that section 1129 of the Bankruptcy Code is complied with in that: (1) classes of impaired creditors have accepted the plan's proposed consolidation, or (2) the 'best interest test' and 'absolute priority rule' protection granted to dissenting creditors has been met by the plan proponent." *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 93 (Bankr. N.D. Tex. 2017). The Debtor anticipates that classes of impaired

creditors will accept the Plan, and thereby accept the proposed plan consolidation. As to any dissenting class, however, the Debtor submits that the proposed plan consolidation will meet the "best interest test" and the "absolute priority rule" as to such dissenting creditors.

If there are dissenting classes of unsecured creditors, the "absolute priority rule" requires senior classes of creditors to be paid in full before value can be provided or retained by a junior class. The Debtor anticipates that all classes of unsecured creditors will consent to the Plan, and accordingly, the "absolute priority rule" will not be triggered. To the extent that the absolute priority rule is triggered, the Debtor submits that the Plan (including consolidation of the Consolidated Subsidiary Entities) satisfies the absolute priority rule, as further explained in section 5.9 of this Disclosure Statement.

The "best interest test" requires that creditors receive at least as much under a proposed plan as they would if the Debtor's case was converted to one under Chapter 7 of the Bankruptcy Code. As explained in section 5.1 of this Disclosure Statement, the Debtor believes that the Plan (including consolidation of the Consolidated Subsidiary Entities) satisfies the "best interest test."

Parties or the Court may disagree with the reasoning discussed in the *ADPT* decision and may assert or require that the Debtor meet the factors generally necessary for "substantive consolidation." In the Tenth Circuit, those factors include: (i) the parent company owns all or the majority of the capital stock of the subsidiary; (ii) the parent and subsidiary corporations have common officers or directors; (iii) the parent corporation finances the subsidiary; (iv) the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (v) the subsidiary has grossly inadequate capital; (vi) the parent corporation pays the salaries or expenses or losses of the subsidiary; (vii) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (viii) in the papers of the parent corporation, and in the statements of its offices, the subsidiary is often referred to as such or as a department or a division; (ix) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (x) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed. *See Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940). In *In re Horsley*, No. 99–30458, 2001 WL 1682013, *4-5 (Bankr. D. Utah, August 17, 2001), this Court summarized the requirements for substantive consolidation as follows: first, "the extent to which the entity to be substantively consolidated was managed or controlled by the debtor"; second, "whether the entity to be substantively consolidated had an economic existence independent from the debtor"; and third, the assets of the entities should be "hopelessly commingled." *Id.*

The Debtor submits that the factors for substantive consolidation are also met as to the Consolidated Subsidiary Entities. Except for Style-Crete, which is owned by PC Land Holdings, the Debtor wholly-owns all of the Consolidated Subsidiary Entities. The Debtor and the Consolidated Subsidiary Entities have identical (or nearly identical) management. Except for Mountain Heavy (in part), the Debtor finances the operations of the Consolidated Subsidiary Entities and pays the Consolidated Subsidiary Entities' payroll, expenses, and debt obligations. The Consolidated Subsidiary Entities do not have adequate capital to meet their obligations. Most of the Consolidated Subsidiary Entities do not have ongoing, income producing operations. The one Consolidated Subsidiary Entity that does—Mountain Heavy—relies substantially on the Debtor to "funnel" business to it. In other words, the Debtor is Mountain Heavy's largest "customer," often accounting for more than fifty percent of Mountain Heavy's income. The Debtor generally refers to Mountain Heavy as a subsidiary or a division of the Debtor. The Consolidated Subsidiary Entities act in the best interest of the Debtor, and corporate formalities as between the Debtor and the Consolidated Subsidiary Entities are only loosely observed, if at all. In short, the Debtor believes that it is necessary and appropriate for the Consolidated Subsidiary Entities to be consolidated with the Debtor as the "Reorganized Debtor" under the Plan.

### 3.3.4    The Plan Administrator

*Initial Plan Administrator.*  Pursuant to section 5.7.1.1 of the Plan, Gil Miller (the "Plan Administrator") will be appointed and shall serve as the initial Plan Administrator under the Plan. As provided in section 5.7.6 of the Plan, the Plan Administrator shall perform his duties and exercise his powers for the benefit of persons entitled to receive distributions from the Distribution Fund under subsections 5.6.1 through 5.6.7 of the Plan, consistent with the priorities described in section 5.6 of this Plan.  The Plan Administrator will be compensated at his regular professional hourly rate for services that her performs in said capacity.

Mr. Miller and his firm, Rocky Mountain Advisory ("RMA"), have acted as the Debtor's accountants and financial advisors since prior to the Petition Date.  Mr. Miller is well suited to act as Plan Administrator given his familiarity with the Debtor's financial records and ongoing business operations. Additionally, Mr. Miller has over 30 years of experience acting as a bankruptcy trustee, "plan administrator," "liquidating trustee," and a receiver in cases in Utah and elsewhere. The Plan Administrator will have sole and absolute authority over the Distribution Account and Distribution Funds, to administer in his sole and absolute discretion, subject to the terms of the Plan. The Plan Administrator also will have sole and absolute authority to investigate and act upon claims by and against the Debtor's insiders and investigate and act upon Avoidance Actions.

*Authority over Distribution Account and Distribution Funds.*  Pursuant to his authority over the Distribution Account and Distribution Fund, the Plan Administrator will have the power, right, and obligation to: (i) make distributions from the Distribution Account; (ii) compel the Reorganized Debtor to contribute Distribution Funds into the Distribution Account, as provided for under the Plan (including, if applicable, exercising the Plan Administrator Lien; (iii) audit and/or review the Reorganized Debtor's accounting records to ensure that Distribution Funds are sufficient and properly accounted for; and (iv) take any other action authorized under the Plan or applicable law with respect to the Distribution Account and Distribution Fund.

*Authority over Avoidance Actions and Insider Claims/Litigation.*  Pursuant to his authority to investigate and act upon claims by or against insiders and Avoidance Actions, the Plan Administrator will have sole and absolute authority to: (i) investigate, object to, challenge, or settle claims of insiders or employees of the Reorganized Debtor; (ii) investigate, prosecute, settle, or otherwise compromise claims against insiders or employees of the Reorganized Debtor; and (iii) investigate, prosecute, settle, or otherwise compromise Avoidance Actions, provided however, that (a) the Plan Administrator will consult in good faith with the Reorganized Debtor prior to bringing any Avoidance Actions against non-insiders; and (b) the Plan Administrator will not investigate, prosecute, settle, or otherwise compromise any Avoidance Actions that are waived pursuant to section 5.2.1 of the Plan. The Plan Administrator also has (non-exclusive) authority to investigate, object to, challenge, settle, or otherwise compromise all other Claims against the Debtor and the Estate, except as otherwise limited by the Plan (or any stipulation incorporated therein).

*Junior Lien and Liquidation Preference.*  Subject to and effective upon the occurrence of the Effective Date, and for the purpose of securing the Reorganized Debtor's obligation to fund the Distribution Fund Amount and to make the Quarterly Deposits into the Distribution Account, the Debtor shall grant to the Plan Administrator for the benefit of unsecured creditors a security interest and liquidation preference (the "Plan Administrator Lien") upon the following assets of the Debtor, whether currently owned and/or controlled by the Debtor or whether acquired after the Effective Date (collectively, the "Plan Administrator Collateral"): (a) the Distribution Account and all cash on deposit therein; (b) all cranes, trucks, trailers and other equipment, (c) all accounts, payment intangibles, accounts receivable and other amounts owing to the Debtor; (d) all general intangibles; (e) all chattel paper; promissory notes, instruments, leases, security agreement and other documents in favor of the Debtor; (f) all

investment property, including any and all stock or membership interests in Subsidiary Entities; and (g) all contracts and contract rights.

The Plan Administrator Lien is, and shall be, subordinate to all Liens that existed and that were properly perfected as of the Effective Date of the Plan. The Plan Administrator may release the Plan Administrator Lien as to particular personal property under limited circumstances.  Additionally, after the Effective Date, the Plan Administrator shall be obligated to execute such reasonable subordination agreement(s) as may be necessary to permit the Debtor (a) to refinance existing secured debt, (b) to obtain an operating line of credit, or (c) to permit the Debtor to acquire new or replacement equipment necessary for the Debtor's business needs and ongoing business operations.  The Plan Administrator, however, shall not be obligated, and may refuse, to subordinate the Plan Administrator Lien if he or she determines, in his or her professional discretion, that the terms of new proposed loan transaction would impair the feasibility of the Plan or would unreasonably increase the likelihood that the Debtor may default in its obligation under the Plan.

The Plan Administrator Lien would be limited to, and enforceable only in the event of, (a) a future bankruptcy case or receivership proceeding by the Reorganized Debtor, (b) the complete cessation of the Reorganized Debtor's business operation, (c) a wholesale liquidation of the Reorganized Debtor's assets or (d) the failure of the Debtor to make Quarterly deposits into the Distribution Account which are not cured within forty-five calendar days after written notice to the Debtor.

*Authority to Employ and Pay Professionals*. The Plan Administrator will have the authority to employ counsel and other professionals to assist him in his duties and pay such professionals' reasonable fees and expenses. Professionals employed by the Plan Administrator after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.  The reasonable fees and expenses of the Plan Administrator and his Professionals will be paid from the Distribution Fund.

*Oversight Committee*.  The Creditors' Committee may, but shall not be required to, appoint a committee of three members (the "Oversight Committee") who shall have the right to request (on no more frequent that a Quarterly basis) reports from the Plan Administrator regarding (a) the status of the Distribution Fund, the Distribution Account and/or past and anticipated distributions from the Distribution Fund, (b) the status of the Plan Administrator's investigation of, prosecution of and/or settlement of claim objections or causes of action within the scope of the Plan Administrator's authority and responsibility, (c) the Administrative Expenses of the Plan Administrator and his professionals paid or to be paid, and (d) other Professional Fees and Expenses paid from the Distribution Fund.  The Oversight Committee may provide comments and suggestions to the Plan Administrator, and may bring concerns to the attention of the Bankruptcy Court.  The Oversight Committee (and its members), however, shall not have the right to seek payment of its fees or expenses, including the fees or expenses of any of its attorneys or other professionals, from the Reorganized Debtor or the Distribution Fund.  The Oversight Committee shall not have the right to oversee the Reorganized Debtor or to seek reports or other information from the Reorganized Debtor, and shall have no right to control or dictate the Debtor's business operations, business decisions or financial affairs.

### 3.3.5    Creation and Disbursement of the Distribution Fund

As more particularly specified in sections 5.5 and 5.6 of the Plan, the Debtor shall set aside, segregate and distribute funds in the aggregate amount of **$8,000,000**, (*i.e.*, the "Distribution Fund" or the "Distribution Fund Amount") to be paid to the holders of Administrative Claims, Unclassified Priority Claims, Class 1 Priority Claims

and Class 2 General Unsecured Claims, Subordinated Claims, Subordinated § 510 Claims, and the canceled Equity Interests.

The Distribution Fund will be deposited and segregated in a special "Distribution Account".  Quarterly deposits into the Distribution Account will commence at the end of the first full Quarter after the Effective Date; provided, however, that the Debtor may make earlier deposits into the Distribution Account to pay Administrative Expense Claims or Convenience Class Claims as contemplated under the Plan.  By way of example, if the Effective Date is August 1, 2018, the initial deposit into the Distribution Account must be made on December 31, 2018. Additional deposits shall be made into the Distribution Account at the end of each subsequent Quarter.  The Quarterly Deposits shall be in the amount of at least $200,000.  The Reorganized Debtor, however, may contribute additional amounts if it has sufficient funds available to pay current and anticipated operating expenses, taking into account both short-term and long-term business and marketing plans. As mentioned above, the Plan Administrator will have sole and absolute authority over the Distribution Account and the Distribution Fund, and will act to ensure that the Reorganized Debtor contributes the minimum quarterly deposits into the Distribution Account. Notwithstanding the Plan Administrator's control and authority over the Distribution Account and Distribution Fund, the Debtor shall be deemed the "owner" of the Distribution Fund and the Distribution Account.

On or before the Final Distribution Date (*i.e.*, the ten-year anniversary of the Effective Date), the Debtor shall set aside funds totaling $8,000,000.00, either by depositing them into the Distribution Account or by direct payment of pre- and post-Effective Date Professionals Fees to those professionals, and (for pre-Effective Date fees) subject to approval by the Court.

Funds on deposit in the Distribution Account will be disbursed and/or reserved on each Distribution Date (*i.e.*, 14 days after the last day of each full Quarter following the Effective Date) through and until the Final Distribution Date.  Distributions will be according to the priorities specified in section 5.6 of the Plan, *to wit*:

> *first*, in payment of *Allowed Administrative Expenses*, including compensation to the attorneys and other Professionals of the Debtor and the Creditors' Committee through the Effective Date;

> *second*, payment of (or a reserve for payment of) Administrative Expenses arising or coming due after the Effective Date including (1) post-Effective Date quarterly fee payments to the United States Trustee, (2) all compensation for actual services provided and reimbursement of expenses incurred (a) by the Plan Administrator, and (b) Professionals providing post-Effective Date services for the Plan Administrator, and (3) all compensation for actual services provided and reimbursement of expenses incurred by Professionals providing post-Effective Date services for the Reorganized Debtor (a) in connection with investigating or objecting to Claims, (b) in connection with investigating or pursuing recovery of Avoidance Actions, and (c) up to a maximum amount of $25,000 in providing general bankruptcy-related and plan-related professional services after the Effective Date;

> *third*, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(3) through (a)(7) of the Bankruptcy Code, in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

> *fourth*, after the foregoing amounts are paid or reserved, the payments due to the holders of Priority Tax Claims entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, as described in section 2.3.2 and 2.3.3. of this Plan;

*fifth*, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(9) through (a)(10) of the Bankruptcy Code in the order of priority described in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

*sixth*, after the foregoing amounts are paid or reserved, *payment pro rata of Allowed Class 34 Convenience Class Claims* until such Claims have been paid in full;

*seventh*, after the foregoing amounts are paid or reserved, *payment pro rata of Allowed Class 2 General Unsecured Claims*, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

*eighth*, after the foregoing amounts are paid or reserved, *payment pro rata of Allowed Class 35 Subordinated Claims*, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full; and

*ninth*, after the foregoing amounts are paid or reserved, *payment pro rata of Allowed Class 36 Subordinated § 510(b) Claims*, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

*tenth*, after the foregoing amounts are paid or reserved, any remaining Cash shall be distributed to those holders of Class 33 Equity Interests (including the holders of Equity Interests that are cancelled under the Plan) pro rata according to the percentages owned immediately prior to the Effective Date.

Notwithstanding the priorities described in section 5.6 of the Plan, Convenience Class Claims may be paid out of the Distribution Account prior to Claims with higher priority if necessary to meet the deadline for payment of Convenience Class Claims under the Plan.

### 3.3.6    Prosecution of Avoidance Actions and Other Claims

The Plan Administrator will have the right, in his sole discretion, to investigate, prosecute, settle or abandon any such claims or causes of action belonging to the Reorganized Debtor, including claims arising under chapter 5 of the Bankruptcy Code (including claims to recover preferential transfers and voidable/fraudulent transfers), and causes of action belonging to the Debtor or the Reorganized Debtor. The Plan Administrator shall use his sound business judgment in determining whether to prosecute, settle, or abandon claims, and as to claims against non-insiders, shall consult with the Reorganized Debtor before determining whether to prosecute such claims.

Under section 5.2.1 of the Plan, certain avoidance actions are barred or waived. Section 5.2.1.1 provides that neither the Plan Administrator nor the Reorganized Debtor shall bring or prosecute Preference Claims against any creditor that accepts this Plan (either by affirmatively voting to accept the Plan or by not returning a ballot rejecting the Plan) and that does not object to confirmation of the Plan, excepting only Preference Claims that are specifically identified in the Plan or this Disclosure Statement as Preserved Claims. To the extent that Avoidance Actions are waived under Sections 5.2.1 of the Plan, the Plan Administrator shall not investigate, prosecute, settle or abandon such waived Avoidance Actions.

### 3.3.7    Objections to and Estimations of Claims

The Debtor and the Plan Administrator will investigate claims and determine, in the exercise of their business judgment, whether there is a sound legal and/or factual basis to object to claims, in whole or in part, and whether (taking into account legal fees and other expenses that will be incurred in objecting to the claim) to file an objection or other challenge to the claim. The Debtor anticipates that the Plan Administrator will undertake most of the responsibility for investigating and objecting to Claims.

Except as otherwise provided in the Plan (including stipulations that are incorporated into and made a part of the Plan, which stipulations may include a waiver of, and prohibition against, objecting to a particular creditor's Claim or Lien), objections to Claims against the Estate may be prosecuted by the Plan Administrator or any other party in interest. Except as otherwise provided in the Plan or by order of the Bankruptcy Court, the deadline to file objections to claims is 180 days after the Effective Date. Upon motion filed within such 180 days, the deadline may be extended for a reasonable period of time, not to exceed an additional 180 days. As provided in the Plan (and set forth in section 3.3.5 herein), the Plan Administrator shall have sole authority to investigate, object to, or otherwise resolve any claims made by insiders of the Reorganized Debtor.

The Debtor or the Plan Administrator may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim. The Debtor and the Plan Administrator shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim. If the Bankruptcy Court determines the maximum limitation of such Claim, such determination shall not preclude the Debtor or Plan Administrator from pursuing any additional proceedings to object to any ultimate payment of such Claim. If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under the Plan. All such proceedings are cumulative and not exclusive remedies.

### 3.3.8    Treatment of Executory Contracts and Unexpired Leases

*Assumption of Certain Contracts.* As more particularly specified in section 8.1 of the Plan, as of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, the following executory contracts and unexpired leases shall be deemed assumed under the Plan: (i) any Executory Contract or Lease which the Debtor was authorized to, and did, assume by order entered in the Case prior to the Effective Date; (ii) all of the Reorganized Debtor's contracts with its customers, including without limitation all master service agreements; (iii) all of the Reorganized Debtor's contracts with unions, including labor agreements and collective bargaining agreements; (iv) all insurance policies in favor of the Debtor; (v) unless specifically identified as a Rejected Contract, all short and long-term contracts and leases under which the Debtor is the lessor; (vi) unless specifically identified as a Rejected Contract, all Executory Contracts and unexpired Leases to which any of the Consolidated Subsidiary Entities (but not the Debtor) is a counter-party; (vii) unless specifically identified as a Rejected Contract, any and all Executory Contracts and unexpired Leases entered into after the Petition Date; (viii) only to the extent the Debtor enters into an amendment or modification agreement acceptable to the Debtor in its sole and absolute discretion prior to the Confirmation Date [i.e., absent such an amendment it will be a Rejected Contract], the Equipment Lease Agreement, dated April 2015, between the Debtor, as lessor, and National Equipment Service, Inc., as lessee; (ix) all Executory Contracts and unexpired Leases listed on the Schedule of Assumed Contracts, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the

Bankruptcy Court to vote on the Plan; and (x) any Executory Contract or Lease that is assumed under a Motion to Assume (as defined in the Plan) that is not, and does not become, a Rejected Contract.

A proposed "Schedule of Assumed Contracts" is attached hereto as **Exhibit 5**. The Debtor reserves its right to amend the Schedule of Assumed Contracts to add or remove Executory Contracts and unexpired Leases, as provided for in the Plan.

Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that were otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date. The Reorganized Debtor shall be deemed to be substituted for any Debtor in such contract or agreement, as applicable.

*Cure Amounts*. Any monetary amounts by which any Executory Contract or unexpired lease to be assumed under the Plan is in default, as well as any nonmonetary defaults, shall be satisfied, to the extent required under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor, as applicable, upon assumption thereof, subject to the conditions provided in the Plan. The Schedule of Assumed Contracts, a Motion to Assume and/or the Schedule of Cure Amounts may set forth the proposed Cure Amount for any particular Executory Contract or unexpired Lease. Unless a different amount is listed, the proposed, reasonable and appropriate Cure Amount for each Executory Contract and unexpired Lease shall be zero dollars ($0).

If any counterparty to an executory contract or unexpired lease disputes (a) any Cure Amount, (b) the ability of the Reorganized Debtor to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, (c) whether a nonmonetary default is required to be cured, or (d) any other matter pertaining to assumption, such counterparty must file an objection with the Bankruptcy Court on or before the date and scheduled for the hearing on confirmation of the Plan. Such disputes shall be adjudicated by the Bankruptcy Court prior to the assumption of such executory contracts and unexpired leases becoming effective; provided that the Reorganized Debtor may reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount shall be deemed to have assented to such assumption and to the Cure Amount proposed by the Debtor (and that no nonmonetary defaults exist or that they need not be cured) and shall be forever barred, estopped, and enjoined from challenging the Cure Amount or the validity of such assumption.

*Rejection of all Contracts Not Assumed*. Except for Assumed Contracts, any and all Executory Contracts and unexpired Leases that have not been either assumed or rejected prior to the Effective Date are rejected by the Debtor (the "Rejected Contracts") as of the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

*Rejection Damages Claims*. If the rejection of an executory contract or unexpired lease by the Debtor or the Reorganized Debtor results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before forty-five (45) days following the later of (a) the Confirmation Date or (b) the effective date of the rejection of such executory contract or unexpired lease.

*Reservation of Rights Under the Plan*.  Neither the exclusion nor the inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to the Plan, in the Schedule of Assumed Contracts, in the Schedule of Rejected Contracts or in the Schedule of Cure Amounts, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is (or is not) an executory contract, unexpired lease, or true lease, or that the Debtor or the Reorganized Debtor has any liability thereunder. Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease. Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtor or Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 3.4    The Plan Injunctions; Release and Satisfaction of Claims

*Permanent Injunction in Favor of the Reorganized Debtor*.  Except as otherwise provided in the Plan, and as more specifically provided under Article 12 of the Plan, all claims against the Debtor, the Consolidated Subsidiary Entities, or the Estate shall be barred as against the Reorganized Debtor permanently and forever. Further all creditors and other persons shall be enjoined from taking any actions against the Reorganized Debtor, the Estate, or its assets.

*Temporary and Contingent Injunction in Favor of Subordinating Guarantors*.  Section 12.4 provides for a contingent injunction, for the duration of the Plan Period, in favor of any co-debtors of the Reorganized Debtor that voluntary subordinates his or her own claims against the Reorganized Debtor to repayment of Class 2 Unsecured Claims and voluntarily accepts treatment under this Plan as a Class 35 Subordinated Claim (a "Subordinating Guarantor").  For the duration of the Plan Period (but not forever) or, if earlier, until an Early Termination Event (as defined in section 12.4.2 of the Plan, and described in more detail below), and in exchange for the voluntary subordination given by such Subordinating Guarantor pursuant to written Subordination Agreements in favor of the Reorganized Debtor (which is anticipated to increase the distributions to the holders of Allowed Class 2 General Unsecured Claims by approximately 15%-19% compared to distributions without such Subordination Agreements), all holders of Class 2 General Unsecured Claims shall be enjoined from taking any actions, instituting or continuing to prosecute any litigation, or otherwise pursuing collection or recovery of any claims against the Subordinating Guarantors which derive from or are related to claims against the Debtor, a Consolidated Subsidiary Entity, the Reorganized Debtor or the Estate (i.e., any claims against a Subordinating Guarantor in his or her capacity as a guarantor or other co-debtor of the Reorganized Debtor).  Except in instances in which the Debtor specifically has stipulated otherwise in favor of a particular holder of a Secured Claim, the holders of Secured Claims likewise shall be enjoined from pursuing collection against or recovery from a Subordinating Guarantors for the duration of the Plan Period or, if earlier, until an Early Termination Event, but only to the extent the Secured Claim is treated and paid under the Plan. The Debtor, the Reorganized Debtor and the Plan Administrator shall be enjoined from pursuing any claims against Subordinating Guarantors (which may, and are anticipated to, include David Paul Belcher, Paul David Belcher, Lon Stam and Vern Belcher) which could be brought under chapter 5 of the bankruptcy code, or under any fraudulent transfer law of the United States or any state thereof.

The contingent injunction described in section 12.4 of the Plan shall terminate automatically upon the occurrence of an Early Termination Event (as defined in section 12.4.2 of the Plan).  Absent an Early Termination Event, the contingent injunction described in this section 12.4 shall remain in effect for the duration of the Plan Period, and shall expire when the Plan Period is complete.  The statutes of limitation for all such enjoined actions against a Subordinating Guarantors shall be tolled from the Effective Date until thirty (30) days after the earlier of

(a) an Early Termination Event, or (b) the end of the Plan Period. Occurrence of any of the following events or conditions shall constitute an "Early Termination Event" (as more fully defined in section 12.4 of the Plan):

(i) a material default by the Debtor in paying its obligations to the holder of a particular Secured Claim as required under this Plan (including under a stipulation incorporated as part of this Plan) which is not timely cured after such notice and cure period as may applicable to the particular Secured Claim shall be an Early Termination Event solely as to the particular holder of the Secured Claim;

(ii) the failure of the Debtor to make Quarterly deposits into the Distribution Account which are not cured within forty-five calendar days after written notice to the Debtor under section 5.7.4.5 of the Plan shall be an Early Termination Event with respect to the holders of Class 2 Unsecured Claims;

(iii) the occurrence of a Plan Administrator Lien Enforcement Event specified in subparagraphs (a), (b) or (c) of section 5.7.4.5 of the Plan shall be an Early Termination Event with respect to all holders of Claims, including the holders of Class 2 Unsecured Claims and the holders of Secured Claims; and

(iv) entry of an order for relief under sections 301 or 303 of the Bankruptcy Code as to a particular Subordinating Guarantor shall be an Early Termination Event solely as to the particular Subordinating Guarantor as necessary to permit persons otherwise enjoined by section 12.4 to file a proof of claim and to participate in the bankruptcy case of that Subordinating Guarantor.

*Value of Subordination Agreements.* The value of the potential subordinations by Subordinating Guarantors is anticipated to be of substantial benefit to the Estate and its Creditors, and the Subordination Agreements are projected to substantially increase the percentage distribution to the holder of Class 2 Unsecured Claims. Specifically, Lon Stam holds an allowed nonpriority unsecured claim in the amount of $553,750.96. Paul David Belcher holds an allowed nonpriority unsecured claim in the amount of $210,725.69. Vernon H. Belcher holds an allowed nonpriority unsecured claim in the amount of $614,367.35. David P. Belcher holds an allowed nonpriority unsecured claim in the amount of $594,159.35. These four claims, in the aggregate, total approximately $1,973,003 (the "Insider Claims"). Exhibit 4 to this Disclosure Statement projects a potential payout to Class 2 Unsecured Creditors of approximately 73.3%. This projection assumes that these Insider Claims are voluntarily subordinated, and further assumes that the Debtor or Plan Administrator will be successful in objecting to certain disputed claims, such that Allowed Class 2 Claims totals approximately $7,659,881. If the Insider Claims are not subordinated (but all other assumption remain in place), the estimated payout to the holders of Allowed Class 2 Claims will be reduced from approximately 73.3 cents on the dollar to only 58.45 cents on the dollar, a decrease of over 15 percent. Absent the voluntary subordination of the Insider Claims, it is possible that approximately $1.2 million of the Insider Claims could be forcibly subordinated under Section 510(b) of the Bankruptcy Code, which provides for the subordination of certain claims arising from the purchase or sale of a security. However, any subordination under Section 510(b) of the Bankruptcy Code would likely require an adversary proceeding to be initiated by the Plan Administrator, and such actions by the Debtor would pose significant risks, such as (i) the risk of losing in such adversary proceedings; (ii) the risk of alienating ownership and management and those employees loyal to them; and (iii) the risk of alienating key customers whose relationships are primarily with Lon Stam, David P. Belcher, or Vernon Belcher. The risk of losing is not insubstantial, as many Courts have held that claims of noteholders for payments under a promissory note are no different than any other general unsecured claim, and thus, are not subject to subordination under Section 510(b) of the Bankruptcy Code. A more detailed explanation of the value of subordinating the Insider Claims is attached hereto as **Exhibit 6**, which sets forth a range based on whether

the Allowed Class 2 Claims increase by $500,000 or $1,000,000 from the amount that the Debtor otherwise anticipates will be Allowed.

*Release and Discharge in Favor of the Reorganized Debtor.* The rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtor and the Consolidated Subsidiary Entities, and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor and the Consolidated Subsidiary Entities.

## ARTICLE 4
## THE DEBTOR AND ITS CREDITORS

### 4.1     Pre-Petition Financing and Capital Structure

#### 4.1.1     Equity Interests; Pre- and Post-Confirmation Management

As of the Petition Date, membership interests and voting securities of the Debtor were held: 91.75% by Paul Belcher, 2.75% by David Belcher, 2.75% by Lon Stam, and 2.75% by Vern Belcher. Since the Petition Date, Paul Belcher has been active in managing and operating the Debtor and the Consolidated Subsidiary Entities, and David Belcher, Lon Stam, and Vern Belcher have continued to be employed by the Debtor consistent with their pre-petition employment by the Debtor.

The Debtor contemplates that Paul Belcher will continue to manage the Reorganized Debtor and its business operations following confirmation of the Plan. The remaining members of the Debtor have not actively participated in the Debtor's management since approximately December 2015, and the Debtor does not anticipate that they will participate in the management of the Reorganized Debtor (although they will likely continue to be employed by the Reorganized Debtor). The remaining members' Equity Interests are being canceled under the Plan, and Paul Belcher shall become the 100% member of the Debtor (subject to the conditions precedent and conditions subsequent described in Section 5.4.1 of the Plan).

#### 4.1.2     Secured Debt

##### 4.1.2.1   Crane & Equipment Loans

*Crane Loans.* Most of the Debtor's Secured debt is related to the cranes that the Debtor utilizes in its day-to-day operations. Because of the high cost of cranes, the Debtor generally requires financing to acquire them. The Debtor has crane related loans with multiple parties, including but not limited to: (i) BBVA Compass; (ii) CCG; (iii) Chapman; (iv) Cheuck Yick; (v) Continental Bank; (vi) De Lage Landen; (vii) Equify; (viii) Everbank; (ix) FNB Layton; (x) Galena; (xi) MACU; (xii) People's Capital; (xiii) the SBA; (xiv) SG Equipment Finance; (xv) Siemens; (xvi) Signature Financial; (xvii) Sterling; (xviii) TCF; (xix) Terex; and (xx) Wells Fargo.

Each of the aforementioned lenders has Claim(s) against the Debtor that are secured or ostensibly secured by one or more cranes and, in some cases, other collateral. Early in the case, however, the Debtor discovered that many of the "crane lenders" used an incorrect name in the UCC-1 financing statements with the Debtor, including using the name "Mountain Crane Service LLC," which does <u>not</u> include the comma that is in the Debtor's legal name. Because of this mistake, the Debtor believes that many of the ostensibly secured lenders may have perfection problems with respect to their alleged liens, in that the "search logic" used by Utah's Department of Commerce search engine requires that the Debtor's name be spelled exactly correct in order to give parties notice of potential liens (even when accounting for the "safe harbor" provision in the Utah UCC). The Debtor has reached stipulations

with some (but not all) of the "crane lenders" with possible perfection problems, which stipulations provide for the resolution of that and other issues as to each creditor.

*Disguised Financing Agreements*.  The Debtor also discovered that some of the Debtor's alleged "leases" with certain parties appear to be disguised financing agreements, and not "true leases." For example, the Debtor asserts that certain agreements with CIT Capital, Trans Lease, Hincklease, Amur, and Continental Bank, though styled as leases, are not "true leases." Notwithstanding these disputes, the Debtor has reached amicable resolutions with Trans Lease, CIT Capital, and Continental Bank regarding the treatment of those parties Claims as Secured Claims rather than true leases. The Debtor hopes to reach similar such resolutions with Hincklease and Amur, but to the extent that it does not, the Debtor has proposed to treat Hincklease and Amur as Secured Claims under the Plan.

*Miscellaneous Equipment Loans*.  The Debtor also has Secured debts related to miscellaneous equipment that it uses in its business—primarily trucks, semi-tractors, semi-trailers, and a "jack-and-slide" system that it uses to move heavy pieces of equipment or machinery. The Claims related to these debts include Claims of: (i) Ally Financial; (ii) CCG; (iii) Chrysler Capital; (iv) Direct Capital; (v) Continental Bank; (vi) Equify; and (vii) Everbank.

*Subsidiary Equipment Loans*.  Certain of the Consolidated Subsidiary Entities have separate secured loans related to non-crane equipment. These include (i) two loans that Mountain Heavy has with CCG, which are secured by a prime mover and an extendable trailer; (ii) one loan that Mountain Heavy has with Equify, which is secured by a semi-tractor; and (iii) one loan that MNHH has with Everbank related to multiple semi-tractors and semi-trailers. The Plan proposes treatment of these loans through the consolidation of the Consolidated Subsidiary Entities into the "Reorganized Debtor." In each of the aforementioned instances, the Debtor and respective Subsidiary Entity has reached (or expects to reach) a stipulation with the relevant creditor party.

### 4.1.2.2   Real Property Loans

Two of the Subsidiary Entities, PC Land Holdings and Style-Crete, own the real property that the Debtor uses for its headquarters and storage yard. Both the PC Land Holdings Real Property and the Style-Crete Real Property secure loans which were used to acquire the respective parcels of real property. The Debtor has not recently appraised the PC Land Holdings Real Property or the Style-Crete Real Property, but estimates that the collective value of the real property is approximately $2.7 million.

*PC Land Holdings.*  The PC Land Holdings Real Property secures the Continental Bank Real Property Loan and the Mountain West Loan. PC Land Holdings is the obligor on those loans, but PC Land Holdings has no income, bank account, or business, and the Debtor has always made the payments owed for the Continental Bank Real Property Loan and the Mountain West Loan.

The Continental Bank Real Property Loan was made in the original principal amount of $288,999.00 on or about July 22, 2014. The estimated outstanding balance owed on the Continental Bank Real Property Loan was approximately $271,580.97 as of the Petition Date. The Continental Bank Real Property Loan accrues interest at a variable rate, which was approximately 6.82% as of the Petition Date. Prior to the Petition Date, the Debtor made monthly payments of approximately $2,318.77 towards the Continental Bank Real Property Loan.

The Mountain West Loan was made in the principal amount of $251,000.00 on or about November 1, 2014. The estimated outstanding balance owed on the Mountain West Loan was approximately $220,544.49 as of the Petition Date. The Mountain West Loan accrues interest at an annual rate of approximately 2.79%. Prior to the Petition Date, the Debtor made monthly payments ranging between $1,469.70 - $1,711.72 towards the Mountain West Loan.

*Style-Crete.*  The Style-Crete Real Property secures the FNB Layton Real Property Loan No. 1 and the FNB Layton Real Property Loan No. 2. The Debtor is the named obligor on the FNB Layton Real Property Loans.

The FNB Layton Real Property Loan No. 1 was made on August 6, 2014, in the original principal balance of $1.3 million, and accrues interest at approximately 5.19% annually. The Debtor makes monthly payments of approximately $8,661.43 on the FNB Layton Real Property Loan No. 1, but the loan requires a balloon payment of approximately $821,673.32 on August 6, 2024. The estimated outstanding balance of the FNB Layton Real Property Loan No. 1 was approximately $1,171,353.20 as of the Petition Date.

The FNB Layton Real Property Loan No. 2 was made on April 15, 2015, in the original principal amount of $495,000. The FNB Layton Real Property Loan No. 2 accrues interest at approximately 5.72% annually. Prior to the Petition Date, the Debtor made monthly payments of approximately $4,066.12 towards the FNB Layton Real Property Loan No. 2, but the loan requires a balloon payment of approximately $430,135.12 on April 15, 2018 (absent the proposed modification under the Plan). The estimated balance of the FNB Layton Real Property Loan No. 2 was approximately $437,057.63 as of the Petition Date.

### 4.1.2.3   Property Taxes Due to Salt Lake County

Upon information and belief, the Debtor has paid in full all real and personal property taxes due prior to the Petition Date.  As such, the Debtor did not schedule a claim owed to Salt Lake County on Schedule D.  Likewise, Salt Lake County has not filed a proof of claim asserting a secured claim.  To the extent, the Salt Lake County asserts a secured tax claim for unpaid real or personal property taxes, such liability will be paid in full under the Plan.

### 4.1.3     Priority Unsecured Debt

The IRS filed a proof of claim [Claim No. 15-3] which, as amended, states estimated tax amounts as a priority unsecured claim in the amount of $8,848.86 and a general unsecured claim in the amount of $3,592.44. As specified in the proofs of claim filed by the IRS, the claim is, in part, based upon estimates and in part based on taxes actually assessed. To the extent necessary, the Debtor reserves its right to request a determination of the IRS Claim pursuant to section 505 of the Bankruptcy Code.

The Utah State Tax Commission filed a claim [Claim No. 50-2] stating estimated tax amounts as a priority unsecured claim in the amount of $7,616.93, and an administrative expense claim in the amount of $13,121.91 for first-Quarter sales and withholding taxes.  The Debtor anticipates that the claim may be amended once the Utah State Tax Commission has processed the required tax returns for second quarter sales and withholding taxes. To the extent necessary, the Debtor reserves its right to request a determination of the Utah State Tax Commission Claim pursuant to section 505 of the Bankruptcy Code.

The Debtor also scheduled has various other potential priority claims on its Schedule E, including priority unsecured claims for sales and withholding taxes in multiple states, union dues, sales and use taxes for multiple states, and other miscellaneous priority claims. Certain taxing entities from various states have also filed proofs of claim in the Bankruptcy Case, primarily related to payroll taxes and sales and use taxes.

### 4.1.4     Non-Priority Unsecured Debt

The Debtor scheduled general unsecured claims in the amount of $11,276,321.92 as of the Petition Date. As of the date of this Disclosure Statement, approximately $39,750,000 in general unsecured claims have been filed

against the Debtor. However, the filed claims include (i) duplicate claims, (ii) disputed claims, (iii) contingent claims, and (iv) claims that are subject to setoff or other defenses.

The Debtor estimates that the total amount of Unsecured Claims that actually will be Allowed and paid under the Plan as Class 2 General Unsecured Claims is in the range of $8,309,274 to $11,276,321.92. Specifically, if scheduled claims that are not "Allowed" are deducted, the Claims of certain insiders are voluntarily subordinated or subordinated as Subordinated § 510(b) Claims, estimated deficiency claims arising from the Auction are added, and claims that are secured by real estate are recharacterized as secured claims pursuant to the proposed consolidation of the Debtor's subsidiary entities, and certain filed Claims are disallowed pursuant to objections filed by the Debtor or the Plan Administrator, then actual Claims treated as General Unsecured Claims are estimated to be approximately $9,500,000.

### 4.2    Events Leading to Bankruptcy

#### 4.2.1    The Debtor's Business

A description of the Debtor's business, and of many of the events preceding its bankruptcy filing, is summarized in Section 2 above. The Debtor's business was adversely affected by various factors including, primarily, the Acquisition, the Construction Accident, and the Aircraft Lease. The Debtor concluded that the best means to restructure its operations and preserve its business was through a Chapter 11 bankruptcy filing. Notwithstanding the issues that led to its bankruptcy filing, the Debtor has a generally healthy and profitable business.

Since the Petition Date, the Debtor has trimmed expenses and streamlined its operations, in an effort to undo many of the factors that led to the filing of the Debtor's bankruptcy petition. The Debtor intends to focus its efforts on its wind turbine work and oil refinery turnarounds, which the Debtor anticipates will continue to grow.

Through the Plan, the Debtor proposes to reorganize and maintain its business in the "sweet spot" at which it has previously been successful. In addition to rejecting the Aircraft Lease and selling many or all of the cranes acquired in the Acquisition, the Plan contemplates a reduction in the monthly debt service due to all of its secured lenders. With the reduction in operating expenses, the right sizing of its fleet, and discounts in monthly debt service, the Debtor anticipates profitable business operations.

#### 4.2.2    The Bankruptcy Filing

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 12, 2018.

### 4.3    The Debtor's Assets

#### 4.3.1    Personal Property

As of the Petition Date the Debtor owned cash or cash equivalents of approximately $1.1 million, most of which is needed for the Debtor's ongoing operating expenses. The Debtor owned deposits and lease prepayments of approximately $952,690.55. It held accounts receivable of 90 days or less in the face amount of approximately $7,009,127.29, although approximately $500,000 of that amount was estimated as uncollectible. As of May 31, 2018, the Debtor held cash or cash equivalents in the approximate amount of $2,482,121 and accounts receivable in the approximate amount of $10,084,300.

The Debtor also owns 100% of the interests of the Consolidated Subsidiary Entities, except for Style-Crete, which is owned by PC Land Holdings (the Debtor's wholly-owned subsidiary). The only Consolidated Subsidiary Entity with ongoing operations is Mountain Heavy. Style-Crete, PC Land Holdings and MNHH all own assets that are valuable to the Debtor's ongoing operations.

The Debtor has many items of office equipment and furniture, computers, software licenses, and the like, with an estimated liquidation value as of the Petition Date of approximately $48,572.62. A more detailed explanation of the Debtor's assets held as of the Petition Date can be found in the Debtor's Schedules and Statement of Financial Affairs, on file at Docket No. 164 in the Bankruptcy Case.

Most of the Debtor's personal property assets consist of the cranes, equipment, tools, trucks, tractors, and trailers that it uses for its ongoing business operations. The Debtor estimates that the liquidation value of these assets was approximately $51,561,785.02, as of the Petition Date. Since the Petition Date and as of the date of the filing of this Disclosure Statement, the Debtor has sold 14 cranes and returned the Aircraft.

### 4.3.2    Claims Against Insiders

Paul Belcher, the majority owner of the Debtor, received salaries and distributions totaling $160,979.48 within one year prior to the bankruptcy filing.  At the time, Mr. Belcher had provided, and continues to provide, valuable management services to the Debtor.  Mr. Belcher has suggested facts which may support defenses to recovery by the Debtor, including evidence of "new value" subsequent to any transfer to him that equal or exceed the value of any cash or other property transferred to him. Many of the distributions that were ostensibly made to Mr. Belcher appear to be reimbursements for expenses incurred on behalf of the Debtor.

Additionally, in the week immediately preceding the Petition Date, Mr. Belcher incurred expenses of approximately $60,000 on his personal credit card, all of which were incurred on the Debtor's behalf. Mr. Belcher incurred those expenses because the Debtor's other credit cards had been temporarily suspended in anticipation of filing the bankruptcy petition, and the Debtor primarily uses credit cards for the purchase of fuel and other day-to-day expenses it incurs. Mr. Belcher has not received reimbursement for the debt he incurred on his credit card in the week prior to the Petition Date.

Since the Petition Date, the Debtor has paid a salary to Mr. Belcher to compensate him for his management services.  Mr. Belcher's salary under the Plan will be $240,000 per year.

The Bankruptcy Code defines "insider" to include officers of the Debtor, any person in control of the Debtor, and any person who is a relative of an officer or a person in control of the Debtor.  Several persons may have served as officers of the Debtor, have had the right to exercise some control of the Debtor's business and financial affairs, and/or are relatives of those persons.  Without limitation, the following persons may constitute "insiders":  Paul Belcher, David Belcher, Vern Belcher, Lon Stam, Josh Chafin, Courtney Belcher, Jared Belcher, Joshua Martin, and Paul Burghardt.

As described more fully in sections 3.3.4 and 4.3.4.1 of this Disclosure Statement, the Plan Administrator shall have the sole authority to investigate and prosecute claims against Paul Belcher, David Belcher, Vern Belcher, Lon Stam, Josh Chafin, Courtney Belcher, Jared Belcher, Joshua Martin, and Paul Burghardt.

Further, the Plan Administrator reserves his right to investigate and prosecute any claims or causes of action against "insiders" that come to his attention.  It is also possible that creditors voting for the plan may be sued, subject to (and limited by) the waiver provided for in Section 5.2.1 of the Plan. The Plan Administrator will consult with the Reorganized Debtor before he brings claims against non-insider creditors of the Debtor, so as to ensure that

any such claims would not be more damaging to the Reorganized Debtor's ongoing business operations (and thus harm its ability to reorganize) than beneficial to creditors and the Estate.

### 4.3.3    The Consolidated Subsidiary Entities

#### 4.3.3.1   Overview of Subsidiary Entities

The Debtor wholly owns nine (9) Subsidiary Entities, one of which (PC Land Holdings), owns 100% of the stock in another entity (Style-Crete). Under the Plan, the Debtor will consolidate four of the Subsidiary Entities into the Reorganized Debtor. The Consolidated Subsidiary Entities are and shall be: (i) Mountain Heavy; (ii) MNHH; (iii) PC Land Holdings; and (iv) Style-Crete. The Consolidated Subsidiary Entities, including Style-Crete, are the alter-egos of the Debtor. They are almost entirely funded by the Debtor's business operations. For the most part, they share bank accounts, offices, managers, and employees with the Debtor. The Debtor has always treated them as part and parcel of its overall operations, not as separate entities. As explained in section 3.3.4 of this Disclosure Statement, the Debtor believes there is good cause to consolidate the Consolidated Subsidiary Entities into the Reorganized Debtor. A summary explanation of each of the Subsidiary Entities (including those Subsidiary Entities that will not be consolidated under the Plan) follows.

#### 4.3.3.2   MC Wyoming, LLC

MC Wyoming, LLC ("MC Wyoming") is a Utah limited liability company that was formed on or about August 21, 2013. MC Wyoming is wholly-owned by the Debtor.

MC Wyoming employs the Debtor's employees who reside in Wyoming. The Debtor formed MC Wyoming to track Wyoming employees' workers compensation insurance hours. The Debtor transfers funds to MC Wyoming sufficient for MC Wyoming to make its payroll payments, and the Debtor records these transactions as intercompany receivables. The Debtor has no expectation of repayment from these intercompany receivables, and they are eliminated in consolidation.

Except for intercompany payables and payroll obligations (and obligations related thereto), MC Wyoming has no secured or unsecured debt. Except for its use as a payroll-entity, MC Wyoming has no ongoing business operations.

#### 4.3.3.3   Mighty Crane Service, LLC

Mighty Crane Service, LLC ("Mighty Crane") is a Nevada limited liability company that was formed on or about January 12, 2007. Mighty Crane, to the extent that it still exists, is wholly owned by the Debtor.

Mighty Crane was formed to run a crane service business in Las Vegas, Nevada, right before the great recession. Because of the great recessions, Mighty Crane's business operations lasted only until approximately 2008 or 2009. Mighty Crane's status with the Nevada Secretary of State is "revoked," and its business license in Nevada expired on January 31, 2015.

Mighty Crane has no operations, revenues, expenses, or employees and maintains no books or records. On information and belief, Mighty Crane has no outstanding debts, including intercompany debts, and has no assets. The Reorganized Debtor anticipates either formally dissolving Mighty Crane or allowing Mighty Crane to be administratively dissolved by the Nevada Secretary of State.

### 4.3.3.4   Mountain National Crane Rental, LLC

Mountain National Crane Rental, LLC ("MNCR") is a Utah limited liability company that was formed on or about May 6, 2008. MNCR is wholly-owned by the Debtor.

MNCR was formed to act as a national crane rental company, and for a brief period of time, operated as such. MNCR has been inactive since approximately 2011, and has no operations, expenses, liabilities, or income. MNCR has been an "expired" entity in the records of the State of Utah since August 30, 2016. The Debtor will most likely formally dissolve MNCR or allow it to become administratively dissolved by the Utah Division of Corporations.

### 4.3.3.5   Mountain Heavy Transport, LLC

Mountain Heavy Transport, LLC ("Mountain Heavy") is a Utah limited liability company that was formed on or about January 20, 2015. Mountain Heavy is wholly-owned by the Debtor.

Mountain Heavy provides "heavy hauling" services for the Debtor's cranes and equipment and for cranes and equipment of unrelated third parties. In some ways, Mountain Heavy is the most "separate" Subsidiary Entity of the Debtor, in that it has its own bank account, its own business operations, and its own independent source of income. However, Mountain Heavy shares the Debtor's offices, officers, and many of its employees. The Debtor previously transferred funds to Mountain Heavy to make payroll payments, which were recorded as intercompany payables, though it discontinued that practice shortly before the Petition Date. Additionally, most of Mountain Heavy's income is derived from hauling services it provides for the Debtor—approximately 50% of total income on an average month, and as high as 85% of total income for many months.

Mountain Heavy has substantial intercompany payables and receivables with the Debtor and with third-parties. Mountain Heavy also serves as a guarantor on many of the Debtor's secured debts, and the Debtor serves as a guarantor on all of Mountain Heavy's secured debts. Mountain Heavy is a party to three secured promissory notes, one with Everbank and two with CCG. Those debts will be treated under the Plan.

Some of the assets used by Mountain Heavy are titled under MNHH. As explained below, however, MNHH has no operations or ongoing business, and it is not apparent to the Debtor, Mountain Heavy, or MNHH why Everbank entered into a loan agreement with MNHH, rather than Mountain Heavy. Mountain Heavy does not file its own tax returns—it is consolidated with the Debtor when the Debtor files its returns.

### 4.3.3.6   Mountain National Heavy Haul, LLC

Mountain National Heavy Haul, LLC ("MNHH") is a Utah limited liability company that was formed on or about December 30, 2008. It was formed to obtain a licensing number with the Department of Transportation. MNHH has no operations, revenues, expenses, or employees and maintains no books or records. MNHH is, however, the recipient of a loan in the original principal amount of $557,885.64, which was made by Everbank on or about December 31, 2015. The MNHH Loan was advanced to allow MNHH to purchase a significant number of trucks and trailers that are utilized by Mountain Heavy in its operations.

### 4.3.3.7   Mountain Transport, LLC

Mountain Transport, LLC ("Mountain Transport") is a Utah limited liability company that was formed on or about May 27, 2008. Mountain Transport was formed to employ and pay the Debtor's truck drivers, laborers, and administrative staff, which was done due to comply with and/or avoid certain restrictions of union insurance plans.

The Debtor transfers the necessary amounts to meet payroll, which transactions are recorded as intercompany payables. The Debtor has no expectation of repayment from these intercompany payables, and all intercompany loans or receivables between the Debtor and Mountain Transport are eliminated in consolidation.

Except for intercompany payables and payroll obligations (and obligations related thereto), Mountain Transport has no secured or unsecured debt. Mountain Transport has an employee benefits package including medical, dental, and vision expenses, and owed a small amount in benefits obligations as of the Petition Date.

### 4.3.3.8   Mountain Wind, LLC

Mountain Wind, LLC ("Mountain Wind") is a Utah limited liability company that was formed on or about August 15, 2016. Mountain Wind is wholly-owned by the Debtor.

Mountain Wind was formed to service a contract that the Debtor received to erect approximately 26 wind turbines on a wind farm in an Oklahoma. The Debtor had hoped to "spin off" all its wind erection work into Mountain Wind, but that has not happened. The Oklahoma contract ended in 2016 and Mountain Wind was paid in full for its work in early 2017. Most of the income that Mountain Wind received from the Oklahoma contract was paid to the Debtor.  While Mountain Wind hired some of its own employees for the Oklahoma contract, the Debtor provided the cranes, equipment, management, crane operators, and administrative staff required to complete the Oklahoma project. Mountain Wind stopped all operations as of the first quarter of 2017, and the Debtor does not intend to continue using Mountain Wind as an entity.

Mountain Wind has no outstanding secured debt, but has approximately $44,000 in unsecured debts outstanding, not including intercompany debts. The Debtor and other Subsidiary Entities loaned Mountain Wind funds, which funds are recorded as intercompany debts. The Debtor does not expect repayment from Mountain Wind for the funds it loaned to Mountain Wind, and all intercompany debts are eliminated in consolidation.

### 4.3.3.9   PC Land Holdings, LLC

PC Land Holdings, LLC ("PC Land Holdings") is a Utah limited liability company that was formed on or about November 14, 2005. PC Land Holdings is wholly-owned by the Debtor.

PC Land Holdings owns real property in Salt Lake County, Utah, on which the Debtor's headquarters and storage yard are located (the "PC Land Holdings Real Property"). PC Land Holdings also owns 100% of the shares of Style-Crete, which is another land-owning entity. Except for holding title to the PC Land Holdings Real Property and the shares of Style-Crete, PC Land Holdings has no operations or ongoing business, and it has no bank account or employees of its own.

The PC Land Holdings Real Property secures obligations owed by PC Land Holdings to the Small Business Administration ("SBA" or "Mountain West") and Continental Bank. The obligation owed to the SBA is referred to in the Plan as the "Mountain West Loan" and the obligation owed to Continental Bank is referred to in the Plan as the "Continental Bank Real Property Loan." The Debtor (and most of the other Subsidiary Entities) serves as a guarantor on the Mountain West Loan and the Continental Bank Real Property Loan, and the Debtor makes the payments owed for both obligations.

Although PC Land Holdings ostensibly acts as a lessor to the Debtor, the Debtor does not make lease payments to PC Land Holdings. Instead, the Debtor makes all payments directly to the SBA and to Continental Bank. The payments made by the Debtor to the SBA and Continental Bank are recorded as equity contributions on

PC Land Holdings' accounting records. Except for property taxes, utilities, and similar obligations, PC Land Holdings has no other debt.

### 4.3.3.10 Reach Higher, LLC

Reach Higher LLC ("Reach Higher") is a Montana limited liability company that was formed on or about August 11, 2015. Reach Higher is wholly-owned by the Debtor.

Reach Higher was formed to enter into the Varilease Lease for the lease of the Aircraft. Reach Higher has no operations, expenses, income, or liabilities, except for liabilities related to the Varilease Lease, if any, which, if they exist, are wholly shared by the Debtor. In light of its stipulation with Bank of Ann Arbor to return the Aircraft and reject the Varilease Lease, the Debtor anticipates either formally dissolving Reach Higher or allowing it to be administratively dissolved by the Montana Division of Corporations.

### 4.3.3.11 Style-Crete, Inc.

Style-Crete, Inc. is a Utah corporation that was formed on or about April 9, 1953. PC Land Holdings owns 100% of Style-Crete's outstanding shares.

Style-Crete owns some of the real property on which the Debtor is headquartered (the "Style-Crete Land"). The Style-Crete Land secures obligations owed by the Debtor to FNB Layton, referred to in the Plan as the "FNB Layton Real Property Loan No. 1" and "FNB Layton Real Property Loan No. 2" (and collectively, as the "FNB Layton Real Property Loans").

Style-Crete grants the Debtor the use of the Style-Crete Land. PC Land Holdings purchased Style-Crete's shares in or about November 2011 in order to acquire the Style-Crete Land. Except for its ownership of the Style-Crete Land, Style-Crete has no operations, ongoing business, or employees of its own. Style-Crete has a bank account that contained approximately $29 as of the Petition Date. Although Style-Crete records rental income from the Debtor, the Debtor does not make actual cash rental payments to Style-Crete, but instead pays FNB Layton directly for the obligations owed under the FNB Layton Real Property Loans. Style-Crete has a loan payable to the Debtor that is equivalent to the loan amounts incurred by the Debtor to purchase the FNB Layton Real Property. Outside of intercompany debts, property taxes, utilities, and related types of obligations (all of which are paid for by the Debtor) Style-Crete has no liabilities or other obligations.

### 4.3.4   Claims Against Other Persons

### 4.3.4.1   Chapter 5 Claims (Preferences, Voidable Transfers, Etc.)

The Debtor may have claims that arise under chapter 5 of the Bankruptcy Code including, without limitation, claims against certain creditors and claims against certain insiders of the Debtor.  Such claims could include, without limitation, claims to recover preferential transfers (under sections 544 and 547 of the Bankruptcy Code and the Utah Uniform Voidable Transactions Act), claims to recover fraudulent/voidable transfers (under sections 544 and 548 of the Bankruptcy Code and the Utah Uniform Voidable Transactions Act), claims for turnover (under sections 542 and 543 of the Bankruptcy Code), claims to recover unauthorized post-petition transfers (under section 549 of the Bankruptcy Code), claims to hold initial and subsequent transferees monetarily liable for avoided transfers (under section 550 of the Bankruptcy Code), and claims to recover pre-petition setoffs (pursuant to section 553 of the Bankruptcy Code).  A further discussion of so called "Chapter 5 Claims" appears below, under Article 6.

Except for "preference" claims waived under Section 5.2.1 of the Plan, the Plan Administrator will be the person solely responsible and authorized to investigate, and if he so determines, prosecute, settle, or otherwise resolve the aforementioned claims.  It is possible that creditors voting for the plan may be sued (although section 5.2.1 of the Plan generally provides that a creditor who "accepts" the Plan will not be sued on a Preference Claim). In addition to the persons specifically identified in the foregoing paragraphs, the Debtor and the Plan Administrator reserves their right to investigate and prosecute any other claims or causes of action against any persons, including claims and persons that are not specifically referenced herein.

### 4.3.4.2    Other Claims

Except for the preference claims waived under Section 5.2.1 of the Plan (or claims waived in stipulations with secured creditors) is possible that creditors voting for the plan may be sued.  The Debtor and the Plan Administrator reserve their rights to investigate and prosecute any claims or causes of action, including against persons that were omitted from the foregoing list and/or on account of claims that come to its attention hereafter. Without limitation, the Debtor and the Plan Administrator specifically reserve their rights and Claims related to subordination under § 510 of the Bankruptcy Code and surcharge under § 506(c) of the Bankruptcy Code, except to the extent that they have specifically waived or released such claims pursuant to a stipulation with any particular secured creditor.

### 4.4    Significant Events During the Bankruptcy Case

#### 4.4.1    Debtor's Retention of Professionals

On January 16, 2018, the Debtor filed an application to employ Matthew M. Boley and the law firm Cohne Kinghorn, P.C. as its general bankruptcy counsel [Docket No. 15].  This application was approved by Order entered on February 5, 2018 [Docket No. 112].

On January 16, 2018, the Debtor filed an application to employ Rocky Mountain Advisory, LLC as accountants and financial advisors [Docket No. 16].  This application was approved by Order entered on February 5, 2018 [Docket No. 113].

On January 16, 2018, the Debtor filed an application to employ Ritchie Bros. Auctioneers (America) Inc. as auctioneer for the Debtor [Docket No. 12]. This application was approved by Order entered on February 6, 2018 [Docket No. 121].

On February 12, 2018, the Debtor filed an application to employ Paul P. Burghardt and the law firm GC Associates Law ("GCA") as special counsel for the Debtor [Docket No. 157]. The Debtor filed this application to continue to employ GCA in litigation pending in the United States District Court for the District of Utah, Case No. 2:17-CV-01051-EJF, *Mountain Crane Service, LLC v. Erix Crane & Rigging, Inc., et al.* This application was approved by Order entered on March 6, 2018 [Docket No. 210]. Mr. Burghardt has since been removed as special counsel, and the law firm Cohne Kinghorn, P.C. has (or shall) replace him and GCA in all pending litigation in which he represents or represented the Debtor.

On February 13, 2018, the Debtor filed an application to employ the Law Offices of Brian C. Webber, PLLC ("BCW") as special litigation counsel for the Debtor [Docket No. 161]. The Debtor filed this application to continue to employ BCW as its attorney charged with collecting the Debtor's outstanding accounts receivable. This application was approved by Order entered on March 26, 2018 [Docket No. 237].

On March 23, 2018, the Debtor filed an application to employ Richards Brandt Miller Nelson, PC ("RBMN") as special litigation counsel for the Debtor [Docket No. 236]. The Debtor filed this application to continue to employ RBMN as its attorney in (i) in certain litigation commenced prepetition, and styled as Mountain Crane Service, LLC v. Hedquist Construction, et al., filed in the Seventh Judicial District Court for Natrona County, State of Wyoming, Case No. 103523; (ii) in certain litigation pending in front of the Utah Labor Commission's Occupational Safety and Health Division; and (iii) to the extent necessary, in certain prepetition litigation in a "strict liability" case against the Debtor, for which the Debtor's insurance carrier has agreed to take full payment responsibility. This application was approved by Order entered on April 5, 2018 [Docket No. 254].

### 4.4.2   Appointment of Unsecured Creditors' Committee and Negotiations with Committee

An Unsecured Creditors' Committee (the "Committee") was appointed on or about January 25, 2018, and originally consisted of three creditors—Trinity Logistics, Inc., Coast 2 Coast Logistics, and Western Heavy Haul, Inc. [Docket No. 35]. On or about February 4, 2018, the Committee was reconstituted to include four additional creditors—Reynolds Rigging & Crane Service, Inc., Bigge Equipment Co., Levitt Cranes, USA, and Construction Truck & Trailer, Inc. [Docket No. 159].

On January 30, 2018, the Committee filed an application to employ Archer & Greiner, P.C. as counsel for the Committee [Docket No. 61], and on January 31, 2018, the Committee filed applications to employ S3 Advisory, LLC as financial advisors [Docket No. 78] and Holland & LLP as local counsel [Docket No. 80] for the Committee. On February 22, 2018, the Bankruptcy Court entered Orders approving the employment of Archer & Greiner, S3 Advisory ("S3"), and Holland & Hart [Docket Nos. 184, 185, and 186, respectively]. On April 25, 2018, the Court entered its order approving the employment of Berkeley Research Group, LLC ("Berkeley") as financial advisor for the Committee, after the primary advisor for S3 (D. Ray Strong), changed his employment from S3 to Berkeley.

The Committee has been a significant and important player in the Case. The Committee has been involved in negotiations with nearly all of the Debtor's secured creditors, and has reviewed and approved each of the stipulations that the Debtor has reached with its secured creditors. The Committee has reviewed and thoroughly analyzed the Debtor's pre-petition finances, post-petition operating reports, and feasibility and cash-flow projections submitted in support of the Plan. The Committee has approved and endorsed the Debtor's Plan.

### 4.4.3   Cash Collateral

The Debtor filed several motions, memoranda, and notices in support thereof [Docket Nos. 5, 7, 9, 36, 180, 235, 281, 326, 358, and 380] requesting approval to use cash collateral, i.e., the Cash Collateral Motions. The Court granted the Cash Collateral Motions by entry of several orders [Docket Nos. 19, 87, 130, 195, 240, 292, 331, 364, and 415].

### 4.4.4   The Auction Motion & Lease Rejection Motion

On January 12, 2018, the Debtor filed the Auction Motion, which it subsequently amended on January 18, 2018 [Docket No. 20]. The Bankruptcy Court entered the Auction Order on February 6, 2018 [Docket No. 120], and on February 19, 2018, Ritchie Bros. conducted an auction of certain cranes owned by the Debtor. The Debtor's *Notice of Auction Results and Sale Accounting* was filed with the Bankruptcy Court on February 28, 2018 [Docket No. 198]. The Auction allowed the Debtor to sell certain cranes that it did not need in order to "right size" its fleet of cranes.

On January 26, 2018, the Debtor filed the Lease Rejection Motion [Docket No. 46]. The Bankruptcy Court entered the Lease Rejection Order on February 23, 2018 [Docket No. 191], by which it authorized the Debtor to

reject three leases of cranes with Wells Fargo Equipment Finance, Inc., and continued without date the Debtor's requests to reject additional leases with CIT Bank and Continental Bank. The Lease Rejection Order further allowed the Debtor to "right size" its fleet of cranes. Now that the Auction is completed and the Lease Rejection Order is entered, the Debtor believes that it has reached a relative "sweet spot" for its fleet, which will allow it to be profitable in the years ahead.

### 4.4.5    The Aircraft Stipulation Motion

On February 14, 2018, the Debtor filed the Aircraft Stipulation Motion [Docket No. 165]. On March 12, 2018, the Bankruptcy Court entered its *Order Granting Stipulation and Joint Motion and (A) Authorizing Rejection of Aircraft Lease, (B) Authorizing the Debtor to Abandon and Surrender the Aircraft, (C)Terminating the Automatic Stay with Respect to the Aircraft to Permit its Immediate Sale, (D) Fixing the Deadline for Aircraft Lessor to File a Proof of Claim, and (E) Granting Related Relief* (the "Aircraft Stipulation Order"). The Aircraft Stipulation Motion and the Aircraft Stipulation Order (i) provided for the Debtor to reject its lease of the Aircraft; (ii) allowed the Debtor to abandon any interest it held in the Aircraft; (iii) capped possible deficiency or rejection damages; and (iv) provided for a waiver of any administrative expense claims by Bank of Ann Arbor.

### 4.4.6    Secured Creditor Negotiations and Stipulations

Throughout the course of the Bankruptcy Case, the Debtor has engaged in substantial negotiations with secured (or ostensibly secured) creditors regarding adequate protection of their Claims and the potential treatment of those creditors' Claims in the Debtor's Plan. In the Debtor's opinion, its negotiations with creditors have been largely successful. Since the Petition Date, the Debtor has reached agreements with creditors as follows: the FNB Layton Stipulation, filed on March 30, 2018 [Docket No. 243]; the MACU Stipulation, filed on April 16, 2018 [Docket No 274]; the Chapman Stipulation, filed on April 30, 2018 [Docket No. 301]; the TCF Stipulation, filed on April 30, 2018 [Docket No. 302]; the SBA Stipulation, filed on May 9, 2018 [Docket No. 307]; the Cheuck Yick Stipulation, filed on May 9, 2018 [Docket No. 308]; the Wells Fargo Stipulation, filed on May 15, 2018 [Docket No. 316]; the CIT Bank Stipulation, filed on May 15, 2018 [Docket No. 317]; the De Lage Landen Stipulation, filed on May 16, 2018 [Docket No. 321]; the Trans Lease Stipulation, filed on May 24, 2018 [Docket No. 333]; the Direct Capital Stipulation, filed on May 25, 2018 [Docket No. 334]; the CCG Stipulation, filed on June 7, 2018 [Docket No. 346]; the Continental Bank Stipulation, filed on June 19, 2018 [Docket No. 352]; the Equify Stipulation, filed on June 19, 2018 [Docket No. 353]; the People's Capital Stipulation, filed on June 19, 2018 [Docket No. 354]; the Signature Financial Stipulation, filed on June 19, 2018 [Docket No. 355]; the BBVA Stipulation, filed on June 22, 2018 [Docket No. 356]; the SG Equipment Finance Stipulation, filed on June 27, 2018 [Docket No. 360]; the Everbank Stipulation, filed on July 18, 2018 [Docket No. 377]; and the Siemens Stipulation, filed on August 10, 2018 [Docket No. 437]. Except for the Everbank Stipulation and the Siemens Stipulation, the Court has entered orders approving the terms of each of the stipulations [*see* Docket Nos. 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 418, 421, and 423]. The Siemens Stipulation and Everbank Stipulation are pending approval by the Court.

Under each of the stipulations, the Debtor, the Committee, and the respective secured creditor reached agreements regarding adequate protection treatment of the creditor and the prospective treatment of the creditor's Claim(s) under the Debtor's Plan. The Debtor anticipates filing more, similar stipulations between the date of this Disclosure Statement and the Effective Date, although (as evidenced by the list above) the vast majority of secured creditors have already reached stipulations with the Debtor and the Committee. These stipulations represent the product of substantial negotiations between and among the Debtor, the Committee, and the respective creditors. By reaching the stipulations, the Debtor (and the Committee) have avoided or resolved many potential objections to the Plan or other potential fights with the secured creditors.

### 4.4.7    Stay Violation by International Bank of Commerce

On or about July 17, 2018, International Bank of Commerce Brownsville ("IBC") repossessed an LTM 11200 – 1200 Ton Liebherr All-Terrain Crane (the "GSS Crane") which the Debtor was leasing on a short-term rental basis from Gulf Special Services, Inc. ("GSS").  IBC's repossession of the GSS Crane interfered with the Debtor's ability to complete performance under the Debtor's contract with Moventas Inc. ("Moventas"), relating to a wind maintenance contract between Moventas and the owner/operator of a wind farm located near Raymondville, Texas (the "Wind Farm"). The Debtor successfully negotiated an agreement (the "IBC Agreement")with IBC, pursuant to which IBC returned the GSS Crane to the Wind Farm and permitted the Debtor to complete its contract for Moventas.

The Debtor is in the process of seeking Court approval of the IBC Agreement. The Debtor is also engaged in negotiations with GSS to address the costs, expenses, and delays arising from the Seizure, so that the Debtor may recoup its additional losses and expenses from GSS.

### 4.4.8    Anticipated Settlement with J&S Equipment Leasing, LLC

J & S Equipment Leasing, LLC ("J&S"), formerly owned five (5) cranes (the "J&S Cranes"), which J&S leased to the Debtor on commercially reasonable terms.  In or about December 2013, J&S sold the J&S Cranes to the Debtor (the "J&S Sale").  The financial terms of the J&S Sale were memorialized in the form of offsetting financial obligations between the Debtor and J&S, to wit: (i) the Debtor incurred the obligation to pay J&S ten (10) annual installments of $277,000.00 each (collectively, the "Note Payable to J&S"), due on December 1st of each year beginning in 2014 and ending in 2023; and (ii) J&S incurred the obligation to pay the Debtor ten (10) annual installments of $231,169.15 each (collectively, the "Note Receivable from J&S") due within ten business days after J&S received payment from the Debtor of the annual installment paid on account of the Note Payable to J&S. As of the Petition Date, the Debtor was obligated to make seven (7) remaining annual payments of $277,000.00 each to J&S [including a past due payment due on December 1, 2017]. Thus, J&S then held (and now holds) an allowed claim against the Debtor in the amount of $1,702,683.56 (the "J&S Allowed Claim"), as listed on Amended Schedule F of record in the Bankruptcy Case [See Docket No. 382, p. 26 of 52, ln. 3.108; see also Docket No. 84, p. 91 of 157, ln. 3.106]. As of the Petition Date, J&S was obligated to make seven (7) remaining annual payments of $231,169.15 each to the Debtor under the Note Receivable from J&S [including a payment anticipated to be paid in December 2017].  Thus, the Debtor held a claim against J&S in the aggregate amount of $1,618,183.81 (the "J&S Receivable"), as listed on Schedule B of record in the Bankruptcy Case [See Docket No. 84, p. 32 of 157, Q. 71].

In determining the appropriate and feasible amount of the "Distribution Fund" under the Plan, the Debtor's financial projections *previously* anticipated that the Debtor would receive timely and full payments from J&S due on account of the J&S Receivable, and included such future payments as part of its anticipated future revenues.  The Debtor is informed and currently believes, however, that as of the Petition Date the Note Payable to J&S was the sole asset of J&S, and J&S then had (and now has) no cash or other assets from which it will be able make payments to the Debtor under the Note Receivable from J&S except if and when the Debtor makes payments under the Note Payable to J&S (or makes distributions to J&S on account of the J&S Allowed Claim).  As a consequence, the Debtor anticipates that J&S will default in its payment obligations to the Debtor, and the Debtor will not receive or realize such cash payments as part of its future gross revenues.

Accordingly, the Debtor is in the process of negotiating a settlement with J&S (the "J&S Agreement"), whereby the J&S Allowed Claim will be treated as a Subordinated Claim, and the Debtor shall agree to defer any collections on the Note Receivable from J&S during the Plan Period. The J&S Agreement remains subject to negotiation and documentation and, thereafter, to Court approval. The Distribution Fund Amount has been fixed at $8 million (versus different amounts contemplated under prior versions of the Plan) based upon adjustments

necessarily made to the Debtor's financial projections, and reductions in anticipated gross revenues. The J&S Agreement is anticipated to adjust for this change, because the anticipated effect of the J&S Agreement is to increase distributions to the holders of other Allowed Class 2 Claims. The changes to the amount of the Distribution Fund Amount combined with the effect of the anticipated J&S Agreement is anticipated to result in approximately 2%-3% higher distributions to General Unsecured Creditors than under the prior version of the Plan, with J&S sharing in distributions from the Distribution Fund.

The negotiations with J&S have progressed almost to the point of execution of an agreement. To the extent, for some reason, the negotiations fail to culminate in an agreement, then it is highly likely that Debtor and/or Plan Trustee will be forced to object to or otherwise challenge the J&S claim.

## ARTICLE 5
## LIQUIDATION AND FINANCIAL ANALYSIS

### 5.1     Best Interest of Creditors and Comparison with Chapter 7 Liquidation

The "best interest test" is set forth in Section 1129(a)(7) of the Bankruptcy Code, and requires that creditors receive at least as much under a proposed plan as they would if the Debtor's case was converted to one under chapter 7 of the Bankruptcy Code. If the Debtor's chapter 11 case is converted to a case under chapter 7 of the Bankruptcy Code, the Debtor would be required to cease all operations, and a chapter 7 trustee would be appointed to liquidate the estate's assets. The Debtor's primary assets would likely be its remaining accounts receivable, miscellaneous equipment and cranes, and Avoidance Actions. Most of the Debtor's most valuable pieces of equipment are encumbered with liens and/or claimed security interests. Additionally, CCG has asserted an "all assets" lien that encumbers much of the Debtor's otherwise unencumbered property, such as cash and accounts receivable.

The Debtor believes that the liquidation value of many of its assets may be insufficient to pay in full the Allowed Claims of is secured creditors. In short, even though some of its assets may have equity, the Debtor does not believe that a liquidation of its assets would result in the best return to unsecured creditors. Further, if this case is converted to chapter 7, the secured creditors might be entitled to obtain relief from the automatic stay, and could foreclose and otherwise realize upon their collateral. The Debtor believes that such a foreclosure by its secured creditors will strip the Debtor and its Estate of many of its most valuable assets. Additionally, a conversion to chapter 7 would result in the appointment of a chapter 7 trustee, who would likely appoint her or his own professionals, resulting in substantially increased administrative expenses for the estate.

In contrast, the Plan requires the Debtor to set aside, segregate and distribute funds in the aggregate amount of $8,000,000 – *i.e.*, the Distribution Fund – to be paid to the holders of Administrative Claims, Unclassified Priority Claims, Class 1 Priority Claims and Class 2 General Unsecured Claims. In other words, the Plan allows the Debtor to retain its most valuable asset—its ongoing business operations—for the benefit of its creditors, its employees, and other important stakeholders. A summary comparison of liquidation in chapter 7 with the distributions proposed under the Plan is as follows[1]:

---

[1]     A more detailed Liquidation Analysis is attached to this Disclosure Statement as **Exhibit 4**.

|                                                                              | Under the Plan | Liquidation in Chapter 7 |
| ---------------------------------------------------------------------------- | -------------: | -----------------------: |
| Gross Proceeds from Liquidation of Assets                                    |             $0 |        $39.9M - $49.6M   |
| Cash from Business Operations                                                |     $8,000,000 |                       $0 |
| Estimated Administrative Expenses (Including quarterly fees payable to the US Trustee) |   ($2,189,753) |        $1.25M - $2M      |
| Estimated Priority Unsecured Claims                                          |      ($193,055) |               ($193,055) |
| Estimated Amount Available to Pay Unsecured Creditors                        |      $5,617,192 |          $4.7M - $5.0M   |
| Estimated General Unsecured Claims                                           |      $7,660,000 |        $15.2M - $34.5M   |
| Estimated Return to Unsecured Creditors                                      |          73.3% |        13.7% - 32.9%     |

If the case converted to chapter 7, then the Claims against the Debtor's Estate would likely increase, or at least, the Estate's obligation to pay such Claims could be triggered. Specifically, the proof of claim filed by the Pension Plan Trust Fund for Operating Engineers (Claim No. 111), which is in the amount of $7,311,071.00, could change from a "contingent" claim against the Estate to a non-contingent claim against the Estate. Similarly, the Debtor anticipates that its Equity Interest holders will voluntarily subordinate their general unsecured claims against the Estate and intercompany claims from Consolidated Subsidiary Entities will be eliminated—results that would not occur in a chapter 7 liquidation. Finally, the Debtor anticipates that there would be substantial claims (many of which would be administrative expense claims) from ongoing work by the Debtor, which would be triggered in the event of a "shutdown" of the Debtor's business operations. As a result, in a chapter 7 liquidation, claims would increase, assets would decrease, and ongoing revenues would cease to exist. It is highly probable that creditor recoveries would be substantially less than they will be under the Plan.  At a minimum, the Debtor believes that the Plan will provide value to creditors not less than the amount such holders would receive or retain if the Debtor is liquidated under chapter 7.

### 5.2      Salaries Payable to Insiders

Paul Belcher is the 91.75% owner and manager of the Debtor. Under the Plan, Paul Belcher will retain his position with the Debtor and his Equity Interest (which will be increased to 100%), subject to certain conditions precedent and conditions subsequent set forth in the Plan, which are also described in section 3.2.3 of this Disclosure Statement. Paul Belcher is the engine that makes the Debtor go. He has been the Debtor's primary executive since the Debtor's existence, and successfully saw the Debtor through the Great Recession. He is a key salesperson for the Debtor, and the value of his relationships in the crane and construction industries cannot be overstated. Put succinctly, without Paul Belcher, the Debtor's efforts to reorganize would almost certainly fail.

Additionally, as explained in greater detail in section 5.9 of this Disclosure Statement, Paul Belcher has agreed to contribute his personal NOLs, valued at approximately $15 million, to ensure the success of the Reorganized Debtor. The Reorganized Debtor would (almost certainly) not be able to make its projected plan payments without the NOLs being contributed by Paul Belcher.

Under the Plan, the Debtor will pay Paul Belcher an annual salary of $240,000. Mr. Belcher has agreed, as consideration for retaining his Equity Interest, that he will not receive any raises from the Reorganized Debtor for a period of five (5) years after the Effective Date; that he will not be entitled to any distributions on account of his retained Equity Interest, except for distributions to offset his tax liabilities (which shall only occur after he uses up his NOLs); and that he will remain employed with the Debtor and not compete with the Debtor for the duration of the Plan.

**5.3      Feasibility of the Plan**

Attached hereto as **Exhibit 2** is a forecast or projection of the Debtor's anticipated cash flow, income statement, and balance sheet during the Plan Period.  Attached hereto as **Exhibit 3** is a summary of the Debtor's historical consolidated income statements from the years 2013-2017.

As reflected on Exhibit 2, the Debtor's budgets and forecasts anticipate net revenues from business operations sufficient to meet the Debtor's payment obligations under the Plan.  In short, the Debtor's forecasts demonstrate that the Plan is feasible.

Nevertheless, it should be noted that the Debtor's projections are based upon estimates and assumptions that, although developed and considered reasonable by the Debtor and its advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the Debtor's control.  Accordingly, there can be no assurance that the projected performance reflected in the projections will be realized.

The projections were prepared by RMA, with input and comments from the Debtor, the Debtor's other professionals, and the Committee and its professionals.  RMA is an experienced accounting firm, with special expertise in business valuation, corporate restructuring, and reorganization. While the Debtor is confident that its projections are reasonable and supportable, any projection of future events is subject to inherent uncertainty and risk.  Detailed information concerning the Debtor's post-petition financial performance and current financial status is reflected in monthly financial reports the Debtor has filed with the Bankruptcy Court.

It must be recognized that the Plan, and the projections provided with this Plan, are not immune to market conditions and industry changes.  It is possible that the projected market conditions will not improve, or will even decline over the next ten years. The Plan does not constitute a risk-free restructuring of debt.

**5.4      Funds Sufficient for Payments Required Under the Plan**

The Debtor's historic performance, including its generation of revenues and payment of adequate protection to Secured Creditors since the Petition Date, demonstrates that it is able to meet the payment obligations due and to come due under the Plan.

The Debtor may require funds necessary for payment of Administrative Expense Claims on the Effective Date of the Plan, and will require funds for payment of the Class 34 Convenience Class Claims within 60 days after the Effective Date of the Plan.  The Debtor believes it will be able to fund these payments from its operations and/or cash on hand, although there is a risk that the Debtor's operations will not generate sufficient revenue to pay Administrative Expense Claims or Class 34 Claims in full as of the Effective Date.  This is particularly true given that a Creditors' Committee was formed, and has hired both counsel and accounting professionals, which have sought reimbursement for fees and expenses from the Debtor's estate. According to fee applications filed by the Committee's professionals in the Case, the Committee's professionals have incurred approximately $364,004 in professionals' fees and expenses through July 31, 2018. Pursuant to their fee applications, the Committee's professionals are seeking Court approval for the payment of their fees and expenses from the Debtor's estate. The Debtor has incurred and continues to incur professional fees and expenses, which are anticipated to be payable from the Debtor's cash and/or current and future income. The Debtor anticipates that it will be able to pay its professional fees and the Committee's professional fees in accordance with the terms of any Court order authorizing the same.

**5.5    Risks Inherent in the Plan**

The confirmation of the Plan carries inherent risks based on the Reorganized Debtor's ability to effectuate the terms of the Plan. As with any business venture, the Reorganized Debtor's future performance is subject to economic, financial, legal, political, catastrophic and other conditions and contingencies beyond the Debtor's control or anticipation. Among other things, the Debtor's profitability is affected by the economy, changes in the construction and/or energy industries, and governmental factors, such as incentives for alternative energy. Additionally, the Debtor is subject to competition from other crane companies nationwide.

Notwithstanding the foregoing, which the Debtor views as ordinary business risks for its industry, the Debtor is confident that it can sustain profitable business operations after confirmation of the Plan. The causes of the Debtor's bankruptcy filing, which are described above, have been resolved through (a) the "right sizing" of its fleet of cranes, (b) the Debtor's rejection of the Aircraft Lease, and (c) the restructuring of debts and monthly payment obligations provided for under the Plan. Accordingly, the Debtor does not believe that the Reorganized Debtor will present any increased business risk to creditors under the Plan.

**5.6    Alternative Plans of Reorganization**

If the Plan is not confirmed, another party in interest in the case could attempt to formulate and propose a different plan or plans. Such plans might, theoretically, involve a reorganization and continuation of the Debtor's and Subsidiary Entities' businesses, an orderly liquidation of their assets or a combination thereof. To date, the Debtor has not received any concrete suggestions for alternate plans. The Debtor believes that a liquidation of its property, given current market conditions, would yield far less for Creditors than the restructuring that the Debtor has proposed through the Plan.

**5.7    Risk Factors**

Both failure to achieve confirmation of the Plan, and consummation of the Plan, are subject to a number of risks. These risks include the following: (i) business and industry factors that may adversely affect the Debtor's revenues; (ii) the business could experience losses outside the scope of insurance coverage which affect profitability and/or requires a substantial capital expenditure; (iii) it is possible that Professional Fees could exceed the Debtor's predictions; and (iv) creditors might vote to reject the Plan rather than voting to accept it.

In addition, there are certain risks inherent in the chapter 11 process. If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if creditors accept the Plan. Although the Debtor believes that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court determines that such requirements are not met, it could require the Debtor to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan. The Debtor believes that the solicitation of votes on the Plan will comply with section 1126(b) of the Bankruptcy Code, that the Plan complies with all requirements for confirmation under section 1129 of the Bankruptcy Code, and that the Bankruptcy Court will confirm the Plan. The Debtor, however, can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

### 5.8    Taxation

#### 5.8.1    Introduction

The following discussion summarizes certain of the important federal income tax consequences of the transactions described herein and in the Plan.  This discussion is for informational purposes only and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice.  Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, life insurance companies and tax-exempt organizations.  Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties.  No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on these or any other tax issues.  There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or other matter addressed.

#### 5.8.2    Tax Consequences to the Debtor

*Cancellation of Indebtedness.*  The Debtor may realize cancellation of debt ("COD") income to the extent that the Debtor pays a creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtor that is worth less than the amount of such Claim.  For this purpose, the amount of consideration paid to a creditor generally will equal the amount of cash or the fair market value of property paid to such creditor.

*Gain or Loss on Sale.*  Generally, a taxpayer recognizes a gain or loss upon the sale of assets.  In the instant Case, the Debtor already has sold certain of its assets and may (but is not required to) liquidate other assets in the course of its business.  Depending upon whether the sale price is or was greater than or less than the Debtor's tax "basis" in the assets sold, the Debtor may realize a gain or loss for tax purposes.  Such gain or loss generally will be a capital gain or loss and, depending upon how long the Debtor owned the property that was sold, any gain may be treated as a long-term capital gain versus a short-term capital gain.  Finally, a sale of assets may trigger a recapture of depreciation or amortization as regular income.

The Debtor has elected tax treatment as a "limited liability company," meaning that its tax attributes pass through to its members.  As a result, any tax consequences to the Debtor may positively or adversely affect the holders of Equity Interests.

#### 5.8.3    Tax Consequences to Creditors

*In General.*  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax

purposes; (b) whether the claimant receives consideration in more than one tax year; (c) whether the claimant is a resident of the United States; (d) whether all the consideration by the claimant is deemed by be received by that claimant as part of an integrated transaction; (e) whether the claimant reports income using the accrual or cash method of accounting; and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

*Gain or Loss on Exchange.* Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 5.8.4    Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate that may be specified by current tax laws or regulations, with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 5.8.5    Importance of Obtaining Assistance from a Tax Professional

**THE TAX INFORMATION PROVIDED IN THIS DISCLOSURES STATEMENT IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

### 5.9    Absolute Priority Rule; New Value Exception

In simplest terms, under the "absolute priority rule" holders of equity interests may not retain their interests unless either (a) the holders of unsecured claims, as a class, accept the Plan, or (b) unsecured creditors are paid in full.  This rule is codified in section 1129(b)(2) of the Bankruptcy Code, which provides that a plan is fair and equitable with respect to a class of interests if the plan provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."

The Plan proposes that Paul Belcher will retain his Equity Interest in the Reorganized Debtor subject to certain conditions precedent and conditions subsequent, and that all other Equity Interests in the Reorganized Debtor shall be cancelled. If the Holders of Unsecured Claims reject the Plan, then the Court must determine whether the Plan complies with the absolute priority rule, which generally requires that they contribute "new value" under the Plan. "New value" requires a junior interest holder to contribute "(1) new, (2) substantial (3) money or money's worth (4) necessary for a successful reorganization (5) reasonably equivalent to the value or interest received" in order to retain its interest. *In re Brown*, 498 B.R. 486, 497 (E.D. Pa. 2013).

The Debtor intends to obtain the consensual confirmation of the Plan, and for that reason, hopes that any discussion of the "absolute priority rule" and the "new value" exception is academic only. Notwithstanding the Debtor's intent, the Debtor believes that the Plan complies with the absolute priority rule, under the new value exception, for at least one significant reason—Paul Belcher's agreement to use his NOLs. Based on the Debtor's analysis, and in consultation with its tax advisor, the Debtor estimates that Paul Belcher currently has a personal net operating loss ("NOL") carryforward of more than $15 million ($11.0 million as of 12/31/2016 and an estimated $4.7 million for 2017). This NOL is from prior years of the Debtor's operating losses.  As the Debtor is a limited liability company, taxed as a partnership, the tax losses passed through to primarily Paul Belcher (and to the other members of the Debtor to a lesser degree).  However, the NOLs are Paul Belcher's personal NOLs rather than the Debtor's.

The Plan proposes to make cash distributions to members to offset their tax liabilities, as is common with any limited liability company. Paul Belcher has agreed to use his NOLs until they are extinguished, rather than receiving cash distributions (initially), so that the Debtor can use that cash elsewhere. Paul Belcher is under no obligation to do this. He could just as easily leave the Debtor, start a new company, and use his NOLs to offset income from his new enterprise. Instead, Paul Belcher wants to make the Plan work for the benefit of the Debtor's creditors.

The Debtor submits that Paul Belcher's agreement to use his NOLs as described provides new and substantial value to the Debtor that is necessary for a successful reorganization of the Debtor. The Debtor, based on discussions with its tax advisors, estimates the value of the approximately $15 million of Paul Belcher's NOLs to the Debtor to be approximately $6 million (based on a tax rate of approximately 40%). In other words, by using his personal NOLs as described, Paul Belcher is providing the means for the Debtor to fund the vast majority of its proposed Distribution Fund.

Accordingly, the NOLs should eliminate or substantially reduce any protective tax distributions required to be made to Paul Belcher to pay his tax liability associated with the Debtor's projected future income set forth in the Plan projections (including cancellation of debt income), at least for the first five or six years of the Plan Period. Should Paul Belcher be replaced or no longer be the majority owner of the Debtor, the Debtor would be faced with significant obligations to make protective tax distributions to a new owner that would likely not be offset by net operating losses.  The Debtor projects the NOL's to offset pass-through income through approximately the year 2023, including cancellation of debt income in 2018. In short, the Debtor believes that through the agreement of Paul Belcher to use his personal NOLs to avoid the need for distributions to cover taxes, the Debtor's Equity Interest holders satisfy the absolute priority rule through the new value exception to the absolute priority rule.

The Debtor reserves its right to amend the Plan to comply with the absolute priority rule if the Debtor is unable to obtain consensual confirmation of the Plan or if the Court determines that the Debtor's plan does not satisfy the absolute priority rule.

# ARTICLE 6
## CAUSES OF ACTION

The Plan reserves the Debtor's right to investigate and prosecute any claims or causes of action. Specifically, many of the claims or causes of action reserved will be investigated and prosecuted by the Plan Administrator.  It is possible that creditors voting for the plan may be sued.

A summary discussion of potential claims and causes of action appears under section 4.3.4 of this Disclosure Statement, above.  The summary contained in section 4.3.4 may reference potential claims and potential defendants that are not repeated in this Article 6 and/or in its subsections.

### 6.1    Preferences

Under the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

There are certain defenses to such recoveries.  Transfers made in the ordinary course of the debtor's and transferee's business and according to the ordinary business may not be recoverable.  Additionally, if the transferee extended credit or provided other "new value" subsequent to the transfer, such new value may constitute a defense to recovery.  If a transfer is recovered by the debtor, the transferee may have the right to assert an unsecured claim against the debtor to the extent of the recovery.

Under Section 5.2.1 of the Plan, neither the Plan Administrator nor the Reorganized Debtor shall bring or prosecute Preference Claims against any creditor that accepts the Plan (either by affirmatively voting to accept the Plan or by not returning a ballot rejecting the Plan) and that does not object to confirmation of the Plan; provided, however, that the Plan Administrator shall have the right to bring and prosecute any Preference Claim that is specifically identified in the Plan or this Disclosure Statement as a Preserved Claim. Notwithstanding Section 5.2.1 of the Plan, the Plan Administrator shall have the right to assert and prosecute (a) any Preference Action against a creditor that votes to reject or objects to confirmation of the Plan, or (b) which is specifically identified in the Plan or this Disclosure Statement as a Preserved Claim.

Unless otherwise expressly released under the Plan (including pursuant to Section 5.2.1), the Debtor reserves the right under the Plan to pursue preferential transfer claims for the benefit of creditors against any person, including against creditors who vote for the plan. Under the Plan, the Plan Administrator will have the sole and absolute authority and discretion to pursue preferential transfer claims, provided, however, that the Plan Administrator must consult with the Reorganized Debtor prior to bringing preferential transfer claims against non-insiders of the Debtor. The reason for the "consultation" requirement is relatively simple—the Reorganized Debtor needs to engage in ongoing business with many of its creditors, and the potential damage to a business relationship that a preference action would cause might not be worth the potential recovery for the estate that a preference action could result in. In other words, productive business relationships are not generally fostered by lawsuits, and the proposed Plan Administrator recognizes that fact.

### 6.2    Voidable and Fraudulent Transfers

Under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the debtor insolvent.

The Debtor may have Claims of this nature against Paul Belcher and other members or insiders of the Debtor. The Debtor also may have "voidable transfer" or "fraudulent transfer" claims against persons identified on Schedule B and/or the Debtor's statement of financial affairs.

Unless expressly released under the Plan, the Debtor reserves the right under the Plan to pursue voidable/fraudulent transfer claims for the benefit of creditors, including against creditors who vote for the plan, as against Paul Belcher, and as against any person identified in the Debtor's schedules and/or statement of financial affairs, and as against all other persons.

**6.3      Causes of Action Generally**

The actions referred to above are not exhaustive. The Debtor reserves its right, to be exercised by the Plan Administrator, to identify and bring lawsuits based on additional preferences, voidable transfers, post-petition transfers, other Avoidance Actions, and any other actions arising under state statute, federal statute, the common law or in equity. The Debtor has not conducted an extensive analysis of potential recoveries under Chapter 5 of the Bankruptcy Code. Any and all avoidance actions and rights pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Plan Administrator, except as expressly waived under the Plan (including any waiver set forth in any stipulation that is incorporated under the Plan).

Under the Plan, and subject to certain exceptions, the Debtor's rights to object to all Claims and Interests asserted against the Estate. The aforementioned "exceptions" are the Claims and Interests asserted against the Estate for which the Debtor and those Claim or Interest holders have reached Stipulations that are filed—or pending filing—with the Court. All of the Debtor's or Estate's Causes of Action, including without limitation any and all Claims and Causes of Action that the Debtor holds pre-confirmation, including, but not limited to, Claims for unpaid accounts receivable and voidable transfers, shall vest in the Estate.

The Plan provides that, unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Estate expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court. The Plan expressly retains rights and Claims related to subordination under § 510 of the Bankruptcy Code and surcharge under § 506(c) of the Bankruptcy Code.

**ARTICLE 7**
**VOTING PROCEDURES AND REQUIREMENTS**

**7.1      Ballots and Voting Deadline**

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement. A creditor who is voting must (1) carefully review the ballot and instructions thereon, (2) complete and execute the ballot indicating the creditor's vote to either accept or reject the Plan, and (3) return the executed ballot to the address below.

Pursuant an Order of the Bankruptcy Court, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by counsel for the Debtor by **4:00 p.m. Salt Lake City time, September 24, 2018**, at the following address:

> Mountain Crane Service, LLC
> c/o Ballot Tabulation
> Cohne Kinghorn, P.C.
> 111 East Broadway, 11th Floor
> Salt Lake City, Utah 84111

### 7.2    Creditors Entitled to Vote

Each holder of an Allowed Claim in an impaired Class under the Plan is entitled to vote separately to accept or reject the Plan. The holders of Claims or Interests whose claims or interests are not "Allowed" are not entitled to vote either to accept or reject the plan. Likewise, holders of Claims that are not "impaired" under the Plan are not entitled to vote, but are deemed to have accepted the Plan.

### 7.3    Nonconsensual Confirmation

If any impaired Class entitled to vote does not accept the Plan, or if any impaired Class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of a Confirmation Order.

### 7.4    Voting Procedures

All voting procedures are summarized and/or described either (a) on the form of Ballot provided to you, and/or (b) in the *Notice of Plan Confirmation Hearing, Deadline to Return Ballots and Deadline to File and Serve Objections to Confirmation* served herewith.

### 7.5    Acceptance of the Plan by a Voting Class

A class that is not impaired under the Plan is "conclusively presumed to have accepted the plan" and is not entitled to vote to reject the Plan.

As to an impaired class of creditors, however, section 1126(c) of the Bankruptcy Code provides: "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated [by the Bankruptcy Court as accepting or rejecting the plan 'not in good faith'], that hold at least two-thirds in [dollar] amount and more than one-half in number of the allowed claims of such class held by creditors … that have accepted or rejected the plan." Further, only claims actually voted count in determining whether the requisite majorities in number and amount are satisfied.

As to an impaired class of interests, section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan when two-thirds in amount of the allowed interests (excluding those designated by the Bankruptcy Court as either accepting or rejecting "not in good faith") that have voted to accept or reject the plan.

Finally, under controlling case law, the Court may presume acceptance of the Plan by any impaired class that does not return a ballot voting either to accept or reject the Plan. See In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1267-68 (10th Cir. 1988) (presuming acceptance of chapter 11 plan by non-voting, non-objecting creditor); In re John

Kuhni Sons, Inc., 10-29038 RKM, 2011 WL 1343206 at *4 (Bankr. D. Utah Mar. 30, 2011) ("As to the classes wherein no creditors voted …, the creditors silence is deemed acceptance of the Plan").

## ARTICLE 8
## CONCLUSION

In sum, the Debtor proposes that $8,000,000 will be funded from the Reorganized Debtor's current and future business operations to be distributed to the holders of Allowed Claims. The Debtor believes, and its financial projections support, the feasibility of the Plan.

Unlike a liquidation in a chapter 7 bankruptcy proceeding, the Plan provides for a substantial distribution to creditors and a realistic possibility of distributions to the holders of priority and general unsecured claims. The Plan is therefore a feasible and desirable way of benefiting all creditors.

**THE DEBTOR STRONGLY URGES ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN.**

DATED this 20th day of August, 2018.

**MOUNTAIN CRANE SERVICE, LLC**

By _____
   Paul Belcher
   Its Member/Manager

**COHNE KINGHORN, P.C.**

/s/ Matthew M. Boley
Matthew M. Boley
Adam Reiser
Jeffrey Trousdale
*Attorneys for* debtor-in-possession
MOUNTAIN CRANE SERVICE, LLC

100398562 DOCX /1

# EXHIBIT 1

Matthew M. Boley (8536)
Adam Reiser (13339)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:  (801) 363-4300
Facsimile:   (801) 363-4378
E-mail:  mboley@cohnekinghorn.com

*Attorneys for* debtor-in-possession
MOUNTAIN CRANE SERVICE, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| In re:<br><br>**MOUNTAIN CRANE SERVICE, LLC**<br><br>Debtor. | Bankruptcy No. 18-20225<br><br>Chapter 11<br><br>Honorable Joel T. Marker |

## DEBTOR'S PLAN OF REORGANIZATION

Dated:  August 13, 2018

MOUNTAIN CRANE SERVICE, LLC, debtor and debtor-in-possession (the "Debtor") in the above-referenced chapter 11 bankruptcy case (the "Case"), hereby proposes the following plan of reorganization (the "Plan") under sections 1121, 1123 and 1129 of title 11 of the United States Code.

## ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

## SECTION A.  DEFINED TERMS

For purposes of this Plan, the following terms shall have the meanings specified in this Article I.  A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.

**1.1**    "Administrative Expense Claim" shall mean a Claim that is Allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including, without limitation,

**1.1.1**  fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and

**1.1.2**  all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

**1.2**    "Allowed" shall mean, with reference to any Claim:

**1.2.1**  a Claim that has been listed by the Debtor in its Schedules and (i) is not listed as disputed, contingent or unliquidated, (ii) is not a Claim as to which a proof of claim has been filed, and (iii) is not a Claim as to which the Debtor has filed an objection;[1]

**1.2.2**  a Claim as to which a timely[2] proof of claim has been filed by the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

**1.2.3**  a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or

---

[1]    Except as otherwise provided in the Plan, the Debtor reserves its right to object to Claims that it has listed in its Schedules notwithstanding that the Schedules may not identify the Claim as disputed, contingent or unliquidated.  The Debtor further reserves the right to amend its Schedules to delete any reference to listed Claims, to adjust the amount of the listed Claim and/or to identify any listed Claim as disputed, contingent or unliquidated.

[2]    A proof of claim is timely filed only if (a) it is filed on or before the applicable Bar Date, or (b) if filed after the applicable Bar Date, on or before the Effective Date the Court has entered an order permitting the holder of the Claim to file a late-filed proof of claim.

{00397523.DOC / 2}

**1.2.4**  any Claim expressly allowed[3] under this Plan or pursuant to the Confirmation Order; or

**1.2.5**  any Claim expressly allowed pursuant to a Final Order of the Bankruptcy Court.

**1.3**    "Ally Financial" shall refer to Ally Financial, Inc. and Ally Bank, collectively.

**1.4**    "Ally Financial Claim" shall mean the Allowed Claims of Ally Financial, in the amount(s) and subject to the treatment specified in section 4.3 of this Plan.

**1.5**    "Ally Financial Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date which is described by category or other designation in the Ally Financial Loan Documents, including, without limitation, the 2012 Dodge Ram 1500, VIN # 1C6RD7LT7CS241001 and 2013 Dodge Ram 1500, VIN # 1C6RR7LG9DS599836.

**1.6**    "Ally Financial Loan" shall mean and refer to, collectively: (i) the loan in the original principal amount of $38,992.74 that Ally Financial made to the Debtor in or about May 11, 2012; and (ii) the loan in the original principal amount of $32,568.00 that Ally Financial made to the Debtor in or about October 9, 2013.

**1.7**    "Ally Financial Loan Documents" shall mean and refer to all loan documents which memorialize and govern the Ally Financial Loan.

**1.8**    "Amur" shall refer to Amur Equipment Finance, Inc (f/k/a Axis Capital, Inc.).

**1.9**    "Amur Claim" shall mean the Allowed Claim(s) of Amur, in the amount(s) and subject to the treatment specified in section 4.4 of this Plan.

**1.10**   "Amur Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date, which is described by category or other designation in the Amur Loan Documents, including, without limitation, the 2014 Peterbilt 337, VIN # 2NP2HM7X0EM225940, and the 2009 Western Star, VIN # 5KJJALCK99PAG7704.

**1.11**   "Amur Loan" shall mean and refer to the loan advanced to the Debtor, disguised as a lease, made on or about November 18, 2015, which, among other terms, requires monthly payments of $2,560.95 for 60 months and requires payment of a final "End of Lease Option" price, which, under the Amur Loan Documents, was to be determined in Amur's sole discretion.

**1.12**   "Amur Loan Documents" shall mean and refer to all loan documents (which are disguised as leases, but are not, in fact, "true leases") which memorialize and govern the Amur Loan.

---

[3]    The fact that a Claim may be specifically referenced and/or its treatment specified under this Plan does not mean that it is "expressly allowed."  Rather, all Claims referenced or discussed in this Plan are subject to potential objection unless the Plan states expressly that the Claim is or shall be allowed, and the amount of the allowed claim is specified.

**1.13** "Applicable Rate" means an annual rate of interest equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week immediately preceding the Confirmation Date; provided, however, that to the extent section 511 of the Bankruptcy Code applies to a particular Claim, the "Applicable Rate" shall be the rate of interest required thereunder.

**1.14** "Avoidance Actions" shall mean Causes of Action arising or held by the Estate under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent and avoidable transfer laws.

**1.15** "Bankruptcy Case" and "Case" shall mean the Debtor's chapter 11 bankruptcy case pending in the Bankruptcy Court under case number 18-20225.

**1.16** "Bankruptcy Code" and "Code" shall mean Title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

**1.17** "Bankruptcy Court" and "Court" shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28 U.S.C. § 151.

**1.18** "Bankruptcy Rules" and "Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

**1.19** "Bar Date" shall mean: (i) May 15, 2018 with respect to a Claim against the Estate other than a Claim of a Governmental Unit; (ii) July 11, 2018 with respect to a Claim of a Governmental Unit against the Estate; (iii) if applicable, any special deadline for certain creditors to file proofs of claim as specified by the Court; or (iv) if this Plan and/or an order of the Court establishes a different bar date for a specific claim or category of claims (e.g., rejection damages claims), the date established by the Plan or order of the Court.

**1.20** "BBVA" shall refer to BBVA Compass Financial Corporation.

**1.21** "BBVA Claim" shall mean the Allowed Claim of BBVA, in the amount(s) and subject to the treatment specified in section 4.5 of this Plan.

**1.22** "BBVA Collateral" shall mean and refer to the "Collateral," as that term is defined in the BBVA Stipulation.

**1.23** "BBVA Loan" shall mean and refer to the "Loan," as that term is defined in the BBVA Stipulation.

**1.24** "BBVA Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the BBVA Stipulation.

**1.25** "BBVA Stipulation" shall have the meaning assigned to it in section 4.5.2 of this Plan.

**1.26**   "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday recognized in the State of Utah.

**1.27**   "Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

**1.28**   "Causes of Action" shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

**1.29**   "CCG" shall refer to Commercial Credit Group, Inc.

**1.30**   "CCG Claim" shall mean the Allowed Claim of CCG, in the amount(s) and subject to the treatment specified in section 4.6 of this Plan.

**1.31**   "CCG Collateral" shall mean and refer to the "Collateral," as that term is defined in the CCG Stipulation.

**1.32**   "CCG Indebtedness" shall mean and refer to the "Indebtedness," as that term is defined in the CCG Stipulation.

**1.33**   "CCG Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the CCG Stipulation.

**1.34**   "CCG Stipulation" shall have the meaning assigned to it in section 4.6.2 of this Plan.

**1.35**   "Chapman" shall refer to Todd Chapman and Julie Chapman.

**1.36**   "Chapman Claim" shall mean the Allowed Claim of Chapman, in the amount(s) and subject to the treatment specified in section 4.6 of this Plan.

**1.37**   "Chapman Collateral" shall mean and refer to the "Collateral," as that term is defined in the Chapman Stipulation.

**1.38**   "Chapman Loan" shall mean and refer to the "Loan," as that term is defined in the Chapman Stipulation.

**1.39**   "Chapman Stipulation" shall have the meaning assigned to it section 4.7.2 of this Plan.

**1.40**   "Cheuck Yick" shall refer to Cheuck Yick Industrial, Ltd.

**1.41**   "Cheuck Yick Claim" shall mean the Allowed Claim of Cheuck Yick, in the amount(s) and subject to the treatment specified in section 4.8 of this Plan.

**1.42**    "Cheuck Yick Collateral" shall mean and refer to the "Collateral," as that term is defined in the Cheuck Yick Stipulation.

**1.43**    "Cheuck Yick Loan" shall mean and refer to the "Loan," as that term is defined in the Cheuck Yick Stipulation.

**1.44**    "Cheuck Yick Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the Cheuck Yick Stipulation.

**1.45**    "Cheuck Yick Stipulation" shall have the meaning assigned to it in section 4.8.2 of this Plan.

**1.46**    "Chrysler Capital" shall refer to Santander Consumer USA, Inc., d/b/a Chrysler Capital.

**1.47**    "Chrysler Capital Claim" shall mean the Allowed Claim of Chrysler Capital, in the amount(s) and subject to the treatment specified in section 4.9 of this Plan.

**1.48**    "Chrysler Capital Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date which is described by category or other designation in the Chrysler Capital Loan Documents, including, without limitation, the 2012 Dodge Ram 3500 VIN 3C63D3CL2CG267785.

**1.49**    "Chrysler Capital Loan" shall mean and refer to, collectively, the loan in the original principal amount of $48,620.91 that Chrysler Capital made to the Debtor in or about June 20, 2013.

**1.50**    "Chrysler Capital Loan Documents" shall mean and refer to all loan documents which memorialize and govern the Chrysler Capital Loan.

**1.51**    "Chrysler Capital Sale Motion" shall have the meaning assigned to it in section 4.9.2.1 of this Plan.

**1.52**    "CIT Bank" shall refer to CIT Bank, N.A.

**1.53**    "CIT Bank Claim" shall mean the Allowed Claim of CIT Bank, in the amount(s) and subject to the treatment specified in section 4.10 of this Plan.

**1.54**    "CIT Bank Stipulation" shall have the meaning assigned to it in section 4.10.2 of this Plan.

**1.55**    "Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.56**    "Class" shall mean those classes designated in Article III of this Plan.

**1.57**    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law. Notwithstanding the identification of any property as "Collateral" in this Plan, the Debtor reserves its right to challenge any purported lien on property identified as Collateral unless otherwise stated or expressly released in the Plan or agreed to by the Debtor in a filed stipulation with a creditor or party-in-interest.

**1.58**    "Collateral Release Amount" shall mean, (i) for any piece of Collateral that serves as Collateral under a Combo Loan, the OLV Percentage multiplied by the outstanding principal balance of the particular Combo Loan at the time of the sale of the Collateral; or (ii) for any piece of Collateral that serves as Collateral for a Claim that is secured by more than one item of Collateral, but that is not subject to a Combo Loan, the portion of the Claim that is attributable to and secured by the particular item of Collateral to be sold or refinanced.

**1.59**    "Combo Loan" shall mean any loan by which any lender made a single advance or multiple advances, at one time or at different times, of funds to the Debtor to be used for the purchase of more than one item of Collateral, and for which all items of Collateral are purported to be cross-collateralized, including but not limited to: (i) the BBVA Loan; (ii) the CCG Loan; (iii) the Continental Bank Equipment Loan; (iv) the Equify Loan; (v) the Everbank Loan; and (vi) the SG Equipment Finance Loan. The identification of any loan as a Combo Loan does not constitute an admission that such loan is, in fact, properly collateralized (or cross-collateralized) by the Debtor's property, and the Debtor expressly reserves its right to challenge that any loan identified as a Combo Loan is properly collateralized or cross-collateralized, unless otherwise expressly stated in this Plan or agreed to in a stipulation with a particular creditor.

**1.60**    "Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

**1.61**    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

**1.62**    "Consolidated Subsidiary Entities" shall mean and refer to, collectively: (i) Mountain Heavy; (ii) MNHH; (iii) PC Land Holdings; and (iv) Style-Crete. No other entities, including direct and direct subsidiaries of the Debtor, are included as Consolidated Subsidiary Entities.

**1.63**    "Continental Bank" shall refer to Continental Bank.

**1.64**    "Continental Bank Claim" shall mean the Allowed Claim of Continental Bank, in the amount(s) and subject to the treatment specified in section 4.11 of this Plan.

**1.65**    "Continental Bank Land" shall mean the "Land," as that term is defined in the Continental Bank Stipulation.

**1.66** "Continental Bank Land Loan" shall mean and refer to the "Land Loan," as that term is defined in the Continental Bank Stipulation.

**1.67** "Continental Bank Leases" shall mean and refer to the "Leases," as that term is defined in the Continental Bank Stipulation.

**1.68** "Continental Bank Loan Documents" shall mean and refer to all loan documents which are defined and set forth in the Continental Bank Stipulation, including the "Land Loan Documents," the "Lease Documents," and the "Truck Loan Documents."

**1.69** "Continental Bank Personal Property Collateral" shall mean and refer to the "Personal Property Collateral," as that term is defined in the Continental Bank Stipulation.

**1.70** "Continental Bank Stipulation" shall have the meaning assigned to it in section 4.11.2 of this Plan.

**1.71** "Continental Bank Truck Loan" shall mean and refer to the "Truck Loan," as that term is defined in the Continental Bank Stipulation.

**1.72** "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which: (a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

**1.73** "Convenience Claim" shall mean all General Unsecured Claims of a single holder of a type that would otherwise be included in Class 2 (or any other Class if such holder makes a Convenience Class Election) which are either (i) $1,000 or less in the aggregate; or (ii) greater than $1,000 in the aggregate but as to which the holder thereof has elected voluntarily to reduce the claim to $1,000 by making a Convenience Class Election pursuant to section 6.4 of this Plan.

**1.74** "Creditors' Committee" shall mean and refer to the committee of creditors appointed pursuant to Bankruptcy Code § 1102.

**1.75** "Cure Amount" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtor or the Consolidated Subsidiary Entities in accordance with the terms of an executory contract or unexpired lease of the Debtor or the Consolidated Subsidiary Entities and (b) permit the Reorganized Debtor to assume such executory contract or unexpired lease under Section 365(a) of the Bankruptcy Code.

**1.76** "Debtor" shall mean Mountain Crane Service, LLC. References to the Debtor shall mean and refer to the Reorganized Debtor at any point in time after the Effective Date.

**1.77** "De Lage Landen" shall refer to De Lage Landen Financial Services, Inc., a/k/a Manitowoc Finance.

**1.78**   "De Lage Landen Claim" shall mean the Allowed Claim of De Lage Landen, in the amount(s) and subject to the treatment specified in section 4.12 of this Plan.

**1.79**   "De Lage Landen Collateral" shall mean and refer to the "Collateral," as that term is defined in the De Lage Landen Stipulation.

**1.80**   "De Lage Landen Loan" shall mean and refer to the "Loan," as that term is defined in the De Lage Landen Stipulation.

**1.81**   "De Lage Landen Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the De Lage Landen Stipulation.

**1.82**   "De Lage Landen Stipulation" shall have the meaning assigned to it in section 4.12.2 of this Plan.

**1.83**   "Direct Capital" shall refer to Direct Capital Corporation.

**1.84**   "Direct Capital Claim" shall mean the Allowed Claim of Direct Capital, in the amount(s) and subject to the treatment specified in section 4.13 of this Plan.

**1.85**   "Direct Capital Collateral" shall mean and refer to the "Collateral," as that term is defined in the Direct Capital Stipulation.

**1.86**   "Direct Capital Loan" shall mean and refer to the "Loan," as that term is defined in the Direct Capital Stipulation.

**1.87**   "Direct Capital Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the Direct Capital Stipulation.

**1.88**   "Direct Capital Stipulation" shall have the meaning assigned to it in section 4.13.2 of the Plan.

**1.89**   "Disallowed" shall mean and refer to any Claim that does not fall within the definition of "Allowed."

**1.90**   "Disclosure Statement" shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**1.91**   "Disputed Claim" shall mean:

**1.91.1** if no proof of claim relating to a Claim has been filed, a Claim that is listed in the Schedules as unliquidated, disputed or contingent; or

**1.91.2** a Claim as to which an objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Debtor and/or any other party in interest in accordance with applicable law, which

objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; or

   **1.91.3** a Claim that otherwise is "Allowed," but which is a Contingent or Unliquidated Claim.

   **1.92**  "<u>Disputed Claim Amount</u>" shall mean the amount set forth in the proof of claim relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Disputed Claim in accordance with Section 502(c) of the Bankruptcy Code.

   **1.93**  "<u>Disputed Lien</u>" shall mean a Lien which is the subject of a pending Avoidance Action or any other type of judicial challenge to the validity, priority or enforceability of the Lien, whether prosecuted by the Debtor or another party-in-interest and whether filed in the Bankruptcy Court or another court of competent jurisdiction.  Independent of and in addition to the foregoing, if the Claim secured by a Lien is a Disputed Claim, the Lien shall be considered a "Disputed Lien" unless and until the Claim is Allowed.

   **1.94**  "<u>Distribution Date</u>" shall mean fourteen (14) days after the last day of each full Quarter following the Effective Date, up to and including the Final Distribution Date, or if the fourteenth day following the last day of any Quarter is not a Business Day, the first Business Day immediately thereafter.

   **1.95**  "<u>Distribution Fund</u>" and "<u>Distribution Fund Amount</u>" shall have the meanings assigned to them under section 5.5.1 of this Plan.

   **1.96**  "<u>Effective Date</u>" shall mean the later of (a) the first Business Day on which the Confirmation Order is no longer subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e) or otherwise, and (b) unless such thirty day period is waived by the Debtor as permitted under section 9.1 of the Plan, the first Business Day that is at least thirty calendar days after the Confirmation Date; <u>provided</u>, <u>however</u>, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have not been satisfied or waived, then the Effective Date shall be the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

   **1.97**  "<u>Equify</u>" shall refer to Equify Financial, LLC.

   **1.98**  "<u>Equify Claim</u>" shall mean the Allowed Claim of Equify, in the amount(s) and subject to the treatment specified in section 4.14 of this Plan.

   **1.99**  "<u>Equify-Debtor Collateral</u>" shall mean and refer to the "Collateral," as that term is defined in the Equify Stipulation.

   **1.100**  "<u>Equify-Debtor Loan</u>" shall mean and refer to the "Loans," as that term is defined in the Equify Stipulation.

   **1.101**  "<u>Equify-Debtor Loan Documents</u>" shall mean and refer to the "Loan Documents," as that term is defined in the Equify Stipulation.

**1.102** "Equify-Heavy Haul Collateral" shall mean and refer to the "Subsidiary Collateral," as that term is defined in the Equify Stipulation.

**1.103** "Equify-Heavy Haul Loan" shall mean and refer to the "Subsidiary Loan," as that term is defined in the Equify Stipulation.

**1.104** "Equify-Heavy Haul Loan Documents" shall mean and refer to the "Subsidiary Loan Documents," as that term is defined in the Equify Stipulation.

**1.105** "Equify Stipulation" shall have the meaning assigned to it in section 4.14.2 of this Plan.

**1.106** "Equity Interest" shall mean any member interest in the Debtor, and all options, warrants and rights, contractual or otherwise, to acquire any such member interests, as such interests exist immediately prior to the Effective Date.

**1.107** "Estate" shall mean the estate created in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code, and pursuant to the consolidation of the Consolidated Subsidiary Entities under this Plan, shall include the respective estates of each of the Consolidated Subsidiary Entities as though each of the Consolidated Subsidiary Entities had commenced a case under sections 301, 302, or 303 of the Bankruptcy Code as of the Petition Date; provided, however, that no payments or transfers by any of the Consolidated Subsidiary Entities may be challenged or avoided pursuant to section 549 of the Bankruptcy Code.

**1.108** "Everbank" shall refer to TIAA Commercial Finance, Inc., a Delaware corporation f/k/a EverBank Commercial Finance.

**1.109** "Everbank Claim" shall mean the Allowed Claim of Everbank, in the amount(s) and subject to the treatment specified in section 4.15 of this Plan.

**1.110** "Everbank-Debtor Collateral" shall mean and refer to the "Collateral," as that term is defined in the Everbank Stipulation.

**1.111** "Everbank-Debtor Loan" shall mean and refer to the "Loans," as that term is defined in the Everbank Stipulation.

**1.112** "Everbank-Debtor Loan Documents" shall mean and refer to the "Original Loan Documents," as that term is defined in the Everbank Stipulation.

**1.113** "Everbank-Heavy Haul Collateral" shall mean and refer to the "Subsidiary Collateral," as that term is defined the Everbank Stipulation.

**1.114** "Everbank-Heavy Haul Loan" shall mean and refer to the "Subsidiary Loan," as that term is defined in the Everbank Stipulation.

**1.115** "Everbank-Heavy Haul Loan Documents" shall mean and refer to the "Subsidiary Loan Documents," as that term is defined in the Everbank Stipulation.

**1.116** "Everbank Stipulation" shall have the meaning assigned to it in section 4.15.2 of this Plan.

**1.117** "Final Distribution Date" shall mean the earlier of (i) the Distribution Date immediately following the ten-year anniversary of the Effective Date; or (ii) the last Distribution Date by which the Distribution Fund Amount has been distributed in full.

**1.118** "Final Order" shall mean an order, decree, or judgment that is not subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e), a stay applicable by order of the Bankruptcy Court or by order of another Court with jurisdiction to stay an order entered in this Case, or otherwise.  If an order is not subject to a stay, the possibility that it may be modified, amended or reversed upon appeal, pursuant to a motion under Federal Rules of Civil Procedure 59 or 60, or otherwise shall not cause such order not to be a Final Order.

**1.119** "FNB Layton" shall refer to First National Bank of Layton.

**1.120** "FNB Layton Claim" shall mean the Allowed Claim of FNB Layton, in the amount(s) and subject to the treatment specified in section 4.16 of this Plan.

**1.121** "FNB Layton Collateral" shall mean and refer the "Collateral," as that term is defined in the FNB Layton Stipulation.

**1.122** "FNB Layton Equipment Loan" shall mean and refer to the "Equipment Loan," as that term is defined in the FNB Layton Stipulation.

**1.123** "FNB Layton Equipment Loan Documents" shall mean and refer to the "Equipment Loan Documents," as that term is defined in the FNB Layton Stipulation.

**1.124** "FNB Layton Land" shall mean and refer to the "Land," as that term is defined in the FNB Layton Stipulation.

**1.125** "FNB Layton Land Loan" shall mean and refer to the "Land Loan," as that term is defined in the FNB Layton Stipulation.

**1.126** "FNB Layton Land Loan Documents" shall mean and refer to the "Land Loan Documents," as that term is defined in the FNB Layton Stipulation.

**1.127** "FNB Layton Stipulation" shall have the meaning assigned to it in section 4.16.2 of this Plan.

**1.128** "Galena" shall refer to Galena Equipment Rental, LLC.

**1.129** "Galena Claim" shall mean the Allowed Claim of Galena, in the amount(s) and subject to the treatment specified in section 4.17 of this Plan.

**1.130** "Galena Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date which is described by category or other designation in the Galena Loan Documents, including, without limitation, the Collateral described in Schedule 4.17, attached hereto.

**1.131** "Galena Loan" shall mean and refer to, collectively, the loan in the original principal amount of $530,242.73 that Galena made to the Debtor in or about November 30, 2016.

**1.132** "Galena Loan Documents" shall mean and refer to all loan documents which memorialize and govern the Galena Loan.

**1.133** "General Unsecured Claim" shall mean a Claim that is not a Secured Claim or that is not entitled to priority of payment under Section 507 of the Bankruptcy Code.

**1.134** "Heavy Haul" or "MNHH" shall refer to Mountain National Heavy Haul, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.135** "Heavy Transport" or "Mountain Heavy" shall refer to Mountain Heavy Transport, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.136** "Initial Distribution Date" shall mean and refer to the Distribution Date first occurring after the Effective Date.

**1.137** "Interim Distribution Date" shall mean each Distribution Date other than the Final Distribution Date.

**1.138** "IRS" shall mean the United States Department of Treasury – Internal Revenue Service.

**1.139** "Hincklease" shall mean Hinckley's, Inc., d/b/a Hincklease.

**1.140** The terms "lease" and "true lease" as used herein mean and refer to (a) a lease of real property and (b) a lease of equipment or other goods satisfying the definitions and requirements of Utah Code Ann. § 70A-2a-103(1)(j). A transaction in the form of, or labeled as, a lease, but which creates a security interest as described under Utah Code Ann. § 70A-1a-203, is not a lease or a true lease.

**1.141** "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; *except that* a Lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

**1.142** As used in this Plan, the term "loan" means and refers to any creditor's advance of cash, goods, or services to the Debtor, hereby creating a payment obligation by the Debtor, and the terms and conditions for repayment, whether formalized in a promissory note, instrument, loan agreement, or a document denominated as a lease which is not a "true lease", but rather is a disguised loan as contemplated under Utah Code Ann. § 70A-1a-203(2).

**1.143** "MACU" shall refer to Mountain America Federal Credit Union.

**1.144** "MACU Claim" shall mean the Allowed Claim of MACU, in the amount(s) and subject to the treatment specified in section 4.19 of this Plan.

**1.145** "MACU Collateral" shall mean and refer to the "Collateral," as that term is defined in the MACU Stipulation.

**1.146**  "MACU Loan" shall mean and refer to the "Loan," as that term is defined in the MACU Stipulation.

**1.147**  "MACU Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the MACU Stipulation.

**1.148**  "MACU Stipulation" shall have the meaning assigned to it in section 4.19.2 of this Plan.

**1.149**  "MC Wyoming" shall refer to MC Wyoming, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.150**  "Mighty Crane" shall refer to Mighty Crane Service, LLC, a Nevada limited liability company that is wholly-owned by the Debtor.

**1.151**  "MNCR" shall refer to Mountain National Crane Rental, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.152**  "MNHH" or "Heavy Haul" shall refer to Mountain National Heavy Haul, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.153**  "Mountain Heavy" or "Heavy Transport" shall refer to Mountain Heavy Transport, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.154**  "Mountain Transport" shall refer to Mountain Transport, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.155**  "Mountain West" shall refer to Mountain West Small Business Finance.

**1.156**  "Mountain West Land" shall mean and refer to the "Land," as that term is defined in the SBA Stipulation.

**1.157**  "Mountain West Loan" shall mean and refer to the "Land Loan," as that term is defined in the SBA Stipulation. As described in the SBA Stipulation, the beneficial interest in the Mountain West Loan has been assigned to the SBA, and the Mountain West Loan is treated as part of the SBA Claim.

**1.158**  "Mountain West Loan Documents" shall mean and refer to the "Land Loan Documents," as that term is defined in the SBA Stipulation.

**1.159**  "Mountain Wind" shall refer to Mountain Wind, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.160**  "OLV Percentage" shall mean the percentage obtained from dividing the liquidation value of a particular item of Collateral (as set forth in the Debtor's most recently amended Schedule A/B on file with the Court), by the combined liquidation value of all of the Collateral that is subject to the particular Combo Loan for which the particular item of Collateral also serves as Collateral.

**1.161** "Owner" means and refers to the holder of an Equity Interest.

**1.162** "PC Land Holdings" shall refer to PC Land Holdings, LLC, a Utah limited liability company that is wholly-owned by the Debtor.

**1.163** "PC Land Holdings Real Property" shall refer to all real property owned or titled in the name of PC Land Holdings.

**1.164** "People's Capital" shall refer to People's Capital and Leasing Corp.

**1.165** "People's Capital Claim" shall mean the Allowed Claim of People's Capital, in the amount(s) and subject to the treatment specified in section 4.20 of this Plan.

**1.166** "People's Capital Collateral" shall mean and refer to the "Collateral," as that term is defined in the People's Capital Stipulation.

**1.167** "People's Capital Loan" shall mean and refer to the "Loan," as that term is defined in the People's Capital Stipulation.

**1.168** "People's Capital Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the People's Capital Stipulation.

**1.169** "People's Capital Stipulation" shall have the meaning assigned to it in section 4.20.2 of this Plan.

**1.170** "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, Governmental Unit or political subdivision thereof.

**1.171** "Petition Date" shall mean January 12, 2018.

**1.172** "Plan" shall mean this Plan of Reorganization, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

**1.173** "Plan Period" shall mean the period of time commencing on the Effective Date and ending on the Final Distribution Date. If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the Petition Date with respect to that particular Claim or creditor. If the treatment of a particular Claim or creditor relates to periods of time after the Final Distribution Date, then the Plan Period shall not be completed as to that particular Claim or creditor until the date of the final payment made with respect to that particular Claim or creditor.

**1.174** "Preference Claims" shall mean and refer to all claims to recover a payment or property transferred on account of an antecedent debt, including without limitation claims under section 547 of the Bankruptcy Code, and claims under Utah Code Ann. § 25-6-203(2) and other similar state statutes.

**1.175** "Preserved Claim" refers to all claims or choses in action (including, if applicable, a Preference Claim) except only claims that the Debtor has waived the right to pursue either (a) under section 5.2.1 of this Plan, or (b) under a stipulation that is incorporated as part of this Plan. Without limitation, Preserved Claims may be specifically identified in this Plan or the Disclosure Statement as claims that the Debtor or the Plan Administrator intends to or reserves the right to prosecute.

**1.176** "Prime Rate" shall mean the per annum rate of interest published from time to time in the Wall Street Journal, under the section entitled "Money Rates," which is denoted as the United States "Prime Rate."

**1.177** "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under Section 507(a) of the Bankruptcy Code other than Administrative Expense Claims. If a Claim otherwise entitled to priority is a Secured Claim, it shall not be deemed to be, or treated as, a Priority Claim.

**1.178** "Priority Tax Claims" shall mean any Claim of a Governmental Unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code, and that is not a Secured Claim.

**1.179** "Pro Rata" shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims in such Class.

**1.180** "Professionals" shall mean (i) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.181** "Quarter" means and refers to the calendar quarters ending, respectively, on March 31, June 30, September 30 and December 31.

**1.182** "Quarterly" means on the basis of a Quarter.

**1.183** "Reach Higher" means and refers to any subsidiary of the Debtor known by this or a similar name including, if applicable, Reach Higher LLC.

**1.184** "Reorganized Debtor" shall mean the Debtor and the Consolidated Subsidiary Entities, as reorganized and consolidated after the Effective Date pursuant to the terms of this Plan.

**1.185** The "SBA" shall refer to the U.S. Small Business Administration.

**1.186** "SBA Claim" shall mean the Allowed Claim of SBA, in the amount(s) and subject to the treatment specified in section 4.21 of this Plan. The SBA Claim includes the Claims that arise from (i) the Mountain West Loan; and (ii) the Utah CDC Loan.

**1.187** "Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

**1.188** "Schedule of Cure Amounts" shall mean the schedule of Cure Amounts which are to be paid with respect to the executory contracts and unexpired leases which are to be assumed pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**1.189** "Schedule of Assumed Contracts" shall mean a schedule of executory contracts and unexpired leases to be assumed by the Reorganized Debtor pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**1.190** "Schedule of Rejected Contracts" shall mean the schedule of executory contracts and unexpired leases to be rejected by the Reorganized Debtor pursuant to this Plan (which will include the effective dates that such executory contracts and unexpired leases shall be deemed to be rejected), as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**1.191** "Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

**1.192** "SG Equipment Finance" shall refer to SG Equipment Finance USA Corp.

**1.193** "SG Equipment Finance Claim" shall mean the Allowed Claim of SG Equipment Finance, in the amount(s) and subject to the treatment specified in section 4.22 of this Plan.

**1.194** "SG Equipment Finance Collateral" shall mean and refer to the "Collateral," as that term is defined in the SG Equipment Finance Stipulation.

**1.195** "SG Equipment Finance Loan" shall mean and refer to the "Loan," as that term is defined in the SG Equipment Finance Stipulation.

**1.196** "SG Equipment Finance Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the SG Equipment Finance Stipulation.

**1.197** "SG Equipment Finance Stipulation" shall have the meaning assigned to it in section 4.22.2 of this Plan.

**1.198**   "Siemens" shall refer to Siemens Financial Services, Inc.

**1.199**   "Siemens Claim" shall mean the Allowed Claim of Siemens, in the amount(s) and subject to the treatment specified in section 4.23 of this Plan.

**1.200**   "Siemens Collateral" shall mean and refer to the "Collateral," as that term is defined in the Siemens Stipulation.

**1.201**   "Siemens Loan" shall mean and refer to the "Loan," as that term is defined in the Siemens Stipulation.

**1.202**   "Siemens Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the Siemens Stipulation.

**1.203**   "Siemens Stipulation" shall have the meaning assigned to it in section 4.23.2 of this Plan.

**1.204**   "Signature Financial" shall refer to Signature Financial, LLC.

**1.205**   "Signature Financial Claim" shall mean the Allowed Claim of Signature Financial, in the amount(s) and subject to the treatment specified in section 4.24 of this Plan.

**1.206**   "Signature Financial Collateral" shall mean and refer to the "Collateral," as that term is defined in the Signature Financial Stipulation.

**1.207**   "Signature Financial Loan" shall mean and refer to the "Loan," as that term is defined in the Signature Financial Stipulation.

**1.208**   "Signature Financial Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the Signature Financial Stipulation.

**1.209**   "Signature Financial Stipulation" shall have the meaning assigned to it in section 4.24.2 of this Plan.

**1.210**   "Statements and Schedules" shall mean the Debtor's Statement of Financial Affairs and Bankruptcy Schedules [Docket No. 164], as amended in the Case.

**1.211**   "Sterling" shall refer to Sterling National Bank.

**1.212**   "Sterling Claim" shall mean the Allowed Claim of Sterling, in the amount(s) and subject to the treatment specified in section 4.25 of this Plan.

**1.213**   "Sterling Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date which is described by category or other designation in the Sterling Loan Documents, including, without limitation, the 2013 Grove TMS 9000E, S/N 234246.

**1.214**   "Sterling Loan" shall mean and refer to, collectively, the loan in the original principal amount of $920,518.76 that Sterling made to the Debtor in or about December 31, 2013.

**1.215** "<u>Sterling Loan Documents</u>" shall mean and refer to all loan documents which memorialize and govern the Sterling Loan.

**1.216** "<u>Style-Crete</u>" shall mean and refer to Style-Crete, Inc., a Utah corporation wholly owned by PC Land Holdings.

**1.217** "<u>Style-Crete Real Property</u>" shall mean and refer to the real property owned or titled in the name of Style-Crete.

**1.218** "<u>Subsidiary Entities</u>" shall mean and refer to, collectively, all direct and indirect wholly owned subsidiaries of the Debtor, including: (i) Mountain Transport; (ii) MC Wyoming; (iii) MNHH; (iv) Mountain Heavy; (v) MNCR; (vi) Mountain Wind; (vii) Mighty Crane (viii) Reach Higher; (ix) PC Land Holdings; and (x) Style-Crete.

**1.219** "<u>Subordinated § 510(b) Claim</u>" shall mean any unsecured Claim that is subordinated under § 510(b) of the Bankruptcy Code.

**1.220** "<u>Subordinated Claim</u>" shall mean any unsecured Claim that is subordinated in right of payment to Class 2 Unsecured Claims by reason of either (a) voluntary agreement or consent by the holder of the Claim, or (b) a Final Order of the Court.

**1.221** "<u>TCF</u>" shall refer to TCF Equipment Finance.

**1.222** "<u>TCF Claim</u>" shall mean the Allowed Claim of TCF, in the amount(s) and subject to the treatment specified in section 4.26 of this Plan.

**1.223** "<u>TCF Collateral</u>" shall mean and refer to the "Collateral," as that term is defined in the TCF Stipulation.

**1.224** "<u>TCF Loan</u>" shall mean and refer to the "Loan," as that term is defined in the TCF Stipulation.

**1.225** "<u>TCF Loan Documents</u>" shall mean and refer to the "Loan Documents," as that term is defined in the TCF Stipulation.

**1.226** "<u>TCF Stipulation</u>" shall have the meaning assigned to it in section 4.26 of this Plan.

**1.227** "<u>Terex</u>" shall refer to Terex Financial Services.

**1.228** "<u>Terex Claim</u>" shall mean the Allowed Claim of Terex, in the amount(s) and subject to the treatment specified in section 4.27 of this Plan.

**1.229** "<u>Terex Collateral</u>" shall mean and refer to all property of the Debtor existing as of the Petition Date which is described by category or other designation in the Terex Loan Documents.

**1.230** "<u>Terex Loan</u>" shall mean and refer to, collectively: (i) the loan in the original principal amount of $755,000.00 that Terex made to the Debtor in or about April 15, 2015; (ii)

the loan in the original principal amount of $796,326.88 that Terex made to the Debtor in or about December 15, 2015; (iii) the loan in the original principal amount of $1,395,238.00 that Terex made to the Debtor in or about December 15, 2015; (iv) the loan in the original principal amount of $1,257,796.66 that Terex made to the Debtor in or about December 22, 2015; and (v) the loan in the original principal amount of $199,081.72 that Terex made to the Debtor in or about December 29, 2015.

**1.231** "Terex Loan Documents" shall mean and refer to all loan documents which memorialize and govern the Terex Loan.

**1.232** "Total Distributions" shall have the meaning assigned to it in section 5.5.3 of this Plan.

**1.233** "Trans Lease" shall refer to Trans Lease, Inc.

**1.234** "Trans Lease Claim" shall mean the Allowed Claim of Trans Lease, in the amount(s) and subject to the treatment specified in section 4.28 of this Plan.

**1.235** "Trans Lease Collateral" shall mean and refer to the "Trucks," as that term is defined in the Trans Lease Stipulation.

**1.236** "Trans Lease Contract" shall mean and refer to the "Contract," as that term is defined in the Trans Lease Stipulation, which Trans Lease contends represents a "true lease," and the Debtor contends represents a "loan." For the purposes of this Bankruptcy Case and the Plan, the dispute regarding the nature of the Contract is resolved under the Trans Lease Stipulation.

**1.237** "Trans Lease Stipulation" shall have the meaning assigned to it in section 4.28.2 of this Plan.

**1.238** "Unclassified Priority Claims" are Priority Claims (other than Administrative Expense Claims) defined in section 2.3 of this Plan, including claims within the scope of sections 507(a)(2), 507(a)(3) and/or 507(a)(8) of the Bankruptcy Code.

**1.239** "Utah CDC" shall refer to Utah Certified Development Company.

**1.240** "Utah CDC Collateral" shall refer to the "Collateral," as that term is defined in the SBA Stipulation.

**1.241** "Utah CDC Loan" shall mean and refer to the "Equipment Loan," as that term is defined in the SBA Stipulation.

**1.242** "Utah CDC Loan Documents" shall mean and refer to the "Equipment Loan Documents," as that term is defined in the SBA Stipulation.

**1.243** "Varilease" shall refer to Varilease Finance, Inc.

**1.244** "Varilease Claim" shall mean the Allowed Claim of Bank of Ann Arbor, and its predecessor in interest, Varilease, in the amount(s) and subject to the treatment specified in section 4.29 of this Plan.

**1.245** "Varilease Collateral" or the "Aircraft" shall mean and refer that certain 1981 Beechcraft King Air B200 aircraft, SN BB-918, Registration Number N918TC.

**1.246** "Varilease Lease" shall mean and refer to, collectively, the true lease between Varilease and the Debtor, which lease was assigned to Bank of Ann Arbor. Varilease continues to act as the servicer on the Varilease Lease.

**1.247** "Varilease Lease Documents" shall mean and refer to all lease documents which memorialize and govern the Varilease Lease.

**1.248** "Wells Fargo" shall refer to Wells Fargo Bank, N.A.

**1.249** "Wells Fargo Claim" shall mean the Allowed Claim of Wells Fargo, in the amount(s) and subject to the treatment specified in section 4.30 of this Plan.

**1.250** "Wells Fargo Collateral" shall mean and refer to the "Collateral," as that term is defined in the Wells Fargo Stipulation.

**1.251** "Wells Fargo Loan" shall mean and refer to the "Loan," as that term is defined in the Wells Fargo Stipulation.

**1.252** "Wells Fargo Loan Documents" shall mean and refer to the "Loan Documents," as that term is defined in the Wells Fargo Stipulation.

**1.253** "Wells Fargo Stipulation" shall have the meaning assigned to it in section 4.30.2 of the Plan.

## SECTION B.  RULES OF CONSTRUCTION

**1.254** **Capitalized Terms.**  Unless otherwise provided, any capitalized terms used in the Plan shall have the meaning set forth in Article 1.

**1.255** **Other Terms.**  All terms not defined in this Article 1 or otherwise defined in the Plan, but that are defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed by the Bankruptcy Code or the Bankruptcy Rules.  For convenience, terms defined in the Bankruptcy Code may be capitalized in the Plan, and the Plan sometimes may include a cross-reference to the Bankruptcy Code.  Neither the failure to capitalize any such term, nor the failure to include a Bankruptcy Code cross-reference, however, shall modify the meaning or use of such term as defined in the Bankruptcy Code.

**1.256** **References Generally.**  All references to an "article" or "articles" are to articles in the Plan, including all sections, subsections, and numbered paragraphs under the referenced article.  All references to a "section" or "sections" designated by capital letters are to the section of this Plan and all numbered paragraphs within such section.  All references to a "section," "paragraph," "sections" or "paragraphs" designated by numbers are to the individual numbered sections or numbered paragraphs in the Plan.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, sub-section or clause contained in the Plan.

**1.257   References to Documents, Headings or Exhibits.**  Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented.  Unless otherwise specified in a particular reference, all references in the Plan to articles, sections, subsections and exhibits are references to articles, sections, subsections and exhibits of or to the Plan.

**1.258   General Rules of Construction.**  The headings at the beginning of each paragraph or section this Plan are solely for convenience and may not be used or construed in any manner to interpret, define, change, modify, amend, alter or restrict the substance of the Plan.  Unless the context requires otherwise, singular nouns and pronouns used in this Plan shall be deemed to include the plural, and pronouns of one gender or the neuter shall be deemed to include the equivalent pronouns of the other gender or the neuter.  The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the terms of this Plan.

**1.259   Computation of Time.**  In computing any period of time prescribed or allowed in the Plan, Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2
## TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS
## AND OTHER UNCLASSIFIED PRIORITY CLAIMS

**2.1   Non-Classification.**  As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Unclassified Priority Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims instead are treated separately in accordance with the terms in this Article 2.

**2.2   Administrative Expense Claims.**

**2.2.1**  Bar Date.  All applications for allowance of Administrative Expense Claims other than (a) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, (b) fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930, and (c) Claims arising pursuant to Section 12.5 of the Plan, shall be filed not later than thirty (30) days after the Effective Date.  All Administrative Expense Claims not filed within thirty days after the Effective Date shall be barred.  The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations.  The Reorganized Debtor shall provide notice to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date.  The Bankruptcy Court shall determine all Administrative Expense Claims.

**2.2.2**  General.  Except as otherwise agreed to by the Debtor and the holder of an Allowed Administrative Expense Claim, and subject to Section 2.2.4. below, each such holder shall be paid in full in Cash on the later of (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms, or (ii) the Effective Date.  If the Debtor disputes any portion of an Administrative Expense Claim, the Debtor shall pay such Claim within 30 days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim. Both pre- and

post-Effective Date fees and expenses of Professionals will be paid from the Distribution Fund.

**2.2.3**  U.S. Trustee's Fees.  The United States Trustee's quarterly fees shall be paid in full without prior approval pursuant to 28 U.S.C. § 1930 on or before the Effective Date.

**2.2.4**  Professional Compensation and Expense Reimbursement Claims.

2.2.4.1    Each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date.  Any award granted by the Bankruptcy Court shall be paid (i) within fifteen days of the entry of the order of the Bankruptcy Court approving such award, unless a stay is obtained, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtor.

2.2.4.2    All fees and expenses of Professionals of the Reorganized Debtor and/or Plan Administrator for services rendered after the Effective Date in connection with the Bankruptcy Case and the Plan shall be paid by the Plan Administrator (if payable from the Distribution Fund) or the Reorganized Debtor upon receipt of reasonably detailed invoices therefor in such amounts and on such terms as such Professional, the Debtor, or the Plan Administrator may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order. Such bankruptcy-related and/or Plan-related fees and expenses of Professionals will be paid from the Distribution Fund (or, if paid by the Reorganized Debtor directly, credited to satisfy the Debtor's obligation to make Quarterly deposits into the Distribution Fund Account) to the extent expressly contemplated and provided under sections 5.5.5, 5.6.1 and 5.6.2 of the Plan.

## 2.3    **Unclassified Priority Claims.**

**2.3.1**  Payment and Treatment.  Allowed Priority Tax Claims shall be paid in Cash after the Effective Date over the Plan Period, in compliance with § 1129(a)(9)(C) of the Bankruptcy Code.  The holders of Allowed Priority Tax Claims shall receive a total value, as of the Effective Date, equal to the Allowed amount of such Claims, plus interest from and after the Effective Date at the Applicable Rate.  Unless they have agreed to different treatment, the Priority Tax Claims shall be paid in full on or before the end of the fifth anniversary of the Petition Date.

**2.3.2**  Payments from the Distribution Fund.  The holders of Allowed Priority Tax Claims shall be paid pro rata from the Distribution Fund.  As described in section 5.5 of the Plan, the Debtor will fund a total Distribution Fund Amount of eight million dollars over ten years (or an average of $200,000 per Quarter over forty Quarters).  Deposits into the Distribution Account will be made Quarterly in the amount of $200,000.  The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution.  Specifically, the holders of Allowed Priority Tax Claims will not receive distributions until the holders of claims with higher priority (listed under

sections 5.6.1 through 5.6.3 of the Plan) have been paid or reserved in full.  Once the holders of Claims with greater priority in right of payment have been satisfied (i.e., subject to the limitations and priorities described in section 5.6), the holders of Allowed Priority Tax Claims shall be paid, pro rata, their share of the funds on deposit in the Distribution Account on each of the Distribution Dates.

     **2.3.3** <u>Annual Installment Payments</u>.  If not paid earlier pursuant to the provisions of section 2.3.2 of this Plan, the Priority Tax Claims shall be paid in five annual installments equal to one-fifth of the total amount of the Allowed Claim.  Specifically, unless such installment amounts have been pre-paid as contemplated under section 2.3.2 of this Plan, the holders of Priority Tax Claims shall be paid regular annual installment payments as follows: the first payment on the later of (a) forty-five days after the Effective Date or (b) the one year anniversary of the Petition Date; the second payment on the second anniversary of the Petition Date; the third payment on the third anniversary of the Petition Date; the fourth payment on the fourth anniversary of the Petition Date; and the fifth and final payment on the fifth anniversary of the Petition Date.

## ARTICLE 3
## CLASSIFICATION OF CLAIMS

     **3.1**    **Claims Provided for in the Plan.**  This Plan treats all Claims against the Debtor, the Consolidated Subsidiary Entities, the Debtor's Property, the Consolidated Subsidiary Entities' Property, and against the Estate. Unless otherwise specified, to the extent that the Plan refers to treatment of a Claim or Claims "against the Debtor," such language should also be construed as treating Claims against the Consolidated Subsidiary Entities. Only Allowed Claims receive any distribution under this Plan.  **All other Claims are disallowed by the Plan and will not receive any distributions under the Plan.**

     **3.2**    **Limitation on Inclusion in a Class.**  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that class.  A Claim is in a particular Class only to the extent that the portion of the Claim is an Allowed Claim in that class.

     **3.3**    **Unclassified Claims.**  In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims are not classified under this Article 3, but are treated in the Plan in accordance with the requirements of 11 U.S.C. § 1129.  Likewise, in accordance with § 1123(a)(1) of the Bankruptcy Code, gap claims within the scope of § 507(a)(3) of the Bankruptcy Code and tax claims within the scope of § 507(a)(8) of the Bankruptcy Code are not classified except to the extent such claim otherwise should be classified, *e.g.*, in the event such claims are not unsecured Priority Claims, but are Secured Claims.

     **3.4**    **Classified Claims and Interests.**  Claims, other than Administrative Expense Claims and Unclassified Priority Claims, shall be classified for all purposes, including voting on, confirmation of, and distribution pursuant to the Plan, as follows:

     **3.4.1** <u>Class 1 – Priority Claims</u>.  Class 1 shall consist of all Allowed Priority Claims against the Debtor other than (a) Unclassified Priority Claims (including Priority Tax Claims), and (b) Priority Claims that are Secured Claims.

**3.4.2** <u>Class 2 – General Unsecured Claims</u>.  Class 2 shall consist of all Allowed General Unsecured Claims against (a) the Debtor, (b) PC Land Holdings and (c) Style-Crete.  Class 2 also shall include all Claims against a Consolidated Subsidiary Entity to the extent the Debtor is a co-debtor as to such claim or obligation.  If, however, any claim against the Debtor or against a Consolidated Subsidiary Entity is secured by property of the Debtor or of any Consolidated Subsidiary Entity, then such claim shall be treated as a "secured claim" against the Reorganized Debtor, not as a Class 2 unsecured claim.

**3.4.3** <u>Class 3 – Ally Financial Secured Claims</u>.  Class 3 shall consist of the Allowed Secured Claim of Ally Financial.

**3.4.4** <u>Class 4 – Amur Secured Claim</u>.  Class 4 shall consist of the Allowed Secured Claim of Amur.

**3.4.5** <u>Class 5 – BBVA Secured Claim</u>.  Class 5 shall consist of the Allowed Secured Claim of BBVA.

**3.4.6** <u>Class 6 – CCG Secured Claim</u>.  Class 6 shall consist of the Allowed Secured Claim of CCG.

**3.4.7** <u>Class 7 – Chapman Secured Claim</u>.  Class 7 shall consist of the Allowed Secured Claim of Chapman.

**3.4.8** <u>Class 8 – Cheuck Yick Secured Claim</u>.  Class 8 shall consist of the Allowed Secured Claim of Cheuck Yick.

**3.4.9** <u>Class 9 – Chrysler Capital Secured Claim</u>.  Class 9 shall consist of the Allowed Secured Claim of Chrysler Capital.

**3.4.10** <u>Class 10 – CIT Bank Secured Claim</u>.  Class 10 shall consist of the Allowed Secured Claim of CIT Bank.

**3.4.11** <u>Class 11 – Continental Bank Secured Claim</u>.  Class 11 shall consist of the Allowed Secured Claim of Continental Bank.

**3.4.12** <u>Class 12 – De Lage Landen Secured Claim.</u>  Class 12 shall consist of the Allowed Secured Claim of De Lage Landen.

**3.4.13** <u>Class 13 – Direct Capital Secured Claim</u>.  Class 13 shall consist of the Allowed Secured Claim of Direct Capital.

**3.4.14** <u>Class 14 – Equify Secured Claim</u>.  Class 14 shall consist of the Allowed Secured Claim of Equify.

**3.4.15** <u>Class 15 – Everbank Secured Claim</u>.  Class 15 shall consist of the Allowed Secured Claim of Everbank.

**3.4.16** Class 16 – FNB Layton Secured Claim.  Class 16 shall consist of the Allowed Secured Claim of FNB Layton.

**3.4.17** Class 17 – Galena Secured Claim.  Class 17 shall consist of the Allowed Secured Claim of Galena.

**3.4.18** Class 18 – Hincklease Secured Claim.  Class 18 shall consist of the Allowed Secured Claim of Hincklease.

**3.4.19** Class 19 – MACU Secured Claim.  Class 19 shall consist of the Allowed Secured Claim of MACU.

**3.4.20** Class 20 – People's Capital Secured Claim.  Class 20 shall consist of the Allowed Secured Claim of People's Capital and Leasing Corp.

**3.4.21** Class 21 – SBA Secured Claim.  Class 21 shall consist of the Allowed Secured Claim of the SBA.

**3.4.22** Class 22 – SG Equipment Finance Secured Claim.  Class 22 shall consist of the Allowed Secured Claim of SG Equipment Finance.

**3.4.23** Class 23 – Siemens Secured Claim.  Class 23 shall consist of the Allowed Secured Claim of Siemens.

**3.4.24** Class 24 – Signature Financial Secured Claim.  Class 24 shall consist of the Allowed Secured Claim of Signature Financial.

**3.4.25** Class 25 – Sterling Secured Claim.  Class 25 shall consist of the Allowed Secured Claim of Sterling.

**3.4.26** Class 26 – TCF Secured Claim.  Class 26 shall consist of the Allowed Secured Claim of TCF.

**3.4.27** Class 27 – Terex Secured Claim.  Class 27 shall consist of the Allowed Secured Claim of Terex.

**3.4.28** Class 28 – Trans Lease Secured Claim.  Class 28 shall consist of the Allowed Secured Claim of Trans Lease.

**3.4.29** Class 29 – Varilease Claim. Class 29 shall consist of the Allowed Secured Claim of Varilease. Bank of Ann Arbor is the successor-in-interest to Varilease, and the holder of this Claim.

**3.4.30** Class 30 – Wells Fargo Secured Claim.  Class 30 shall consist of the Allowed Secured Claim of Wells Fargo.

**3.4.31** Class 31 – Salt Lake County Secured Claim.  Class 31 shall consist of the Allowed Secured Claims of Salt Lake County for unpaid property taxes, if any, plus any interest and penalties for tax years through and including 2018.

**3.4.32** Class 32 – Miscellaneous Secured Claims.  Class 32 shall consist of all Allowed Claims that are secured by property of the Debtor or the Consolidated Subsidiary Entities that are not otherwise classified under this Plan, or that are otherwise subject to treatment as Class 32 Claims.

**3.4.33** Class 33 – Equity Interests in the Debtor.  Class 33 shall consist of all Equity Interests in the Debtor.

**3.4.34** Class 34 – Convenience Claims.  Class 34 shall consist of all Allowed Convenience Claims against the Reorganized Debtor.

**3.4.35** Class 35 – Subordinated Claims.  Class 35 shall consist of all (i) Claims of insiders of the Reorganized Debtor that are voluntarily subordinated; or (ii) Claims that are otherwise subordinated by an Order of the Court.

**3.4.36** Class 36 – Subordinated § 510(b) Claims.  Class 36 shall consist of all Subordinated § 510(b) Claims, including but not limited to the Claims of insiders or former insiders of the Debtor to the extent that those Claims are based on the rescission of a purchase or sale of a security of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under § 502 of the Bankruptcy Code for such Claim.

# ARTICLE 4
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1** **Class 1 – Priority Claims.**

**4.1.1** Impairment and Voting.  Class 1 is impaired under the Plan.  Each holder of an Allowed Class 1 Claim shall be entitled to vote to accept or reject the Plan.

**4.1.2** Payment.  The holders of Allowed Class 1 Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution.

**4.1.3** Distributions.  Subject to the limitations and priorities described in section 5.6, the holders of Allowed Class 1 Claims shall be paid, pro rata, (a) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available on such dates, and (b) on the Final Distribution Date.

**4.1.4** <u>Contingent Right to Request Dismissal</u>.  Section 1129(a)(9)(B) of the Bankruptcy Code provides that, unless the holder of a particular claim has agreed to a different treatment, if a class of claims specified in sections 507(a)(1), (a)(4), (a)(5), (a)(6) or (a)(7) has accepted the plan, the plan must provide that the holders of claims in such class will receive deferred cash payments equal to the allowed amount of such claim.  The Debtor's analysis of claims supports the conclusion that the projected payments from the Distribution Fund should satisfy in full all such Allowed Priority Claims.  If, however, on or after the third Distribution Date, the aggregate amount of Allowed Priority Claims is in excess of Distribution Fund Amount, any holder of an Allowed Priority Claim entitled to priority in payment under sections 507(a)(1), (a)(4), (a)(5), (a)(6) or (a)(7) may file a request for dismissal of the Case on the ground that the Plan does not provide for the payment in full of such holder's Allowed Priority Claim.  If such a motion is filed, the Debtor will have the burden to prove that the Plan complies with section 1129(a)(9)(B) of the Bankruptcy Code.  Alternatively, the Debtor may modify the Plan to increase the Distribution Fund Amount in an amount sufficient to satisfy the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.

**4.1.5**  <u>Effect of Consolidation</u>.  To the extent the holder of any Class 1 Claim holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor.

**4.2**      **<u>Class 2 – General Unsecured Claims</u>**.

**4.2.1**  <u>Impairment and Voting</u>.  Class 2 is impaired under the Plan.  Each holder of an Allowed Class 2 Claim shall be entitled to vote to accept or reject the Plan.

**4.2.2**  <u>Distributions</u>.  The holders of Allowed Class 2 Claims shall be paid pro rata from the Distribution Fund.  As described in section 5.5 of the Plan, the Debtor will fund a total Distribution Fund Amount of eight million dollars over ten years (or an average of $200,000 per Quarter over forty Quarters).  Deposits into the Distribution Account will be made Quarterly in the amount of $200,000.  The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution.  Specifically, the holders of Allowed Class 2 Claims will not receive distributions until the holders of claims with higher priority (listed under sections 5.6.1 through 5.6.6 of the Plan) have been paid or reserved in full.

**4.2.3** <u>Pro Rata Payments on Quarterly Distribution Dates</u>.  Once the holders of Claims with greater priority in right of payment have been satisfied (i.e., subject to the limitations and priorities described in section 5.6), the holders of Allowed Class 2 Claims shall be paid, pro rata, their share of the funds on deposit in the Distribution Account on each of the Distribution Dates.

**4.2.4**  <u>Effect of Consolidation</u>.  To the extent the holder of any Class 2 Claim holds or asserts separate claims against the Debtor and any Consolidated Subsidiary

Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor.

**4.3**     **Class 3 – Ally Financial Secured Claim.**

**4.3.1**     <u>Impairment and Voting</u>.  Class 3 is impaired under the Plan.  Ally Financial shall be entitled to vote to accept or reject the Plan.

**4.3.2**     <u>Treatment of Claim</u>.  To the extent it is Allowed and Secured, the Secured Claim of Ally Financial shall be treated and paid as provided below.

4.3.2.1     *Treatment of Claim.*  The payment and treatment of the Class 3 Claim shall be as follows –

4.3.2.1.1     *Interest on the Ally Financial Secured Claim.*  Interest on the Ally Financial Secured Claim shall continue to accrue from the Effective Date on the unpaid principal balance of the Ally Financial Loan at four and ninety-nine hundredths percent per annum (4.99%).

4.3.2.1.2     *Monthly Installment Payments*.  The Ally Financial Secured Claim shall be paid in monthly installments calculated on a two-year amortization. Beginning on the fifteenth day of the month first occurring after the Effective Date, the Debtor shall pay equal monthly installments to Ally Financial, amortized over two years at the rate of interest described in paragraph 4.3.2.1.1.

4.3.2.1.3     *Option to Sell Collateral*.  At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing the Allowed Class 3 Claim may be sold free and clear of such holder's Lien(s), provided that (i) Ally Financial consents in writing to the sale of the Ally Financial Collateral, or (ii) the proceeds to be realized from the sale of the Ally Financial Collateral are sufficient to pay in full the Allowed Class 3 Claim. Upon the sale of the Collateral, (a) the holders of Allowed Class 3 Claims will be paid in full from the proceeds of sale, or (b) the holder's Lien(s) will attach to the proceeds of sale and the Claim holder will be paid 100% of the proceeds up to the full amount of the Allowed Class 3 Claim less property taxes due or coming due, reasonable broker's commissions (where applicable), reasonable costs of sale, and subject to payment of any senior liens.

4.3.2.1.4     *Payment Upon Sale of Collateral.*  If Collateral which secures the Class 3 Claim is sold, the Reorganized Debtor will pay in full the portion of the Allowed Secured Claim attributable to such Collateral.  At the discretion of the Reorganized Debtor, the Class 3 Claim may be paid either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale.  To the extent the Reorganized Debtor elects to pay a Class 3 Claim after closing, the

Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 3 Claim with all liens to attach instead to the proceeds of the sale.

**4.3.3**   Retain Lien.   Except only as otherwise provided in this section 4.3, to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 3 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full.

## 4.4   Class 4 – Amur Secured Claim.

**4.4.1**   Impairment and Voting.   Class 4 is impaired under the Plan.   The holders of Class 4 Claims shall be entitled to vote to accept or reject the Plan.

**4.4.2**   Secured Claim; Not a True Lease.   The Claim of Amur shall be treated as a secured claim, and not as a true lease.   To the extent the contract(s) between the Debtor and Amur is(are) determined to be a true lease, then the Debtor shall assume the "lease" on the terms and conditions specified in this section 4.4.

**4.4.3**   All Objections to Claim Reserved.   The Debtor and the Plan Administrator reserve, and shall have, the right to object to or challenge the Class 4 Claim in whole or in part, including with respect to amount, validity and priority of Liens, and in all other respects.

**4.4.4**   Treatment of Claim.   To the extent it is Allowed and Secured, the Class 4 Secured Claim shall be treated and paid as provided below.

4.4.4.1     *Treatment of Claim.*   The payment and treatment of the Class 4 Claim shall be as follows –

4.4.4.1.1     *Interest on the Secured Claim.*   Interest on the Class 4 Secured Claim shall continue to accrue from the Effective Date on the unpaid principal balance of the Amur Loan at lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the Amur Loan Documents.

4.4.4.1.2     *Monthly Installment Payments.*   The Class 4 Secured Claim shall be paid in monthly installments calculated on a five-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to the holder of the Class 4 Secured Claim, amortized over five years at the rate of interest described in the immediately preceding paragraph.

4.4.4.1.3     *Option to Sell Collateral.*   At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing the Allowed Class 4 Claim may be sold—collectively

or individually—free and clear of such holder's Lien(s), provided that (i) Amur consents in writing to the sale of the Amur Collateral, or (ii) the proceeds to be realized from the sale of any item(s) of Amur Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. Upon the sale of the Collateral, (a) the holders of Allowed Class 4 Claims will be paid the Collateral Release Amount for the Collateral sold, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the Collateral Release Amount, and the Claim holder will be paid 100% of the proceeds up to the Collateral Release Amount for the Collateral sold. For any item(s) of Collateral sold, the Reorganized Debtor shall be entitled to retain, free and clear of Amur's Liens, any proceeds that exceed the Collateral Release Amount(s) for the particular item(s) of Collateral sold.

4.4.4.1.4   *Payment Upon Sale of Collateral.*   If any item(s) of Amur Collateral is sold, the Reorganized Debtor will pay in full the Collateral Release Amount(s) either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale.  To the extent the Reorganized Debtor elects to pay the Collateral Release Amount(s) after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 4 Claim with all liens to attach instead to the proceeds of the sale, up to the Collateral Release Amount

4.4.4.1.5   *Debtor's Right to Abandon Property in Satisfaction of Claim.*  If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for the Class 4 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of the Allowed Class 4 Claim in complete and full settlement and satisfaction of such Claim.  To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 4 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.4.5**  Retain Lien.  Except only as otherwise provided in this section 4.4, to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 4 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full.

**4.4.6**  Effect of Consolidation.  To the extent the holder of any Class 4 Claim holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor.

**4.5**     **Class 5 – BBVA Secured Claim.**

**4.5.1**   Impairment and Voting.  Class 5 is impaired under the Plan.  BBVA shall be entitled to vote to accept or reject the Plan.

**4.5.2**   Treatment of Claim.  Provided that the holder of the Class 5 Claim accepts the Plan and does not object to the Plan, then the BBVA Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of BBVA Compass Financial Corporation, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "BBVA Stipulation"), filed on June 22, 2018 [Docket No. 356]. Subject to the following paragraph, the terms and conditions of the BBVA Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the BBVA Stipulation. To the extent of any inconsistency between section 4.5 of the Plan and the BBVA Stipulation, the terms of the BBVA Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the BBVA Stipulation, the BBVA Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.5.3**   Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 5 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the BBVA Stipulation), then the Debtor shall have the rights and remedies specified in the BBVA Stipulation, including the right to modify the Plan to provide treatment of the Class 5 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.5.4**   Pre-Effective Date Payments.  As set forth in the BBVA Stipulation, and subject to the entry of the Confirmation Order, all adequate protection payments made after the date of the BBVA Stipulation, but prior to the Effective Date of the Plan, are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to BBVA was made on or about June 22, 2018.

**4.5.5**   Effect of Consolidation.  To the extent BBVA holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable BBVA Collateral.

**4.6**     **Class 6 – CCG Secured Claim.**

**4.6.1**   Impairment and Voting.  Class 6 is impaired under the Plan.  CCG shall be entitled to vote to accept or reject the Plan.

**4.6.2**   Treatment of Claim.  Provided that the holder of the Class 6 Claim accepts the Plan and does not object to the Plan, then the CCG Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Creditor Commercial Credit Group, and Resolving*

*Secured Creditor's Actual and Potential Objections to the Debtor's Plan of Reorganization* (the "CCG Stipulation"), filed on June 7, 2018 [Docket No. 346]. Subject to the following paragraph, the terms and conditions of the CCG Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the CCG Stipulation. To the extent of any inconsistency between section 4.6 of the Plan and the CCG Stipulation, the terms of the CCG Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the CCG Stipulation, the CCG Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.6.3** Treatment of Claim (Objecting or not Accepting). In the event that the holder of the Class 6 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the CCG Stipulation), then the Debtor shall have the rights and remedies specified in the CCG Stipulation, including the right to modify the Plan to provide treatment of the Class 6 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.6.4** Pre-Effective Date Payments. As set forth in the CCG Stipulation, and subject to the entry of the Confirmation Order, all adequate protection payments made after the date of the CCG Stipulation, but prior to the Effective Date of the Plan, are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to CCG was made on or about June 7, 2018.

**4.6.5** Effect of Consolidation. To the extent CCG holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable CCG Collateral.

**4.7** **Class 7 – Chapman Secured Claim.**

**4.7.1** Impairment and Voting. Class 7 is impaired under the Plan. Chapman shall be entitled to vote to accept or reject the Plan.

**4.7.2** Treatment of Claim. Provided that the holder of the Class 7 Claim accepts the Plan and does not object to the Plan, then the Chapman Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Todd Chapman and Julie Chapman and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Chapman Stipulation"), filed on April 30, 2018 [Docket No. 301]. Subject to the following paragraph, the terms and conditions of the Chapman Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Chapman Stipulation. To the extent of any inconsistency between section 4.7 of the Plan and the Chapman Stipulation, the terms of the Chapman Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Chapman Stipulation, the Chapman Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.7.3** <u>Treatment of Claim (Objecting or not Accepting)</u>.  In the event that the holder of the Class 7 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Chapman Stipulation), then the Debtor shall have the rights and remedies specified in the Chapman Stipulation, including the right to modify the Plan to provide treatment of the Class 7 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.7.1** <u>Pre-Effective Date Payments</u>.  As set forth in the Chapman Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Chapman Stipulation) are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to Chapman was made on or about April 30, 2018.

**4.7.2** <u>Effect of Consolidation</u>.  To the extent Chapman holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Chapman Collateral.

**4.8**   **<u>Class 8 – Cheuck Yick Secured Claim.</u>**

**4.8.1** <u>Impairment and Voting</u>.  Class 8 is impaired under the Plan.  Cheuck Yick shall be entitled to vote to accept or reject the Plan.

**4.8.2** <u>Treatment of Claim</u>.  Provided that the holder of the Class 8 Claim accepts the Plan and does not object to the Plan, then the Cheuck Yick Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Cheuck Yick Industrial, Ltd., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "<u>Cheuck Yick Stipulation</u>"), filed on May 9, 2018 [Docket No. 308]. Subject to the following paragraph, the terms and conditions of the Cheuck Yick Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Cheuck Yick Stipulation. To the extent of any inconsistency between section 4.8 of the Plan and the Cheuck Yick Stipulation, the terms of the Cheuck Yick Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Cheuck Yick Stipulation, the Cheuck Yick Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.8.3** <u>Treatment of Claim (Objecting or not Accepting)</u>.  In the event that the holder of the Class 8 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Cheuck Yick Stipulation), then the Debtor shall have the rights and remedies specified in the Cheuck Yick Stipulation, including the right to modify the Plan to provide treatment of the Class 8 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.8.4**   Pre-Effective Date Payments.  As set forth in the Cheuck Yick Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Cheuck Yick Stipulation) are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to Cheuck Yick was made on or about May 15, 2018.

**4.8.5**   Effect of Consolidation.  To the extent Cheuck Yick holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Cheuck Yick Collateral.

**4.9**     **Class 9 – Chrysler Capital Secured Claim.**

**4.9.1**   Impairment and Voting.  Class 9 is impaired under the Plan.  Chrysler Capital shall be entitled to vote to accept or reject the Plan.

**4.9.2**   Treatment of Claim.  To the extent it is Allowed and Secured, the Secured Claim of Chrysler Capital shall be treated and paid as provided below.

**4.9.2.1**   *Treatment of Claim if Anticipated Sale Occurs.*  The Class 9 Claim shall be paid in full from the proceeds of the sale of the Chrysler Capital Collateral, as contemplated in the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Sell Vehicle "Free and Clear" of Liens, Claims, Interests, and Encumbrances*, filed on June 7, 2018 [Docket No. 347] (the "Chrysler Capital Sale Motion").

**4.9.2.2**   *Treatment of Claim if the Anticipated Sale Does Not Fund.*  If the sale contemplated under the Chrysler Capital Sale Motion does not occur, the Allowed and Secured claim of Chrysler Capital will be paid and treated as follows.

**4.9.2.2.1**   *Interest on the Chrysler Capital Secured Claim.*  Interest on the Chrysler Capital Secured Claim shall continue to accrue on the unpaid principal balance of the Chrysler Capital Loan at four and ninety-nine hundredths percent (4.99%).

**4.9.2.2.2**   *Monthly Installment Payments.*  The Chrysler Capital Secured Claim shall be paid in monthly installments calculated on a two-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to Chrysler Capital, amortized over two years at the rate of interest described in paragraph 4.9.2.1.1.

**4.9.2.2.3**   *Option to Sell Collateral.*  At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing the Allowed Class 9 Claim may be sold free and clear of such holder's Lien(s), provided that (i) the Court enters in the Case an Order authorizing the Debtor to sell the Collateral, or (ii) Chrysler Capital consents in writing to the sale of the Chrysler Capital Collateral, or (iii) the

proceeds to be realized from the sale of the Chrysler Capital Collateral are sufficient to pay in full the Allowed Class 9 Claim. Upon the sale of the Collateral, (a) the holders of Allowed Class 9 Claims will be paid in full from the proceeds of sale, or (b) the holder's Lien(s) will attach to the proceeds of sale and the Claim holder will be paid 100% of the net proceeds up to the full amount of the Allowed Class 9 Claim less property taxes due or coming due, reasonable broker's commissions (where applicable), reasonable costs of sale, and subject to payment of any senior liens.

4.9.2.2.4   *Payment Upon Sale of Collateral.*   If Collateral which secures the Class 9 Claim is sold, the Reorganized Debtor will pay in full the portion of the Allowed Secured Claim attributable to such Collateral.  At the discretion of the Reorganized Debtor, the Class 9 Claim may be paid either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale.  To the extent the Reorganized Debtor elects to pay a Class 9 Claim after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 9 Claim with all liens to attach instead to the proceeds of the sale.

4.9.2.2.5   *Debtor's Right to Abandon Property in Satisfaction of Claim.*   If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for the Class 9 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of an Allowed Class 9 Claim in complete and full settlement and satisfaction of such Claim.  To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 9 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.9.3**   Retain Lien.  Except only as otherwise provided in this section 4.9, to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 9 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full. .

**4.9.4**   Effect of Consolidation.  To the extent Chrysler Capital holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Chrysler Capital Collateral.

**4.10**    **Class 10 – CIT Bank Secured Claim.**

**4.10.1**  Impairment and Voting.  Class 10 is impaired under the Plan.  CIT Bank shall be entitled to vote to accept or reject the Plan.

**4.10.2**  Treatment of Claim.  The CIT Bank Secured Claim shall be treated consistent with the stipulation set forth in the *Motion to Approve Stipulation and Agreement (I) Granting Relief from the Automatic Stay (II) Resolving Claims of CIT Bank, N.A., and (III) Authorizing Abandonment of Equipment* (the "CIT Stipulation") filed on May 15, 2018 [Docket No. 317], and approved by Order of the Court entered on June 5, 2018 [Docket No. 345].

**4.10.3**  Abandonment in Full Satisfaction.  As set forth in the CIT Stipulation, all of the Reorganized Debtor's right, title, and interest in the CIT Bank Collateral was, or hereby is, abandoned to CIT Bank in complete and full satisfaction of the CIT Bank Allowed Secured Claim. CIT Bank is deemed to have fully, finally, and forever released and discharged the Debtor and the Estate (and other parties set forth in the CIT Stipulation) from any and all Claims against them.

**4.10.4**  Effect of Consolidation.  To the extent CIT Bank holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor which was (and is) satisfied by the abandonment of the CIT Bank Collateral.

**4.11**    **Class 11 - Continental Bank Secured Claim.**

**4.11.1**  Impairment and Voting.  Class 11 is impaired under the Plan.  Continental Bank shall be entitled to vote to accept or reject the Plan.

**4.11.2**  Treatment of Claim.  Provided that the holder of the Class 11 Claim accepts the Plan and does not object to the Plan, then the Continental Bank Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Continental Bank, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Continental Bank Stipulation"), filed on June 19, 2018 [Docket No. 352]. Subject to the following paragraph, the terms and conditions of the Continental Bank Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Continental Bank Stipulation. To the extent of any inconsistency between section 4.11 of the Plan and the Continental Bank Stipulation, the terms of the Continental Bank Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Continental Bank Stipulation, the Continental Bank Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.11.3**  Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 11 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Continental Bank

Stipulation), then the Debtor shall have the rights and remedies specified in the Continental Bank Stipulation, including the right to modify the Plan to provide treatment of the Class 11 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.11.4** <u>Pre-Effective Date Payments</u>.  As set forth in the Continental Bank Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Continental Bank Stipulation) are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to Continental Bank was made on or about June 15, 2018.

**4.11.5** <u>Effect of Consolidation</u>.  To the extent Continental Bank holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Continental Bank Collateral.

**4.12** **Class 12 – De Lage Landen Secured Claim.**

**4.12.1** <u>Impairment and Voting</u>.  Class 12 is impaired under the Plan.  De Lage Landen shall be entitled to vote to accept or reject the Plan.

**4.12.2** <u>Treatment of Claim</u>.  Provided that the holder of the Class 12 Claim accepts the Plan and does not object to the Plan, then the De Lage Landen Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of De Lage Landen Financial Services, Inc., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "De Lage Landen Stipulation"), filed on May 16, 2018 [Docket No. 321]. Subject to the following paragraph, the terms and conditions of the De Lage Landen Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the De Lage Landen Stipulation. To the extent of any inconsistency between section 4.12 of the Plan and the De Lage Landen Stipulation, the terms of the De Lage Landen Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the De Lage Landen Stipulation, the De Lage Landen Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.12.3** <u>Treatment of Claim (Objecting or not Accepting)</u>.  In the event that the holder of the Class 12 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the De Lage Landen Stipulation), then the Debtor shall have the rights and remedies specified in the De Lage Landen Bank Stipulation, including the right to modify the Plan to provide treatment of the Class 12 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims)..

**4.12.4** <u>Pre-Effective Date Payments</u>.  As set forth in the De Lage Landen Stipulation, and subject to the entry of the Confirmation Order, all adequate protection

payments made on or after the date of the De Lage Landen Stipulation are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to De Lage Landen was made on or about May 16, 2018.

     **4.12.5**  <u>Effect of Consolidation</u>.  To the extent De Lage Landen holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable De Lage Landen Collateral.

**4.13**    <u>**Class 13 – Direct Capital Secured Claim.**</u>

     **4.13.1**  <u>Impairment and Voting</u>.  Class 13 is impaired under the Plan.  Direct Capital shall be entitled to vote to accept or reject the Plan.

     **4.13.2**  <u>Treatment of Claim</u>.  Provided that the holder of the Class 13 Claim accepts the Plan and does not object to the Plan, then the Direct Capital Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Direct Capital Corporation and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "<u>Direct Capital Stipulation</u>"), filed on May 25, 2018 [Docket No. 334]. Subject to the following paragraph, the terms and conditions of the Direct Capital Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Direct Capital Stipulation. To the extent of any inconsistency between section 4.13 of the Plan and the Direct Capital Stipulation, the terms of the Direct Capital Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Direct Capital Stipulation, the Direct Capital Stipulation shall be deemed approved by the entry of the Confirmation Order.

     **4.13.3**  <u>Treatment of Claim (Objecting or not Accepting)</u>.  In the event that the holder of the Class 13 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Direct Capital Stipulation), then the Debtor shall have the rights and remedies specified in the Direct Capital Stipulation, including the right to modify the Plan to provide treatment of the Class 13 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

     **4.13.4**  <u>Pre-Effective Date Payments</u>.  As set forth in the Direct Capital Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Direct Capital Stipulation) are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to Direct Capital was made on or about May 25, 2018.

     **4.13.5**  <u>Effect of Consolidation</u>.  To the extent Direct Capital holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-

debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Direct Capital Collateral.

**4.14    Class 14 – Equify Secured Claim.**

      **4.14.1**  Impairment and Voting.  Class 14 is impaired under the Plan.  Equify shall be entitled to vote to accept or reject the Plan.

      **4.14.2**  Treatment of Claim.  Provided that the holder of the Class 14 Claim accepts the Plan and does not object to the Plan, then the Equify Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Equify Capital, LLC, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Equify Stipulation"), filed on June 19, 2018 [Docket No. 353]. Subject to the following paragraph, the terms and conditions of the Equify Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Equify Stipulation. To the extent of any inconsistency between section 4.14 of the Plan and the Equify Stipulation, the terms of the Equify Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Equify Stipulation, the Equify Stipulation shall be deemed approved by the entry of the Confirmation Order.

      **4.14.3**  Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 14 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Equify Stipulation), then the Debtor shall have the rights and remedies specified in the Equify Stipulation, including the right to modify the Plan to provide treatment of the Class 14 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

      **4.14.4**  Pre-Effective Date Payments.  As set forth in the Equify Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Equify Stipulation) are hereby deemed to constitute Monthly Plan Payments. Accordingly, the first Monthly Plan Payment paid to Equify was made on or about June 19, 2018.

      **4.14.5**  Effect of Consolidation.  To the extent Equify holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Equify Collateral.

**4.15    Class 15 – Everbank Secured Claim.**

      **4.15.1**  Impairment and Voting.  Class 15 is impaired under the Plan.  Everbank shall be entitled to vote to accept or reject the Plan.

      **4.15.2**  Treatment of Claim.  Provided that the holder of the Class 15 Claim accepts the Plan and does not object to the Plan, the Everbank Allowed Secured Claim

shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of TIAA Commercial Finance, Inc. f/k/a Everbank Commercial Finance, Inc., Resolving Potential Claim Disputes, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Everbank Stipulation"), filed on July 18, 2018 [Docket No. 377]. The terms and conditions of the Everbank Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Everbank Stipulation. To the extent of any inconsistency between section 4.15 of the Plan and the Everbank Stipulation, the terms of the Everbank Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Everbank Stipulation, the Everbank Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.15.3** Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 15 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Everbank Stipulation), then the Debtor shall have the rights and remedies specified in the Everbank Stipulation, including the right to modify the Plan to provide treatment of the Class 15 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.15.4** Pre-Effective Date Payments.  As set forth in the Everbank Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Everbank Stipulation) are hereby deemed to constitute Monthly Plan Payments to Everbank. The first Monthly Plan Payment to Everbank shall be made on or before August 15, 2018.

**4.15.5** Effect of Consolidation.  To the extent Everbank holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Everbank Collateral.

**4.16    Class 16 – FNB Layton Secured Claim.**

**4.16.1** Impairment and Voting.  Class 16 is impaired under the Plan.  FNB Layton shall be entitled to vote to accept or reject the Plan.

**4.16.2** Treatment of Claim.  Provided that the holder of the Class 16 Claim accepts the Plan and does not object to the Plan, the FNB Layton Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of First National Bank of Layton and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "FNB Layton Stipulation"), filed on March 30, 2018 [Docket No. 243]. The terms and conditions of the FNB Layton Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the FNB Layton Stipulation. To the extent of any

inconsistency between section 4.16.2 of the Plan and the FNB Layton Stipulation, the terms of the FNB Layton Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the FNB Layton Stipulation, the FNB Layton Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.16.3**   Treatment of Claim (Objecting or not Accepting).   In the event that the holder of the Class 16 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the FNB Layton Stipulation), then the Debtor shall have the rights and remedies specified in the FNB Layton Stipulation, including the right to modify the Plan to provide treatment of the Class 16 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.16.4**   Pre-Effective Date Payments.   As set forth in the FNB Layton Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the FNB Layton Stipulation) are hereby deemed to constitute Monthly Plan Payments to FNB Layton. Accordingly, the first Monthly Plan Payment paid to FNB Layton was made on or about March 30, 2018.

**4.16.5**   Effect of Consolidation.   To the extent FNB Layton holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable FNB Layton Collateral.

**4.17**   **Class 17 – Galena Secured Claim.**

**4.17.1**   Impairment and Voting.   Class 17 is impaired under the Plan.  Galena shall be entitled to vote to accept or reject the Plan.

**4.17.2**   Treatment of Claim.   To the extent it is Allowed and Secured, the Secured Claim of Galena shall be treated and paid as provided below.

**4.17.2.1**   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor, Galena and the Committee have entered into a stipulation providing for the treatment of Galena's Claim (the "**Galena Stipulation**") then, provided that the holder of the Class 17 Claim accepts the Plan and does not object to the Plan, the Class 17 Claim shall be treated consistent with the terms set forth in the Galena Stipulation.

**4.17.2.1.1**   In such event, subject to the following paragraph, the terms and conditions of the Galena Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 4.17 of the Plan and the Galena Stipulation, the terms of the Galena Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Galena Stipulation, the Galena Stipulation shall be deemed approved by the entry of the Confirmation Order.

4.17.2.1.2   In the event, however, that the holder of the Class 17 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Galena Stipulation), then the Debtor shall have the rights and remedies specified in the Galena Stipulation, including the right to modify the Plan to provide treatment of the Class 6 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims), or as provided in section 4.17.2.2, below.

4.17.2.2   *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor, Galena and the Committee shall have entered into a Galena Stipulation, the payment and treatment of the Class 17 Claim shall be as follows –

4.17.2.2.1 *Potential Bifurcation of Claim.*  To the extent the Class 17 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral, the Claim shall be treated as a Secured Claim only to the extent of such value.

4.17.2.2.2 *Reservation of All Objections to Claim and Lien.*  The Reorganized Debtor and Plan Administrator (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 17 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

4.17.2.2.3 *Interest on the Galena Secured Claim.*  Interest on the Class 17 Secured Claim shall accrue, from and after the Effective Date, on the unpaid principal balance of the Galena Loan at lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the Galena Loan Documents.

4.17.2.2.4 *Monthly Installment Payments.*  The Class 17 Secured Claim shall be paid in monthly installments calculated on a ten-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to the holder of the Class 17 Secured Claim, amortized over ten years at the rate of interest described in the immediately preceding paragraph.

4.17.2.2.5 *Option to Sell Collateral.*  At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing the Allowed Class 17 Claim may be sold free and clear of such holder's Lien(s), provided that (i) the Court enters an Order approving the sale, (ii) Galena consents in writing to the sale of the Galena Collateral, or (iii) the proceeds to be realized from the sale of the Galena Collateral are sufficient to pay in full the Allowed Class 17 Claim. Upon the sale of the Collateral, (a) the holders of Allowed Class 17 Claims will be paid in full from the proceeds of sale, or (b) the holder's Lien(s) will attach to the

proceeds of sale and the Claim holder will be paid 100% of the proceeds up to the full amount of the Allowed Class 17 Claim less property taxes due or coming due, reasonable broker's commissions (where applicable), reasonable costs of sale, and subject to payment of any senior liens.

4.17.2.2.6 *Payment Upon Sale of Collateral.* If Collateral which secures the Class 17 Claim is sold, the Reorganized Debtor will pay in full the portion of the Allowed Secured Claim attributable to such Collateral. At the discretion of the Reorganized Debtor, the Class 17 Claim may be paid either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale. To the extent the Reorganized Debtor elects to pay a Class 17 Claim after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 17 Claim with all liens to attach instead to the proceeds of the sale.

4.17.2.2.7 *Debtor's Right to Abandon Property in Satisfaction of Claim.* If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for the Class 17 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of the Allowed Class 17 Claim in complete and full settlement and satisfaction of such Claim. To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 17 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.17.3** Retain Lien. Except only as otherwise provided in this section 4.17 (or in the Galena Stipulation), to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 18 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full.

**4.17.4** Effect of Consolidation. To the extent Galena holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Galena Collateral.

## 4.18    Class 18 – Hincklease Secured Claim.

**4.18.1** Impairment and Voting. Class 18 is impaired under the Plan. Hicklease shall be entitled to vote to accept or reject the Plan.

**4.18.2** Secured Claim; Not a True Lease. The Claim of Hincklease shall be treated as a secured claim, and not as a true lease. To the extent the contract(s) between

the Debtor and Hincklease is(are) determined to be a true lease, then the Debtor shall assume the "lease" on the terms and conditions specified in this section 4.18.

**4.18.3**   Treatment of Claim.  To the extent it is Allowed and Secured, the Secured Claim of Hincklease shall be treated and paid as provided below.

**4.18.3.1**   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor, Hincklease and the Committee have entered into a stipulation providing for the treatment of Hincklease's Claim (the "Hincklease Stipulation") then, provided that the holder of the Class 18 Claim accepts the Plan and does not object to the Plan, Class 18 Claim shall be treated consistent with the terms set forth in the Hincklease Stipulation.

**4.18.3.1.1**   In such event, subject to the following paragraph, the terms and conditions of the Hincklease Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 4.18 of the Plan and the Hincklease Stipulation, the terms of the Hincklease Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Hincklease Stipulation, the Hincklease Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.18.3.1.2**   In the event, however, that the holder of the Class 18 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Hincklease Stipulation), then the Debtor shall have the rights and remedies specified in the Hincklease Stipulation, including the right to modify the Plan to provide treatment of the Class 18 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims), or as provided in section 4.18.2.2, below.

**4.18.3.2**   *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor, Hincklease and the Committee shall have entered into a Hincklease Stipulation, the payment and treatment of the Class 18 Claim shall be as follows –

**4.18.3.2.1**   *Potential Bifurcation of Claim.*  To the extent the Class 18 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral, the Claim shall be treated as a Secured Claim only to the extent of such value.

**4.18.3.2.2**   *Reservation of All Objections to Claim and Lien.*  The Reorganized Debtor and Plan Administrator (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 18 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

4.18.3.2.3 *Interest on the Hincklease Secured Claim.* Interest on the Class 18 Secured Claim shall accrue, from and after the Effective Date, on the unpaid principal balance of the Hincklease Loan at the lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the Hincklease Loan Documents.

4.18.3.2.4 *Monthly Installment Payments.* The Class 18 Secured Claim shall be paid in monthly installments calculated on a ten-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to the holder of the Class 18 Secured Claim, amortized over ten years at the rate of interest described in the immediately preceding paragraph.

4.18.3.2.5 *Option to Sell Collateral.* At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing an Allowed Class 18 Claim may be sold—collectively or individually—free and clear of such holder's Lien(s), provided that (i) the Court enters an order approving such sale, (ii) the holder of the Class 18 Claim consents in writing to the sale of the Collateral, or (ii) the proceeds to be realized from the sale of any item(s) of Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. Upon the sale of the Collateral, (a) the holder of the Allowed Class 18 Claim will be paid the Collateral Release Amount for the Collateral sold, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the Collateral Release Amount, and the Claim holder will be paid 100% of the proceeds up to the Collateral Release Amount for the Collateral sold. For any item(s) of Collateral sold, the Reorganized Debtor shall be entitled to retain, free and clear of the Class 18 Claim holder's Liens, any proceeds that exceed the Collateral Release Amount(s) for the particular item(s) of Collateral sold.

4.18.3.2.6 *Payment Upon Sale of Collateral.* If any item(s) of a Class 18 Claim holder's Collateral is sold, the Reorganized Debtor will pay in full the Collateral Release Amount(s) either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale. To the extent the Reorganized Debtor elects to pay the Collateral Release Amount(s) after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 18 Claim with all liens to attach instead to the proceeds of the sale, up to the Collateral Release Amount.

4.18.3.2.7 *Debtor's Right to Abandon Property in Satisfaction of Claim.* If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for the Class 18 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of the Allowed Class 18 Claim in complete and

full settlement and satisfaction of such Claim.  To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 18 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.18.4**   Retain Lien.  Except only as otherwise provided in this section 4.18 (or in the Hincklease Stipulation), to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 18 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full. .

**4.18.5**   Effect of Consolidation.  To the extent Hincklease holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Hincklease Collateral.

## 4.19     Class 19 – MACU Secured Claim.

**4.19.1**   Impairment and Voting.  Class 19 is impaired under the Plan.  MACU shall be entitled to vote to accept or reject the Plan.

**4.19.2**   Treatment of Claim.  Provided that the holder of the Class 19 Claim accepts the Plan and does not object to the Plan, the MACU Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Mountain America Federal Credit Union and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "MACU Stipulation"), filed on April 16, 2018 [Docket No. 274]. The terms and conditions of the MACU Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the MACU Stipulation. To the extent of any inconsistency between section 4.19 of the Plan and the MACU Stipulation, the terms of the MACU Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the MACU Stipulation, the MACU Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.19.3**   Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 19 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the MACU Stipulation), then the Debtor shall have the rights and remedies specified in the MACU Stipulation, including the right to modify the Plan to provide treatment of the Class 19 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.19.4**   Pre-Effective Date Payments.  As set forth in the MACU Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection

Payments (as defined in the MACU Stipulation) are hereby deemed to constitute Monthly Plan Payments to MACU. Accordingly, the first Monthly Plan Payment paid to MACU was made on or about April 16, 2018.

**4.19.5**  Effect of Consolidation.  To the extent MACU holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable MACU Collateral.

**4.20**  **Class 20 – People's Capital Secured Claim.**

**4.20.1**  Impairment and Voting.  Class 20 is impaired under the Plan.  People's Capital shall be entitled to vote to accept or reject the Plan.

**4.20.2**  Treatment of Claim.  Provided that the holder of the Class 20 Claim accepts the Plan and does not object to the Plan, the People's Capital Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of People's Capital and Leasing Corp. and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "People's Capital Stipulation"), filed on June 19, 2018 [Docket No. 354]. The terms and conditions of the People's Capital Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the People's Capital Stipulation. To the extent of any inconsistency between section 4.20 of the Plan and the People's Capital Stipulation, the terms of the People's Capital Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the People's Capital Stipulation, the People's Capital Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.20.3**  Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 20 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the People's Capital Stipulation), then the Debtor shall have the rights and remedies specified in the People's Capital Stipulation, including the right to modify the Plan to provide treatment of the Class 20 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.20.4** Pre-Effective Date Payments.  As set forth in the People's Capital Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the People's Capital Stipulation) are hereby deemed to constitute Monthly Plan Payments to People's Capital. Accordingly, the first Monthly Plan Payment paid to People's Capital was made on or about May 15, 2018.

**4.20.5**  Effect of Consolidation.  To the extent Peoples Capital holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-

debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable People's Capital Collateral.

### 4.21    Class 21 – The SBA Secured Claim

**4.21.1**  Impairment and Voting.  Class 21 is impaired under the Plan. The SBA shall be entitled to vote to accept or reject the Plan.

**4.21.2**  Treatment of Claim.  Provided that the holder of the Class 21 Claim accepts the Plan and does not object to the Plan, the SBA Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Claim of U.S. Small Business Administration and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "SBA Stipulation"), filed on May 9, 2018 [Docket No. 307]. The terms and conditions of the SBA Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the SBA Stipulation. To the extent of any inconsistency between section 4.21 of the Plan and the SBA Stipulation, the terms of the SBA Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the SBA Stipulation, the SBA Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.21.3**  Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 21 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the SBA Stipulation), then the Debtor shall have the rights and remedies specified in the SBA Stipulation, including the right to modify the Plan to provide different treatment of the Class 21 Claim.

**4.21.4**  Pre-Effective Date Payments.  As set forth in the SBA Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the SBA Stipulation) are hereby deemed to constitute Monthly Plan Payments to the SBA. Accordingly, the first Monthly Plan Payment paid to the SBA was made on or about May 11, 2018.

**4.21.5**  Effect of Consolidation.  To the extent the SBA holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable SBA Collateral.

### 4.22    Class 22 – SG Equipment Finance Secured Claim.

**4.22.1**  Impairment and Voting.  Class 22 is impaired under the Plan.  The holders of Class 22 Claims shall be entitled to vote to accept or reject the Plan.

**4.22.2**  Treatment of Claim.  Provided that the holder of the Class 22 Claim accepts the Plan and does not object to the Plan, the SG Equipment Finance Allowed

Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Claim of SG Equipment Finance USA Corp. and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "SG Equipment Finance Stipulation"), filed on June 27, 2018 [Docket No. 360]. The terms and conditions of the SG Equipment Finance Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the SG Equipment Finance Stipulation. To the extent of any inconsistency between section 4.22 of the Plan and the SG Equipment Finance Stipulation, the terms of the SG Equipment Finance Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the SG Equipment Finance Stipulation, the SG Equipment Finance Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.22.3** Treatment of Claim (Objecting or not Accepting). In the event that the holder of the Class 22 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the SG Equipment Finance Stipulation), then the Debtor shall have the rights and remedies specified in the SG Equipment Finance Stipulation, including the right to modify the Plan to provide treatment of the Class 22 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.22.4** Pre-Effective Date Payments. As set forth in the SG Equipment Finance Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the SG Equipment Finance Stipulation) are hereby deemed to constitute Monthly Plan Payments to SG Equipment Finance. Accordingly, the first Monthly Plan Payment paid to SG Equipment Finance is anticipated to be made on or about July 15, 2018.

**4.22.5** Effect of Consolidation. To the extent SG Equipment Finance holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable SG Equipment Finance Collateral.

**4.23** **Class 23 – Siemens Secured Claim.**

**4.23.1** Impairment and Voting. Class 23 is impaired under the Plan. Siemens shall be entitled to vote to accept or reject the Plan.

**4.23.2** Treatment of Claim. Provided that the holder of the Class 23 Claim accepts the Plan and does not object to the Plan, the Siemens Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Siemens Financial Services, Inc., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Siemens Stipulation"), filed on August 10, 2018 [Docket No. 437]. The terms and conditions of the Siemens Stipulation are, and shall be, deemed fully

incorporated under the Plan by this reference to the Siemens Stipulation. To the extent of any inconsistency between section 4.23 of the Plan and the Siemens Stipulation, the terms of the Siemens Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Siemens Stipulation, the Siemens Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.23.3**   Treatment of Claim (Objecting or not Accepting).   In the event that the holder of the Class 23 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Siemens Stipulation), then the Debtor shall have the rights and remedies specified in the Siemens Stipulation, including the right to modify the Plan to provide treatment of the Class 23 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.23.4**   Pre-Effective Date Payments.   As set forth in the Siemens Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Siemens Stipulation) are hereby deemed to constitute Monthly Plan Payments to Siemens. The first Monthly Plan Payment to Siemens shall be made on or before August 15, 2018.

**4.23.5**   Effect of Consolidation.   To the extent Siemens holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Siemens Collateral.

## 4.24   **Class 24 – Signature Financial Secured Claim.**

**4.24.1**   Impairment and Voting.   Class 24 is impaired under the Plan. Signature Financial shall be entitled to vote to accept or reject the Plan.

**4.24.2**   Treatment of Claim.   Provided that the holder of the Class 24 Claim accepts the Plan and does not object to the Plan, the Signature Financial Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection Agreement and Stipulated Plan Treatment Relating to Secured Claim of Signature Financial, LLC, and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Signature Financial Stipulation"), filed on June 19, 2018 [Docket No. 355]. The terms and conditions of the Signature Financial Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Signature Financial Stipulation. To the extent of any inconsistency between section 4.24 of the Plan and the Signature Financial Stipulation, the terms of the Signature Financial Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Signature Financial Stipulation, the Signature Financial Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.24.3**  Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 24 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Signature Financial Stipulation), then the Debtor shall have the rights and remedies specified in the Signature Stipulation, including the right to modify the Plan to provide treatment of the Class 24 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.24.4**  Pre-Effective Date Payments.  As set forth in the Signature Financial Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Signature Financial Stipulation) are hereby deemed to constitute Monthly Plan Payments to Signature Financial. Accordingly, the first Monthly Plan Payment paid to Signature Financial was made on or about May 29, 2018.

**4.24.5**  Effect of Consolidation.  To the extent Signature holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Signature Collateral.

**4.25**  **Class 25 – Sterling Secured Claim.**

**4.25.1**  Impairment and Voting.  Class 25 is impaired under the Plan.  The holders of Class 25 Claims shall be entitled to vote to accept or reject the Plan.

**4.25.2**  Treatment of Claim.  To the extent it is Allowed and Secured, the Secured Claim of Sterling shall be treated and paid as provided below.

4.25.2.1  *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor, Sterling and the Committee have entered into a stipulation providing for the treatment of Sterling's Claim (the "Sterling Stipulation") then, provided that the holder of the Class 25 Claim accepts the Plan and does not object to the Plan, the Class 25 Claim shall be treated consistent with the terms set forth in the Sterling Stipulation.

4.25.2.1.1  In such event, subject to the following paragraph, the terms and conditions of the Sterling Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 4.25 of the Plan and the Sterling Stipulation, the terms of the Sterling Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Sterling Stipulation, the Sterling Stipulation shall be deemed approved by the entry of the Confirmation Order.

4.25.2.1.2  In the event, however, that the holder of the Class 25 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Sterling

Stipulation), then the Debtor shall have the rights and remedies specified in the Sterling Stipulation, including the right to modify the Plan to provide treatment of the Class 25 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims), or as provided in section 4.25.2.2, below.

4.25.2.2   *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor, Sterling and the Committee shall have entered into a Sterling Stipulation, the payment and treatment of the Class 25 Claim shall be as follows –

4.25.2.2.1 *Potential Bifurcation of Claim.*  To the extent the Claim of Sterling as of the Petition Date exceeds the forced liquidation value of the Sterling Collateral, the Claim shall be treated as a Secured Claim only to the extent of such value.

4.25.2.2.2 *Reservation of All Objections to Claim and Lien.*  The Reorganized Debtor and Plan Administrator (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 25 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

4.25.2.2.3 *Interest on the Secured Claim.*  Interest on the Class 25 Secured Claim shall accrue, from and after the Effective Date, on the unpaid principal balance of the Sterling Loan at lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the Sterling Loan Documents.

4.25.2.2.4 *Monthly Installment Payments*.  The Class 25 Secured Claim shall be paid in monthly installments calculated on a ten-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to the holder of the Class 25 Secured Claim, amortized over ten years at the rate of interest described in the immediately preceding paragraph.

4.25.2.2.5 *Option to Sell Collateral*.  At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing an Allowed Class 25 Claim may be sold—collectively or individually—free and clear of such holder's Lien(s), provided that (i) the Court enters an order approving such sale, (ii) the holder of the Class 25 Claim consents in writing to the sale of the Collateral, or (ii) the proceeds to be realized from the sale of any item(s) of Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. Upon the sale of the Collateral, (a) the holder of the Allowed Class 25 Claim will be paid the Collateral Release Amount for the Collateral sold, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the Collateral Release Amount, and the Claim holder will be paid 100% of the proceeds up

to the Collateral Release Amount for the Collateral sold. For any item(s) of Collateral sold, the Reorganized Debtor shall be entitled to retain, free and clear of the Class 25 Claim holder's Liens, any proceeds that exceed the Collateral Release Amount(s) for the particular item(s) of Collateral sold.

4.25.2.2.6 *Payment Upon Sale of Collateral.* If any item(s) of a Class 25 Claim holder's Collateral is sold, the Reorganized Debtor will pay in full the Collateral Release Amount(s) either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale. To the extent the Reorganized Debtor elects to pay the Collateral Release Amount(s) after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 25 Claim with all liens to attach instead to the proceeds of the sale, up to the Collateral Release Amount.

4.25.2.2.7 *Debtor's Right to Abandon Property in Satisfaction of Claim.* If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for the Class 25 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of the Allowed Class 25 Claim in complete and full settlement and satisfaction of such Claim. To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 25 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.25.3** Retain Lien. Except only as otherwise provided in this section 4.25 (or in the Sterling Stipulation), to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 25 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full.

**4.25.4** Effect of Consolidation. To the extent Sterling holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Sterling Collateral.

**4.26    Class 26 – TCF Secured Claim.**

**4.26.1** Impairment and Voting. Class 26 is impaired under the Plan. TCF shall be entitled to vote to accept or reject the Plan.

**4.26.2** Treatment of Claim. Provided that the holder of the Class 26 Claim accepts the Plan and does not object to the Plan, the TCF Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for*

*Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of TCF Equipment Finance and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "TCF Stipulation"), filed on April 30, 2018 [Docket No. 302]. The terms and conditions of the TCF Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the TCF Stipulation. To the extent of any inconsistency between section 4.26 of the Plan and the TCF Stipulation, the terms of the TCF Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the TCF Stipulation, the TCF Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.26.3** Treatment of Claim (Objecting or not Accepting). In the event that the holder of the Class 26 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the TCF Stipulation), then the Debtor shall have the rights and remedies specified in the TCF Stipulation, including the right to modify the Plan to provide treatment of the Class 26 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.26.4** Pre-Effective Date Payments. As set forth in the TCF Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the TCF Stipulation) are hereby deemed to constitute Monthly Plan Payments to TCF. Accordingly, the first Monthly Plan Payment paid to TCF was made on or about May 15, 2018.

**4.26.5** Effect of Consolidation. To the extent TCF holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable TCF Collateral.

**4.27** **Class 27 – Terex Secured Claim.**

**4.27.1** Impairment and Voting. Class 27 is impaired under the Plan. Terex shall be entitled to vote to accept or reject the Plan.

**4.27.2** Treatment of Claim. The Terex Collateral was sold at auction on or about February 19, 2018, and shortly thereafter Terex's secured claim was paid and satisfied in full from the net auction proceeds.

**4.27.3** Effect of Consolidation. To the extent Terex holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Terex Collateral (or, in this instance, the net cash proceeds that were paid to Terex upon the sale of the Terex Collateral).

**4.28** **Class 28 – Trans Lease Secured Claim.**

**4.28.1** Impairment and Voting. Class 28 is impaired under the Plan. Trans Lease shall be entitled to vote to accept or reject the Plan.

**4.28.2**  Treatment of Claim.  Provided that the holder of the Class 28 Claim accepts the Plan and does not object to the Plan, the Trans Lease Allowed Secured Claim shall be treated consistent with that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Claim of Trans Lease, Inc., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization* (the "Trans Lease Stipulation"), filed on May 24, 2018 [Docket No. 333]. The terms and conditions of the Trans Lease Stipulation are, and shall be, deemed fully incorporated by reference under the Plan. To the extent of any inconsistency between section 4.28 of the Plan and the Trans Lease Stipulation, the terms of the Trans Lease Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Trans Lease Stipulation, the Trans Lease Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.28.3**  Treatment of Claim (Objecting or not Accepting).  In the event that the holder of the Class 28 Claim votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Trans Lease Stipulation), then the Debtor shall have the rights and remedies specified in the Trans Lease Stipulation, including the right to modify the Plan to provide treatment of the Class 28 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.28.4**  Pre-Effective Date Payments.  As set forth in the Trans Lease Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Trans Lease Stipulation) are hereby deemed to constitute Monthly Plan Payments to Trans Lease. Accordingly, the first Monthly Plan Payment paid to People's Capital was made on or about May 17, 2018.

**4.28.5**  Effect of Consolidation.  To the extent Trans Lease holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Trans Lease Collateral.

**4.29**  **Class 29 – Varilease Claim.**

**4.29.1**  Impairment and Voting.  Class 29 is impaired under the Plan. The holder of the Class 29 Claim shall be entitled to vote to accept or reject the Plan.

**4.29.2**  Treatment of Claim.  The Varilease Lease is a true lease which has been rejected by order of the Bankruptcy Court or, if not previously rejected, hereby is rejected pursuant to the Plan. This Plan is not intended to, and shall not, modify or alter the terms and conditions of any previous stipulations or orders regarding the Varilease Lease or the Aircraft, and all such prior stipulations and orders are incorporated into this Plan by reference.

**4.29.3**  Abandon Aircraft in Satisfaction of Claim.  The Debtor has abandoned, or hereby abandons, all of the Reorganized Debtor's right, title and interest in the Aircraft.

**4.29.4** <u>Retain Lien</u>.  Varilease shall retain its Lien upon the Aircraft. .

**4.29.5** <u>Effect of Consolidation</u>.  To the extent Varilease holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Varilease Collateral.

**4.30**   **Class 30 – Wells Fargo Secured Claim.**

**4.30.1** <u>Impairment and Voting</u>.  Class 30 is impaired under the Plan.  Wells Fargo shall be entitled to vote to accept or reject the Plan.

**4.30.2** <u>Treatment of Claim</u>.  Provided that the holder of the Class 30 Claim accepts the Plan and does not object to the Plan, the Wells Fargo Allowed Secured Claim shall be treated consistent with the terms set forth in that certain *Stipulation and Joint Motion for Entry of an Order Approving Adequate Protection and Stipulated Plan Treatment Relating to Secured Claim of Wells Fargo Bank, N.A., and Resolving Secured Creditor's Potential Objections to the Debtor's Plan of Reorganization Relating to Treatment of the Secured Claim* (the "<u>Wells Fargo Stipulation</u>"), filed on May 15, 2018 [Docket No. 316]. The terms and conditions of the Wells Fargo Stipulation are, and shall be, deemed fully incorporated under the Plan by this reference to the Wells Fargo Stipulation. To the extent of any inconsistency between section 4.30 of the Plan and the Wells Fargo Stipulation, the terms of the Wells Fargo Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Wells Fargo Stipulation, the Wells Fargo Stipulation shall be deemed approved by the entry of the Confirmation Order.

**4.30.3** <u>Treatment of Claim (Objecting or not Accepting)</u>.  In the event that the holder of the Class 30 Claim votes to reject the Plan or objects to the Plan on behalf of the Class 30 Claim (for a reason other than that the Plan is not consistent with the express terms of the Wells Fargo Stipulation), then the Debtor shall have the rights and remedies specified in the Wells Fargo Stipulation, including the right to modify the Plan to provide treatment of the Class 30 Claim consistent with the treatment specified for Class 32 (Miscellaneous Secured Claims).

**4.30.4** <u>Pre-Effective Date Payments</u>.  As set forth in the Wells Fargo Stipulation, and subject to the entry of the Confirmation Order, all Approved Adequate Protection Payments (as defined in the Wells Fargo Stipulation) are hereby deemed to constitute Monthly Plan Payments to Wells Fargo. Accordingly, the first Monthly Plan Payment paid to Wells Fargo was made on or about May 15, 2018.

**4.30.5** <u>Effect of Consolidation</u>.  To the extent Wells Fargo holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable Wells Fargo Collateral.

**4.31**   **Class 31 – Salt Lake County Claim.**

**4.31.1** Impairment and Voting.  Class 31 is impaired under the Plan.  The holders of Allowed Claims in Class 31 shall be entitled to vote to accept or reject the Plan.

**4.31.2** Treatment of Claim.  The Allowed Class 31 Claims shall be treated and paid as follows:

4.31.2.1   *Payment.*  The holders of Allowed Class 31 Claims shall be paid the full amount of their claim as of the Petition Date, plus interest as described in the next paragraph.

4.31.2.2   *Interest.*  Interest shall accrue on the principal balance of each Class 31 Claim at the rate prescribed by applicable non-bankruptcy law from the Petition Date through the Effective Date until such Claim is paid in full; provided, however, that the total amount of the Claim shall not exceed the value of the property securing it.

4.31.2.3   *Deadline for Payment.*  The Debtor shall pay all past-due property taxes for tax years through and including 2017 (including taxes accruing and/or coming due during post-petition periods of 2015, 2016 and 2017), together with any interest or penalties due thereon, on or before (a) the second Interim Distribution Date or (b) if applicable under nonbankruptcy law, such later date as the Reorganized Debtor may have the right to redeem the property of the Estate from tax sale.

4.31.2.4   *Relief from Plan Injunction.*  The injunction imposed under the Plan automatically shall terminate and expire as to the holders of Allowed Class 31 Claims on the second Interim Distribution Date.  If Allowed Class 31 Claims have not been paid in full on or before said date, the holders thereof shall be free thereafter to exercise their rights and remedies in their Collateral as prescribed by applicable nonbankruptcy law.

**4.31.3** Retain Lien.  The holders of Allowed Class 31 Claims shall retain their Liens upon the property of the Debtor until their Claims are paid in full.

**4.32**   **Class 32 – Miscellaneous Secured Claims.**

**4.32.1** Impairment and Voting.  Class 32 is impaired under the Plan.  The holders of Class 32 Claims shall be entitled to vote to accept or reject the Plan.

**4.32.2** Treatment of Claim.  To the extent that they are Allowed and Secured, the Class 32 Secured Claims shall be treated and paid as provided below.

4.32.2.1   *Treatment of Claims.*  The payment and treatment of a Class 32 Claim shall be as follows –

4.32.2.1.1 *Potential Bifurcation of Claim.* To the extent the amount of the Class 32 Claim as of the Petition Date exceeds the forced liquidation value of the applicable Collateral, the Claim shall be treated as a Secured Claim only to the extent of such value.

4.32.2.1.2 *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor and Plan Administrator (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 32 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

4.32.2.1.3 *Interest on the Secured Claim.* Interest on a Class 32 Secured Claim shall continue to accrue on the unpaid principal balance of such holder's applicable loan at the lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the loan documents governing the holder's Class 32 Claim.

4.32.2.1.4 *Monthly Installment Payments.* The Class 32 Secured Claims shall be paid in monthly installments calculated on a ten-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to the holder of a Class 32 Secured Claim, amortized over ten years at the rate of interest described in the immediately preceding paragraph.

4.32.2.1.5 *Option to Sell Collateral.* At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing an Allowed Class 32 Claim may be sold—collectively or individually—free and clear of such holder's Lien(s), provided that (i) the Court enters an order approving such sale, (ii) the holder of the Class 32 Claim consents in writing to the sale of the Collateral, or (ii) the proceeds to be realized from the sale of any item(s) of Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. Upon the sale of the Collateral, (a) the holder of the Allowed Class 32 Claim will be paid the Collateral Release Amount for the Collateral sold, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the Collateral Release Amount, and the Claim holder will be paid 100% of the proceeds up to the Collateral Release Amount for the Collateral sold. For any item(s) of Collateral sold, the Reorganized Debtor shall be entitled to retain, free and clear of the Class 32 Claim holder's Liens, any proceeds that exceed the Collateral Release Amount(s) for the particular item(s) of Collateral sold.

4.32.2.1.6 *Payment Upon Sale of Collateral.* If any item(s) of a Class 32 Claim holder's Collateral is sold, the Reorganized Debtor will pay in full the Collateral Release Amount(s) either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Distribution Date following the closing of the sale. To the extent the Reorganized Debtor elects

to pay the Collateral Release Amount(s) after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 32 Claim with all liens to attach instead to the proceeds of the sale, up to the Collateral Release Amount.

4.32.2.1.7 *Debtor's Right to Abandon Property in Satisfaction of Claim.* If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for a Class 32 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of an Allowed Class 32 Claim in complete and full settlement and satisfaction of such Claim. To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 32 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.32.3** Retain Lien. Except as otherwise provided in Sections 4.32.2.1.3, 4.32.2.1.4, and 4.32.2.1.5 of the Plan, to the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 32 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full.

**4.32.4** Effect of Consolidation. To the extent the holder of a Class 23 Claim holds or asserts separate claims against the Debtor and any Consolidated Subsidiary Entities, as co-debtors, such claims shall be treated as a single claim against the Reorganized Debtor secured by the applicable holder's Collateral.

## 4.33 Class 33 – Equity Interests in the Debtor.

**4.33.1** Impairment and Voting. Class 33 is impaired under the Plan. Each holder of an Equity Interest in the Debtor shall be entitled to vote to accept or reject the Plan.

**4.33.2** Treatment of Equity Interests. The existing Equity Interests in the Debtor will be canceled under the Plan; *provided, however*, that Paul Belcher shall retain his Equity Interest (and his Equity Interest shall not be cancelled) subject to the conditions precedent and conditions subsequent set forth in section 5.4.1 of this Plan.

## 4.34 Class 34 – Convenience Claims.

**4.34.1** Impairment and Voting. Class 34 is impaired under the Plan. Each holder of an Allowed Class 34 Convenience Claim shall be entitled to vote to accept or reject the Plan.

**4.34.2** Payment. The holders of Allowed Class 34 Claims shall be paid 100% of the Allowed amount of such Claims in full satisfaction of those Claims on or before sixty days after the Effective Date.

**4.35    Class 35 – Subordinated Claims.**

    **4.35.1** <u>Impairment and Voting</u>.  Class 35 is impaired under the Plan.  Each holder of an Allowed Class 35 Subordinated Claim shall be entitled to vote to accept or reject the Plan.

    **4.35.2** <u>Payment</u>.  The holders of Allowed Class 35 Subordinated Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution.

    **4.35.3** <u>Distributions</u>.  Subject to the limitations and priorities described in section 5.6, the holders of Allowed Class 35 Claims shall be paid, pro rata, on or before the Final Distribution Date.  The holders of Allowed Class 35 Claims will not receive distributions until the holders of claims with higher priority (listed under sections 5.6.1 through 5.6.7 of the Plan), including Allowed Class 2 Claims, have been paid or reserved in full.

**4.36    Class 36 – Subordinated § 510(b) Claims.**

    **4.36.1** <u>Impairment and Voting</u>.  Class 36 is impaired under the Plan.  Each holder of an Allowed Class 36 Claim shall be entitled to vote to accept or reject the Plan.

    **4.36.2** <u>Payment</u>.  The holders of Allowed Class 36 Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution.

    **4.36.3** <u>Distributions</u>.  Subject to the limitations and priorities described in section 5.6, the holders of Allowed Class 36 Claims shall be paid, pro rata, on or before the Final Distribution Date.  The holders of Allowed Class 36 Claims will not receive distributions until the holders of claims with higher priority (listed under sections 5.6.1 through 5.6.8 of the Plan), including Allowed Class 2 Claims, have been paid or reserved in full.

    **4.37    Satisfaction of Claims and Release.**  As of the Effective Date, all Claims against the Debtor and the Consolidated Subsidiary Entities shall be released except as provided in the Plan.

    **4.38    No Assumed Liability.**  Except as otherwise expressly set forth in the Plan, the Reorganized Debtor shall not assume or be liable for any Claims.

    **4.39    Disputed Claims.**  Notwithstanding any other provision of this Plan, no cash or property shall be distributed under the Plan on account of any Disputed Claim until the Claim is Allowed.  The Reorganized Debtor shall establish a reserve ("Disputed Claims Reserve") with respect to Disputed Claims.  Cash and property to be distributed on account of Disputed Claims shall be held by the Debtor until such Claims are Allowed or disallowed by Final Order.  At the option of the Reorganized Debtor, Cash which is held in Disputed Claim Reserve may be held in

the Debtor's current operating account, may be deposited into one or more segregated, interest bearing bank accounts that satisfy the requirements of 11 U.S.C. § 345, or may be used to purchase a short-term certificate of deposit or another short term investment.  Upon the later of the Effective Date or thirty (30) days after a Disputed Claim becomes Allowed, the holder shall receive a distribution from the Disputed Claims Reserve, based upon the Allowed amount of the Claim, plus a proportionate amount of any interest earned thereon, and, thereafter, shall participate in any further distributions under the Plan as the holder of an Allowed Claim.  Any cash or property remaining in the Disputed Claims Reserve after the resolution of all disputes by Final Order shall be distributed in accordance with the Plan.

**4.40    No Penalties.**  Except as expressly stated in the Plan or allowed by the Bankruptcy Court, no late charge, or penalty, including but not limited to prepayment penalties, shall be allowed on any Claim subsequent to the Petition Date.

**4.41    All Defaults Cured and Waived; All Notes and Obligations Decelerated and Reinstated.**  Pursuant to sections 1123(a)(5)(G) and 1124(2) of the Bankruptcy Code, among others, and except as otherwise provided by this Plan, all defaults that existed or that may have existed under any promissory note, loan document, unexpired lease, executory contractor or other written agreement of or by the Debtor shall be deemed cured and waived as of the Effective Date.  All notes, instruments or obligations that were accelerated pre-petition and/or pre-confirmation shall be decelerated and reinstated as of the Effective Date.  All judicial and non-judicial foreclosure actions and proceedings that were instituted pre-petition and/or pre-confirmation shall be canceled, terminated and/or deemed withdrawn and rescinded as of the Effective Date.

## ARTICLE 5
## MEANS FOR EXECUTION OF THE PLAN

**5.1    Vesting of Property**.  Except as otherwise provided in this Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the assets of the Estate.

**5.2    Avoidance Actions and Other Claims.**  Without limiting the foregoing, the Reorganized Debtor and the Plan Administrator shall be vested with all claims and causes of action of the Debtor including, without limitation, Avoidance Actions and other claims arising under sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.  The Plan Administrator, however, shall have the sole and exclusive right to investigate, file, prosecute and/or settle Avoidance Actions, as more particularly described in section 5.7.3.4.

**5.2.1**  Waiver of Right to Pursue Certain Chapter 5 Claims

**5.2.1.1** *Waiver of Right to Pursue Certain Preference Actions.*  Neither the Plan Administrator nor the Reorganized Debtor shall bring or prosecute Preference Claims against any creditor that accepts this Plan (either by affirmatively voting to accept the Plan or by not returning a ballot rejecting the Plan) and that does not object to confirmation of the Plan; provided, however, that

the Plan Administrator shall have the right to bring and prosecute any Preference Claim that is specifically identified in this Plan or the Disclosure Statement as a Preserved Claim.

5.2.1.2 *Waiver of Right to Pursue Certain Fraudulent Transfer Actions.* Where the Debtor or any of the Consolidated Subsidiary Entities paid an obligation that was not its obligation but was a valid obligation of one of the other entities that are consolidated and identified as part of the Reorganized Debtor under this Plan, such payment or transfer shall not be avoidable (under sections 544, 548, 549, 550 or 553 of the Bankruptcy Code) on the ground that the entity that paid the obligation did not owe the obligation.

**5.2.2** Preserved Claims. Notwithstanding the foregoing section 5.2.1, the Plan Administrator shall have the right to assert and prosecute (a) any Preference Action against a creditor that votes to reject or objects to confirmation of the Plan, or (b) which is specifically identified in this Plan or the Disclosure Statement as a Preserved Claim.

**5.3** **Bankruptcy Case Administration**. Except as otherwise provided in this Plan, from and after the Effective Date and continuing through the date on which a final decree closing the Bankruptcy Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Reorganized Debtor shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Bankruptcy Case. In addition to the foregoing, for all matters arising under or related to the Bankruptcy Case, the Reorganized Debtor shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of all applications, motions and other papers and pleadings before the Bankruptcy Court.

**5.4** **Continuation of Business Operations**. From and after the Effective Date of the Plan, the Reorganized Debtor is authorized to continue its normal business operations and enter into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

**5.4.1** Employment of Paul Belcher. Paul Belcher shall retain his Equity Interest in the Reorganized Debtor, subject to the following conditions precedent and conditions subsequent:

5.4.1.1 *No Distributions on Account of Equity Interest.* Unless and until all other Claims and Interests are paid in full as provided for under the Plan, Paul Belcher shall not receive any distributions on account of his Equity Interest in the Debtor for ten (10) years after the Effective Date; *provided, however*, that the Reorganized Debtor may make cash distributions to Paul Belcher solely to account for and to permit Paul Belcher to pay taxes due and payable on account of his Equity Interest.

     5.4.1.2   *No Raises or Bonuses for Five Years*.  Paul Belcher shall be paid a salary of $240,000 per year for his services as an officer and employee of the Reorganized Debtor.  Except as may be approved by the Plan Administrator, Paul Belcher shall not be entitled to receive any raises in his salary, bonuses or additional compensation for a period of five (5) years after the Effective Date.  After the initial five year period, Paul Belcher shall not be entitled to receive any raises in his salary, bonuses or additional compensation if the Reorganized Debtor is not then current on its obligation to make deposits of the Distribution Fund Amount into the Distribution Account.

     5.4.1.3   *Equity Ownership Contingent on Continued Employment*.  Paul Belcher's retention of his Equity Interest is contingent on him continuing to work for the Reorganized Debtor on a full time basis for the entire Plan Period, and not competing with the Reorganized Debtor during the Plan Period.  Until all of the Reorganized Debtor's payment and distribution obligations under this Plan are paid and satisfied in full, the Equity Interest of Paul Belcher shall be, and remain, contingent and non-vested.  The Equity Interest of Paul Belcher will "vest" only if and when (a) the Reorganized Debtor satisfies in full all of its payment and other obligations under this Plan, (b) Paul Belcher has continued to act as a full time employee and officer of the Reorganized Debtor for the entire Plan Period.

     5.4.1.4   *Restriction on Transfer; Subject to Plan Injunction*.  Until the Plan Period is complete and all payment and distributions obligations of the Reorganized Debtor are paid and satisfied in full, the Equity Interest of Paul Belcher may not be transferred or assigned, voluntarily or involuntarily.  Any attempt by Paul Belcher or any other person, prior to expiration of the Plan Period, to transfer, assign, take, seize or interfere with Paul Belcher's Equity Interest shall be void and subject to contempt under the injunctions issued under Article 12 of this Plan.

     5.4.1.5   *Voluntary Subordination of Claim*.  Paul Belcher shall voluntarily subordinate any Claim(s) he has against the Debtor, to be treated as a Class 35 Claim.

     5.4.1.6   *Contribution of NOLs as New Value*.  Paul Belcher personally owns net operating loss ("NOL") carryforwards of approximately $15 million.  Paul Belcher is willing to utilize the NOL carryforwards to offset pass-through income and personal income taxes that otherwise would come due from the Debtor (or its Equity Owners) on account of the anticipated future profitable operations consistent with the Plan.  Utilization of the NOL's will substantially benefit the Reorganized Debtor and its Creditors, and will make the funding of the Distribution Fund as contemplated under this Plan feasible.  As a further condition of retaining his Equity Interest in the Debtor, Paul Belcher shall apply and utilize the NOLs until the later of (a) completion of the entire Plan Period, or (b) until the NOLs are fully used and extinguished.

    **5.5**    **Distributions on Account of Claims and Interests**.  The Debtor shall make distributions to Creditors and Interest Holders as more particularly described below.

**5.5.1**  Fund for Distribution to Creditors.  Both before and after the Effective Date, the Debtor shall set aside, segregate, pay, and distribute funds in the aggregate amount of **$8,000,000.00** (the "Distribution Fund" or the "Distribution Fund Amount") to be paid to the holders of Administrative Expense Claims, Unclassified Priority Claims, Class 1 Priority Claims, Class 34 Convenience Class Claims, Class 2 General Unsecured Claims, Class 35 Subordinated Claims, Class 36 Subordinated § 510(b) Claims, and Class 33 Equity Interests, in the order of priority set forth in section 5.6 of this Plan. The Distribution Fund Amount shall include, and shall not be in addition to, all amounts paid by the Debtor to holders of Allowed Administrative Expense Claims, whether pre- or post-Effective Date, including but not limited to quarterly payments paid pursuant to 28 U.S.C. § 1930(a)(6) and any compensation and reimbursement awarded to Professionals under 11 U.S.C. §§ 330, 331 and/or 503(b).

**5.5.2**  Establishment of the Distribution Account.  No later than ten (10) days after the Effective Date, the Plan Administrator and the Reorganized Debtor jointly shall establish an account at an FDIC or CUNA insured financial institution into which the Debtor shall, when required pursuant to the terms of this Plan, deposit the Distribution Funds (the "Distribution Account").  Although the Reorganized Debtor shall be the owner of the Distribution Account, as described in section 5.7.3.1, below, the Plan Administrator shall control the Distribution Account and all distributions, payments and disbursements therefrom.  The Reorganized Debtor and its professionals, however, shall have the right and ability to monitor the Distribution Account, including the ability to track deposit, disbursement and balance information.

**5.5.3**  No Commingling; Distribution Fund Shall Not Be Use to Pay Debtor's Operating Expenses.  The Reorganized Debtor shall not deposit or commingle any funds into the Distribution Account, excepting only amounts that the Debtor expressly is required or permitted to deposit into said account.  The Debtor may not use funds on deposit in the Distribution Account to pay operating expenses.  The Distribution Fund shall not be used by the Debtor or the Plan Administrator to pay the Reorganized Debtor's operating expenses or for any other purpose except as set forth in sections 5.5 and 5.6 of the Plan.

**5.5.4**  Quarterly Deposits into the Distribution Account.  The Debtor shall commence making deposits into the Distribution Account at the end of the first full Quarter after the Effective Date.  Additional deposits shall be made into the Distribution Account at the end of each subsequent Quarter.  The Quarterly Deposits shall be in an amount of at least $200,000.00 per Quarter.  The Reorganized Debtor, however, may contribute (or pre-pay) additional amounts if it has sufficient funds available to pay current and anticipated operating expenses, taking into account both short-term and long-term business and marketing plans.  Without limitation, the Debtor may make earlier deposits into the Distribution Account as necessary to pay Administrative Expense Claims, Convenience Class Claims, Allowed Priority Tax Claims or other Allowed Claims and Expenses as when payment is contemplated or required under the Plan.  To the extent the Debtor prepays amounts it is required to deposit into the Distribution Account (and to the extent the Debtor makes direct payments as provided in section

5.5.5, below) such prepayments shall be credited against and satisfy the Debtor's obligations to make Quarterly deposits coming due thereafter

**5.5.5**   Direct Payment of Administrative Expense Claims Allowed. Notwithstanding anything to the contrary in sections 5.5.2, 5.5.4, and 5.5.8 of this Plan, the Debtor (or the Plan Administrator) may pay Administrative Expense Claims from the Distribution Fund without first depositing funds into the Distribution Account, in accordance with the time required for payment of Administrative Expense Claims set forth in section 2.2.2 of this Plan. For the avoidance of doubt, any amounts paid towards Administrative Expense Claims will be counted towards the Distribution Fund Amount, even if those amounts are not paid into or through the Distribution Account, and even if such amounts were paid prior to the Effective Date.

**5.5.6**   Deposits from Proceeds of Avoidance Actions.   If the Plan Administrator realizes proceeds from Avoidance Actions or Claims against third-parties, creditors, insiders or employees of the Debtor, the Plan Administrator shall deposit the proceeds into the Distribution Account, to be distributed on the Interim Distribution Date immediately following his deposit of the proceeds into the Distribution Account. Such amounts shall be included in—not in addition to—the Distribution Fund Amount.

**5.5.7**   Final Deposit into the Distribution Account.   On or before the Final Distribution Date, the Reorganized Debtor shall deposit funds into the Distribution Account in an amount such that the total deposits into the account are equal to the Distribution Fund Amount specified in section 5.5.1.

**5.5.8**   Distributions from the Distribution Account.   On each Distribution Date (and/or on such earlier or more frequent dates as the Reorganized Debtor may elect, in its absolute discretion), the Plan Administrator shall pay (or, if applicable, reserve) all cash on deposit in the Distribution Account (less only such amount as the applicable financial institution may require as a minimum balance) according to the priorities described in Section 5.6.   The total distributions from the Distribution Account over the course of the entire Plan Period shall be referred to herein as the "Total Distributions".   Further, despite reservation of funds for Disputed Claims or payment of Priority Claims over time (as agreed by the Claimant or as allowed pursuant to the Code), all available Cash on deposit in the Distribution Account (less only the minimum amounts required to be held by the Plan Administrator pursuant to section 4.39 of the Plan as part of the "Disputed Claims Reserve") shall be distributed by the Plan Administrator, including to Class 2 Claimants if applicable, even though certain Claims of higher priority have not been paid due to a Dispute or payment of that Claim over time as agreed or provided by the Code.

**5.6**     **Priorities in Distribution from the Distribution Account**.  Notwithstanding anything else in this Plan to the contrary, cash deposited in the Distribution Account shall be distributed (or, if applicable, reserved) according to the following priorities in distribution:

**5.6.1**   Payment of Administrative Expense Claims [507(a)(2)] – first, in payment of Allowed Administrative Expenses, including compensation to the attorneys and other

Professionals of the Debtor, the Plan Administrator, and the Creditors' Committee as contemplated under section 2.2.4 of the Plan;

**5.6.2** Payment of (and Reserve for) Post-Effective Date Administrative Expenses [507(a)(2)] – second, payment of (or a reserve for payment of) Administrative Expenses arising or coming due after the Effective Date including –

5.6.2.1  All post-Effective Date quarterly fee payments to the United States Trustee,

5.6.2.2  all compensation for actual services provided and reimbursement of expenses incurred (a) by the Plan Administrator, and (b) Professionals providing post-Effective Date services for the Plan Administrator, and

5.6.2.3  all compensation for actual services provided and reimbursement of expenses incurred by Professionals providing post-Effective Date services for the Reorganized Debtor (a) in connection with investigating or objecting to Claims, (b) in connection with investigating or pursuing recovery of Avoidance Actions, and (c) up to a maximum amount of $25,000 in providing general bankruptcy-related and plan-related professional services after the Effective Date;

**5.6.3** Payment of Priority Claims [507(a)(3) through (a)(7)] – third, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(3) through (a)(7) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

**5.6.4** Priority Tax Claims [507(a)(8)] – fourth, after the foregoing amounts are paid or reserved, the payments due to the holders of Priority Tax Claims entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, as described in section 2.3.2 and 2.3.3. of this Plan;

**5.6.5** Payment of Priority Claims [507(a)(9) through (a)(10)] – fifth, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(9) through (a)(10) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

**5.6.6** Payment of Class 34 Convenience Class Claims – sixth, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 34 Convenience Class Claims until such claims have been paid in full;

**5.6.7** <u>Payment of Class 2 General Unsecured Claims</u> – seventh, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 2 General Unsecured Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

**5.6.8** <u>Payment of Class 35 Subordinated Claims</u> – eighth, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 35 Subordinated Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

**5.6.9** <u>Payment of Class 36 Subordinated § 510(b) Claims</u> – ninth, after the foregoing amounts are paid or reserved in full, payment pro rate of Allowed Class 36 Subordinated § 510(b) Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full; and

**5.6.10** <u>Remainder Distributed to Owners</u> – after the foregoing amounts are paid or reserved in full, any remaining Cash shall be distributed to those holders of Class 33 Equity Interests (including the holders of Equity Interests that are cancelled under this Plan) pro rata according to the percentages owned immediately prior to the Effective Date.

Notwithstanding the foregoing, Convenience Class Claims may be paid out of the Distribution Account prior to Claims with higher priority if necessary to meet the deadline for payment of Convenience Class Claims under the Plan.

**5.7** **Plan Administrator**

**5.7.1** Appointment of Plan Administrator.

5.7.1.1 *Initial Plan Administrator.* Gil Miller will be appointed and shall serve as the initial Plan Administrator (the "<u>Initial Plan Administrator</u>").

5.7.1.2 *Successor Plan Administrator.* If the Initial Plan Administrator voluntarily resigns or is unable to serve as Plan Administrator by reason of death, infirmity or other incapacity, the Successor Plan Administrator shall be such person as is nominated jointly by counsel for the Reorganized Debtor and the United States Trustee.

**5.7.2**  Compensation of the Plan Administrator.  The Plan Administrator shall be compensated at his regular professional hourly rate for services that he or she performs in said capacity.

**5.7.3**  Duties and Powers of the Plan Administrator.

**5.7.3.1**  *Authority Over Distribution Account and Distribution Funds.*  The Plan Administrator shall have sole and absolute authority over the Distribution Account and Distribution Funds, to administer in his sole and absolute discretion, subject to the terms of this Plan. Pursuant to his authority over the Distribution Account and Distribution Funds, the Plan Administrator shall have the power, right, and obligation to: (i) make distributions from the Distribution Account; (ii) remind and urge the Reorganized Debtor to contribute Distribution Funds into the Distribution Account, as provided for under the Plan; (iii) audit and/or review the Reorganized Debtor's accounting records to ensure that Distribution Funds are sufficient and properly accounted for; and (iv) take any other action authorized under this Plan or applicable law with respect to the Distribution Account and Distribution Funds. Notwithstanding his control and authority over the Distribution Account and Distribution Funds, the Debtor shall be considered the "owner" of the Distribution Account, and the Plan Administrator shall <u>not</u> be considered an owner of the Distribution Account or Distribution Funds.

**5.7.3.2**  *Investigate, Object to, and Settle Claims of Insiders and Employees*. The Plan Administrator shall have sole and absolute authority to investigate any and all claims of insiders and/or employees of the Reorganized Debtor and, if he deems reasonable and appropriate within his sound discretion, to object to or otherwise challenge, settle, compromise, or abandon such claims.

**5.7.3.3**  *Investigate, Prosecute, and Settle Claims Against Insiders and Employees*.  The Plan Administrator shall have sole and absolute authority to investigate any and all claims or potential claims of the Reorganized Debtor against insiders or employees that, as of the Confirmation Date, (a) are disclosed in the Debtor's Statement of Financial Affairs, or (b) are identified by written notice entitled "Notice of Claims Against Insiders or Employees" that is served upon the Reorganized Debtor and its counsel and filed with the Court. The Plan Administrator further shall have authority, if he deems reasonable and appropriate within his sound discretion, to prosecute, settle, compromise, or abandon such claims.

**5.7.3.4**  *Investigate and Act Upon Avoidance Actions*.  Subject to section 5.2.1 of the Plan, the Plan Administrator shall have sole and absolute authority to investigate any and all Avoidance Actions or potential Avoidance Actions and, if he deems reasonable and appropriate within his sound discretion, to prosecute, settle, compromise, or abandon such claims; provided, however, that the Plan Administrator shall consult in good faith with the Reorganized Debtor prior to filing or making demand upon any Avoidance Actions.

5.7.3.5   *Investigate, Object to, and Settle Claims Against the Reorganized Debtor or the Estate.*  The Plan Administrator may, in his discretion, investigate any and all Claims against the Debtor or the Estate, and, if he deems reasonable and appropriate within his sound discretion, to object to or otherwise challenge, settle, compromise, or abandon such claims. The Plan Administrator's authority under this section 5.7.3.5 is not meant to limit the ability of the Debtor or any other party-in-interest to object to Claims as provided in section 6.2 of the Plan.

**5.7.4**   Junior Lien and Liquidation Preference.  Subject to and effective upon the occurrence of the Effective Date, and for the purpose of securing the Reorganized Debtor's obligation to fund the Distribution Fund Amount and to make the Quarterly Deposits into the Distribution Account, the Debtor hereby grants to the Plan Administrator (for the benefit of persons to entitled to distribution under sections 5.6.1 through 5.6.7 of the Plan) a security interest and liquidation preference (the "Plan Administrator Lien") upon the following assets of the Debtor, whether currently owned and/or controlled by the Debtor or whether acquired after the Effective Date (collectively, the "Plan Administrator Collateral"): (a) the Distribution Account and all cash on deposit therein; (b) all cranes, trucks, trailers and other equipment, (c) all accounts, payment intangibles, accounts receivable and other amounts owing to the Debtor; (d) all general intangibles; (e) all chattel paper; promissory notes, instruments, leases, security agreement and other documents in favor of the Debtor; (f) all investment property, including any and all stock or membership interests in Subsidiary Entities; and (g) all contracts and contract rights.

5.7.4.1   *Perfection of Plan Administrator Lien.*  The Plan Administrator Lien shall attach and become valid, binding, continuing, enforceable, fully-perfected and non-avoidable by operation of law as of the Effective Date without any further action by the Debtor, the Plan Administrator, or any other person, and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, mortgages, deeds of trust, or other documents. Nonetheless, the Reorganized Debtor and the Plan Administrator may file financing statements in appropriate filing offices (including the State of Utah, Department of Commerce, Division of Corporations and Commercial Code) as they deem necessary or appropriate to perfect the Plan Administrator Lien.

5.7.4.2   *Subordinate to All Existing Liens.*  The Plan Administrator Lien is, and shall be, subordinate to all Liens that existed and that were properly perfected as of the Effective Date of the Plan.  If the Plan Administrator determines that existence of the Plan Administrator Lien against a particular item or equipment or other particular Collateral violates applicable law or would undermine the feasibility of the Plan, then the Plan Administrator may act to release the Plan Administrator Lien as to particular Collateral solely to the extent reasonably necessary to avoid such violation of law or maintain the feasibility of the Plan.

5.7.4.3   *Obligation to Subordinate to Accommodate Future Indebtedness.* After the Effective Date, the Plan Administrator shall be obligated to execute such

reasonable subordination agreement(s) as may be necessary to permit the Debtor (a) to refinance existing secured debt, (b) to obtain an operating line of credit, or (c) to permit the Debtor to acquire new or replacement equipment necessary for the Debtor's business needs and ongoing business operations.  The Plan Administrator shall not be obligated, and may refuse, to subordinate the Plan Administrator Lien if he or she determines, in his or her professional discretion, that the terms of new proposed loan transaction would impair the feasibility of the Plan or would unreasonably increase the likelihood that the Debtor may default in its obligation under the Plan.

5.7.4.4    *Plan Administrator Lien Shall Not Trigger a Default.*  Notwithstanding any provision in this Plan or in any lease, loan agreement or executory contract of the Debtor to the contrary, neither the granting of the Plan Administrator Lien, nor the continuation of the Plan Administrator Lien for the duration of the Plan Period nor any acts by the Debtor or Plan Administrator to perfect the lien shall constitute, create or trigger a default by the Debtor or an event of default.

5.7.4.5    *Limitations on Enforcement*.  The Plan Administrator Lien shall be limited to, and enforceable only in the event of (each a "Plan Administrator Lien Enforcement Event"): (a) a future bankruptcy case or receivership proceeding by the Reorganized Debtor; (b) the complete cessation of the Reorganized Debtor's business operation; (c) a wholesale liquidation of the Reorganized Debtor's assets; or (d) the failure of the Debtor to make Quarterly deposits into the Distribution Account which are not cured within forty-five calendar days after written notice to the Debtor.

5.7.4.6    *Enforcement of the Plan Administrator Lien*.  If a Plan Administrator Lien Enforcement Event shall occur and be continuing, the Plan Administrator shall have the right to enforce the Plan Administrator Lien pursuant to article 9a of title 70A of the Utah Code, including the right to foreclose the Plan Administrator Lien judicially or non-judicially and to liquidate the Plan Administrator Collateral for an amount sufficient to fund the unfunded portion of the Distribution Fund Amount, with any excess to be paid to the Reorganized Debtor.

**5.7.5**  The Plan Administrator May Employ Professionals.  The Plan Administrator may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtor or the Plan Administrator after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.  Without limitation, in his discretion, the Plan Administrator may retain attorneys, accountants or other professionals that have represented the Debtor in the Bankruptcy Case, including the Debtor's general bankruptcy counsel. The fees and expenses of the Plan Administrator and his Professionals shall be paid as Administrative Expense Claims from the Distribution Fund.

**5.7.6**  Fiduciary Obligations.  The Plan Administrator shall perform his duties and exercise his powers for the benefit of persons entitled to receive distributions from the Distribution Fund under subsections 5.6.1 through 5.6.7 of the Plan, consistent with the priorities described in section 5.6 of this Plan.

**5.7.7**  Oversight Committee.  The Creditors' Committee may, but shall not be required to, appoint a committee of three members (the "Oversight Committee") who shall have the right to request (on no more frequent that a Quarterly basis) reports from the Plan Administrator regarding (a) the status of the Distribution Fund, the Distribution Account and/or past and anticipated distributions from the Distribution Fund, (b) the status of the Plan Administrator's investigation of, prosecution of and/or settlement of claim objections or causes of action within the scope of the Plan Administrator's authority and responsibility, (c) the Administrative Expenses of the Plan Administrator and his professionals paid or to be paid, and (d) other Professional Fees and Expenses paid from the Distribution Fund.  The Oversight Committee may provide comments and suggestions to the Plan Administrator, and may bring concerns to the attention of the Bankruptcy Court.  If the Oversight Committee believes that fees or expenses paid from the Distribution Fund (including Professional Fees of the Reorganized Debtor and the Plan Administrator) are unreasonable, it may challenge the fees before the Bankruptcy Court.  The Oversight Committee (and its members), however, shall not have the right to seek payment of the fees or expenses of the Oversight Committee (or its members), including the fees or expenses of any of its attorneys or other professionals, from the Reorganized Debtor or the Distribution Fund.  The Oversight Committee shall not have the right to oversee the Reorganized Debtor or to seek reports or other information from the Reorganized Debtor, and shall have no right to control or dictate the Debtor's business operations, business decisions or financial affairs.

**5.7.8**  Financial Reporting by the Debtor; Reporting to the Oversight Committee.  The Reorganized Debtor shall provide financial information and documents to the Plan Administrator upon request, and shall provide annual financial statements as maintained by the Reorganized Debtor in the ordinary course of business.  The Plan Administrator shall share the Debtor's annual financial statements with the Oversight Committee.  The Plan Administrator also shall report to the Oversight Committee all professional fees and expenses paid from the Distribution Fund after the Effective Date, and shall provide copies of the professional invoices (subject to necessary redactions) upon request.

**5.8**    **Consolidation of the Debtor and the Consolidated Subsidiary Entities**.
Except as expressly set forth in this Plan, on the Effective Date, the Debtor and the Consolidated Subsidiary Entities shall be deemed consolidated pursuant to Bankruptcy Code § 1123(a)(5).

**5.8.1**  Effect of Consolidation.  The consolidation of the Estates shall include, but shall not be limited to, the following:

**5.8.1.1**    *Consolidation of Assets and Liabilities*. Except as expressly provided in this Plan (or as otherwise ordered by the Bankruptcy Court), on the Effective Date, all assets (and all proceeds thereof) and all liabilities of the Debtor

and the Consolidated Subsidiary Entities shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other. Creditors are entitled to only one Claim against the Reorganized Debtor (including the Debtor and each of the Consolidated Subsidiary Entities, collectively) and but a single satisfaction of the Claim. Any joint or several liability of the Debtor and the Consolidated Subsidiary Entities shall be deemed to be one obligation of the Reorganized Debtor. All guaranties of the Debtor or any Consolidated Subsidiary Entity of the obligations of any other entity comprising the Reorganized Debtor shall be deemed eliminated and extinguished, and any Claim against any of the Reorganized Debtor entities, and any guaranty thereof executed by any of the Reorganized Debtor entities, shall be deemed to be one obligation of the Reorganized Debtor. If a proof of claim was defective prior to consolidation of the Debtor and the Consolidated Subsidiary Entities (*i.e.*, the Claim related to an obligation of a Consolidated Subsidiary Entity, but was filed against the Debtor) such Claim should not be disallowed solely because it was filed against an entity other than the entity that was purportedly liable for the Claim prior to the consolidation provided for in this Plan.

5.8.1.2    *No Increase or Augmentation of Security Interests*. Notwithstanding anything in section 5.8.1.1 of this Plan to the contrary, the consolidation of the Debtor and the Consolidated Subsidiary Entities shall not act to increase or augment the Collateral for any Secured Claim. For example, if any Claim holder has an "all assets" lien against the Debtor or any Consolidated Subsidiary Entity, the lien shall not extend to the assets of the other Reorganized Debtor entities, if it would not otherwise extend to those assets under the operative security agreement(s).

5.8.1.3    *Release of Intercompany Claims.*  No distributions shall be made under the Plan on account of intercompany Claims among or between any of the Reorganized Debtor entities, and such intercompany Claims shall be deemed released and discharged on the Effective Date.  This release and discharge includes, without limitation, any Avoidance Actions and any set-off rights

**5.8.2**  Extended Claims Bar Date for Creditors of Consolidated Subsidiary Entities.  The Debtor will provide notice of this Plan and the approved Disclosure Statement to all known creditors or Claim holders of the Consolidated Subsidiary Entities (the "Consolidated Subsidiary Entities' Creditors"). Notwithstanding section 6.7 of the Plan, or anything else to the contrary in the Plan, the Consolidated Subsidiary Entities' Creditors shall have until ninety (90) days after the Confirmation Date to file a proof of claim (a "Consolidated Subsidiary Entities' Creditor Proof of Claim") against the Reorganized Debtor, but only to the extent that the Consolidated Subsidiary Entities' Creditor Proof of Claim asserts a Claim that would not constitute a Claim against the Debtor absent the consolidation provided under this Plan. For the avoidance of doubt, any Claim that is properly a Claim against the Debtor (and only the Debtor), absent the effect of consolidation under this Plan, must be filed on or before the Bar Date, or it shall be forever disallowed as provided under section 6.7 of the Plan. The Consolidated

Subsidiary Entities' Creditors must file the Consolidated Subsidiary Entities' Creditors Proofs of Claim with the Bankruptcy Court on the Court's official Claims Register, and with the Reorganized Debtor addressed to undersigned counsel. The Reorganized Debtor shall mail (or otherwise serve) notice to all Consolidated Subsidiary Entities' of their right and the deadline to file proofs of claim on later than twenty-one days after the Confirmation Date.

### 5.8.3  Treatment of Claims Against Consolidated Subsidiary Entities.

5.8.3.1   *Secured Claims*.  Unless otherwise modified or treated under this Plan (or in a stipulation filed in the Case), the Consolidated Subsidiary Entities shall continue to pay any obligations secured by property of the Consolidated Subsidiary Entities according to the terms of the loan documents among the Consolidated Subsidiary Entities and their respective secured creditors.

5.8.3.2   *Operating Expenses.*  The Debtor has been paying its post-Petition Date operating expenses in the ordinary course of business, consistent with their actual or potential status as administrative claims.  Likewise, the Consolidated Subsidiary Entities have been paying their operating expenses in the ordinary course of business.  The Consolidated Subsidiary Entities (or Reorganized Debtor) may pay any of the Consolidated Subsidiary Entities' operating expenses in the ordinary course of business, and may pay any post-Petition Date obligations in full.

5.8.3.3   *Section 549 of the Bankruptcy Code Shall Not Apply.*  No transfers or payments by the Consolidated Subsidiary Entities prior to the Effective Date shall be avoidable as unauthorized post-petition transfers under section 549 of the Bankruptcy Code.

5.8.3.4   *Unsecured Claims.*  Any unsecured claims against the Consolidated Subsidiary Entities which arose or existed prior to the Petition Date (and which have not already been paid by the Consolidated Subsidiary Entities) shall be paid from the Distribution Fund as a Class 1 or Class 2 Claim, as applicable, but only to the extent such Claim is or becomes an Allowed Claim.  A claim against a Consolidated Subsidiary Entity may be Allowed only via compliance with the requirements of section 5.8.2, *i.e.*, the filing of a Consolidated Subsidiary Entities' Creditor Proof of Claim on or before ninety (90) days after the Confirmation Date.  Claims against a Consolidated Subsidiary Entity also are subject to potential objections, as described under Article 6 of the Plan.

### 5.8.4  Continued Separate Corporate Existence.  Each of the Debtor and the Consolidated Subsidiary Entities shall continue to exist after the Effective Date as

separate corporate entities, limited liability companies, partnerships, or other forms as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, under the applicable law in the jurisdiction in which each applicable entity is incorporated or formed and subject to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective

Date, unless amended by the Plan, and to the extent such documents are amended, those documents are deemed to be amended by the Plan and the applicable entity is not required to take any further action or seek any further approval (other than requisite filings required under applicable state law).  Except only as expressly provided in this Plan, the Debtor and each of the Consolidated Subsidiary Entities also shall continue to enjoy "limited liability" as permitted by applicable non-bankruptcy law.  Neither the Debtor nor any Consolidated Subsidiary Entity shall be liable for the debts and obligations of any other except only as expressly and unambiguously provided in this Plan.

   **5.8.5** <u>Formalizing Consolidation</u>.  Notwithstanding section 5.8.4 of the Plan, the Reorganized Debtor may, but is not required to, formalize the consolidation of the Debtor and the Consolidated Subsidiary Entities by filing articles of merger, articles of dissolution or other corporate filings with applicable state and federal authorities, as the Reorganized Debtor may determine in its sole and absolute discretion.  The Reorganized Debtor may do so at any time on or after the Effective Date, or may elect never to do so.

   **5.8.6** <u>Tax Filings</u>.  The Reorganized Debtor may file separate returns for the Debtor and the Consolidated Subsidiary Entities, or may file a consolidated return for the consolidated Reorganized Debtor, as it determines in its sole and absolute discretion and/or as may be suggested by the Reorganized Debtor's tax preparers and/or tax advisors. All tax filings by the Reorganized Debtor shall be prepared and filed in accordance with Title 26 of the United States Code.

   **5.9** **<u>Employment of Professionals</u>**. The Reorganized Debtor may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtor after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.

   **5.10** **<u>Ability to Incur Debt</u>.**  The Reorganized Debtor may incur debt after the Effective Date on a secured or unsecured basis without further notice, opportunity for hearing or order, except only to the extent the terms and provisions of this Plan (including any stipulation incorporated as part of this Plan) may expressly forbid.  Until the Reorganized Debtor shall have satisfied its obligations under section 5.5 of the Plan in full (i.e., until the full Distribution Fund Amount shall have been paid or deposited), however, the Reorganized Debtor's ability to incur debt in amounts in excess of $150,000 shall be subject to approval by the Plan Administrator. The Plan Administrator may withhold approval, or refuse it, if he determines, in his professional discretion, that the terms of new proposed loan transaction would impair the feasibility of the Plan or would unreasonably increase the likelihood that the Debtor may default in its obligation under the Plan.  As he determines in his sole discretion, the Plan Administrator may provide blanket approval or pre-approval to incur certain categories of debts (e.g., premium financing, short term equipment rental, etc.), to incur debts on certain terms, or to increase the discretionary borrowing limit to an amount greater than $150,000.

**5.11** **Approval of Agreements; Authority to Perform and Implement**. Unless otherwise expressly provided in the Confirmation Order, entry of the Confirmation Order shall constitute approval of and authorization permitting the Reorganized Debtor to enter into, perform under and implement each of the transactions expressly contemplated under this Plan.

**5.12** **The Creditors' Committee Shall Be Dissolved**. Upon the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from the Case. The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Confirmation Date. Notwithstanding the foregoing, the Professionals retained by the Creditor's Committee may file final applications for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date within the time period contemplated under section 2.2.4.1 of this Plan.

**5.13** **Continuation of Anti-Discrimination Provisions of Bankruptcy Code**. A governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, the Reorganized Debtor, or another Person with whom the Debtor or the Reorganized Debtor have been or are associated or affiliated, solely because of the commencement, continuation, or termination of the Bankruptcy Case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a governmental unit.

**ARTICLE 6**
**IMPLEMENTATION OF THE PLAN**

**6.1** **Method of Distributions under the Plan.**

**6.1.1** In General. Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Debtor (or the Plan Administrator, if applicable) to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Effective Date, unless the Debtor (or the Plan Administrator, if applicable) has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules. The Debtor (or the Plan Administrator, if applicable) shall have no obligation to locate holders whose distributions or notices are properly mailed but nevertheless returned. Distributions may be made under this Plan through payments directly from the Debtor (or the Plan Administrator, if applicable).

**6.1.2** Form of Distributions. Any payment of Cash made by the Debtor (or the Plan Administrator, if applicable) pursuant to the Plan shall be made by regular check; *provided, however,* that after the occurrence of the Effective Date, the Debtor (or the Plan Administrator, if applicable) is not obligated to make any Cash payment under the Plan unless the payment exceeds twenty-five dollars ($25); *provided, further,* that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to twenty-five dollars ($25)

shall be maintained in a reserve (the "<u>Small Payment Reserve</u>") for the benefit of such holder until an aggregate of at least twenty-five dollars ($25) is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

**6.1.3**  <u>Distributions to be on Business Days</u>.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**6.1.4**  <u>Withholding Taxes on Distributions</u>.  The Reorganized Debtor <u>(or the Plan Administrator, if applicable)</u> shall withhold from any Cash or property distributed under the Plan such amounts as the Debtor is obligated under non-bankruptcy law to withhold and transmit to taxing authorities.

**6.1.5**  <u>Minimum Distributions</u>.  The Reorganized Debtor (or the Plan Administrator, if applicable) shall not be obligated to make any distribution, including a final distribution, unless the payment exceeds twenty-five dollars ($25).  To the extent the entire amount distributable to the holder of a claim is not at least twenty-five dollars ($25), the Reorganized Debtor (or the Plan Administrator, if applicable) may retain the funds otherwise distributable to such holder and may use such funds for the benefit of the Reorganized Debtor's business and/or its other creditors.

**6.1.6**  <u>Treatment of De Minimus Amounts on Deposit in the Distribution Account</u>.  In the event that the Distribution Fund contains less than $10,000 on a particular Distribution Date, the Plan Administrator may elect not to make a distribution at that time and may hold the funds until the next Distribution Date.  If on or before the Final Distribution Date the Debtor has deposited, paid or otherwise contributed the entire Distribution Fund Amount, and if prior distributions from the Distribution Account have left the cash remaining on deposit an amount such that the Plan Administrator, in his or her sole discretion, believes that the cost to make a distribution to creditors (including the fees and expenses of the Plan Administrator and his Professionals) would equal or exceed the cash remaining on hand for distribution (or otherwise would be impracticable), the Plan Administrator may disburse the remining funds, not to exceed $10,000, back to the Reorganized Debtor.

**6.2**  **Objections to Claims.**  Except as otherwise provided in this Plan (including stipulations that are incorporated into and made a part of this plan, which stipulations may include a waiver of, and prohibition against, objecting to a particular creditor's Claim or Lien) any objections to Claims against the Estate may be prosecuted by the Plan Administrator, theDebtor or the Reorganized Debtor or any other party in interest.  Except as otherwise provided by order of the Bankruptcy Court, the Plan Administrator, the Debtor or any other party in interest may file an objection to any Claim until 180 days after the Effective Date.  Upon motion filed within such one hundred eighty (180) days, the Bankruptcy Court may extend the period within which to object to a Claim for a reasonable period of time, not to exceed an additional one hundred eighty (180) days.  Any Claim to which no timely objection has been filed shall be deemed an Allowed Claim.

**6.3     Estimation of Claims.**  The Debtor or the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.  The Debtor and the Reorganized Debtor shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim.  If the Bankruptcy Court determines the maximum limitation of such Claim, such determination shall not preclude the Debtor or Reorganized Debtor from pursuing any additional proceedings to object to any ultimate payment of such Claim.  If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under this Plan.  All such proceedings are cumulative and not exclusive remedies.

**6.4     Convenience Class Election.**  The holder of any Claim may, on or before the Voting Deadline for returning ballots either accepting or rejecting this Plan (*i.e.*, August __, 2018), provide an authenticated written notice to the Debtor voluntarily electing (a "Convenience Class Election"): (a) if the Claim is, or may be, greater than $1,000, voluntarily to reduce the amount of the Claim to $1,000; (b) if the Claim is secured, to waive any and all Liens and other interests in Collateral; and (c) if the Claim is a Priority Claim, to waive any and all priority in payment or treatment vis-à-vis General Unsecured Claims.  Such an election constitutes an irrevocable waiver and release of all amounts in excess of $1,000, any rights in Collateral and any priority.  Any holder that makes a Convenience Class Election shall be deemed to release the Debtor from any and all liability for amounts in excess of $1,000.  In the event a holder timely makes such a Convenience Class Election, its Claim shall be treated as a Convenience Claim in the lesser amount of (a) $1,000, or (b) the Allowed Amount of the Claim.  Holders of Allowed Convenience Claims shall receive distributions after the Effective Date in accordance with Sections 4.34, 5.5 and 5.6 of the Plan.

**6.5     Determination of Tax Liability.**  To the fullest extent permitted under section 505 of the Bankruptcy Code, the Debtor or the Reorganized Debtor may, at any time, (a) request that the Bankruptcy Court determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, (b) exercise or pursue any other rights or remedies of the Debtor with respect to tax liabilities and/or tax claims under the Bankruptcy Code, under the Bankruptcy Rules and/or under applicable nonbankruptcy law.

**6.6     No Distributions to the Holders of Disallowed Claims.**  Any and all Claims which are not Allowed, as specified herein, shall be Disallowed.  Claims which are Disallowed (or not Allowed) shall be forever barred as against the Debtor, and shall receive no payments or distribution under this Plan; provided, however, that any Claim which is a Disputed Claim solely by reason of an objection or other legal challenge that is pending and unresolved shall be treated as a Disputed Claim, and may receive payments or distributions to the extent it later becomes Allowed, in whole in part, upon resolution of such objection or challenge.

**6.7     Late-Filed Claims Forever Barred.**  All Claims arising from proofs of claim filed after the Bar Date (or, in the case of a Consolidated Subsidiary Entities' Creditor Proof of Claim, not filed on or before ninety days after the Confirmation Date) automatically shall be

disallowed without the need for the Debtor to file an objection, and without any further order of the Court.  No Claim that is late-filed (*i.e.*, filed after the applicable Bar Date) shall be treated or paid as an Allowed Claim under this Plan unless the tardiness is excused and the late-filing of such Claim specifically is permitted pursuant to a Final Order entered prior to the Effective Date. Rather, any such "late" Claim automatically and without further notice or opportunity for hearing shall be disallowed under this Plan.  Notwithstanding the foregoing, a claim filed after the applicable Bar Date may be treated as an Allowed Claim only if, prior to the Effective Date and after notice and an opportunity for hearing, the Court has entered an order expressly allowing the Claim and/or permitting the holder of the Claim to file a late-filed proof of claim.

**6.8**     **Reversion of Unclaimed Checks.**  The amount of any checks issued for distributions under the Plan that remain uncashed for a period of ninety days after the date of such distribution, and for which the payee does not request a replacement check within the additional time period contemplated under section 6.9, shall revert and be vested in the Reorganized Debtor free and clear of any claim or interest of any holder of a Claim under the Plan.

**6.9**     **Cash Payments and Time Bar.**  Cash distributions made by the Plan Administrator or the Reorganized Debtor shall be by checks drawn on a domestic bank, and promptly mailed, postage prepaid.  Any check issued to pay an Allowed Claim will be null and void if such check is not negotiated within ninety (90) days of its issuance; *provided, however,* that the payee of a check may request reissuance of a "stale" check on or before 60 days after the expiration of the 90-day period following the date of issuance of such check.   Requests for reissuance of any check shall be in writing to the Plan Administrator by the holder of the Allowed Claim (or check payee) to whom such check originally was issued.  If both the initial ninety-day period and subsequent sixty-day period shall expire, thereafter, the portion of the Claim that would have been paid by the voided check shall be barred and disallowed, and all rights to such distribution by such Creditor shall be forfeited.  The Reorganized Debtor or Plan Administrator, as applicable, will retain the funds resulting from such void checks.

**6.10**     **Retention and Preservation of Claim Objections and Causes of Action.** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtor, the Reorganized Debtor, and the Plan Administrator's rights to object to all Claims and Interests asserted against the Estate and (except only as provided in section 5.2.1 of the Plan or under a stipulation that is incorporated as part of this Plan) all of the Debtor's or Estate's Causes of Action, including without limitation: (1) the Debtor's Causes of Action asserted in any adversary proceeding, U.S. District Court litigation, state court proceeding, or any other proceeding  which is pending as of the Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; (3) all Claims and Causes of Action described in the Disclosure Statement; (4) any Claims and Causes of Action contained in any contested matter or objection to Claim pending on the Confirmation Date; and (5) any and all other Claims and Causes of Action that the Debtor holds pre-confirmation, including, but not limited to, Claims for unpaid accounts receivable, shall vest in the Estate.  Subject only to section 5.2.1 and notwithstanding anything else in the Plan to the contrary, no provision in this Plan is intended or shall be construed to preclude or otherwise bar the Debtor (through the Plan Administrator) from pursuing any claims arising under chapter 5 of

the Bankruptcy Code or under other applicable law.  Among other things, except only as provided in section 5.2.1 of the Plan, no Person sued pursuant to sections 547, 548, 549, 550, 553 of the Bankruptcy Code or otherwise may argue that confirmation of this Plan precludes such claim on grounds of res judicata, issue preclusion or otherwise. The Debtor, the Reorganized Debtor, and the Plan Administrator expressly reserve their rights, Claims, and Causes of Action for surcharge under § 506(c) of the Bankruptcy Code and subordination under § 510 of the Bankruptcy Code.

   **6.11** <u>**No Release or Waiver.**</u> Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtor expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court. For the avoidance of doubt, the use of a defined term such as "Collateral," "Secured," "lease," "true lease," "Lien," and so forth, is not, and shall not be construed as, an admission that the referenced thing, item, document, or description does, in fact, constitute such thing, item, document, or description.

## ARTICLE 7
## VOTING ON THE PLAN

   **7.1** <u>**Voting of Claims**</u>. Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

   **7.2** <u>**Nonconsensual Confirmation**</u>. If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan in accordance with Article 11 hereof to the extent necessary to obtain entry of a Confirmation Order.

## ARTICLE 8
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1** **Assumption of Executory Contracts and Leases.** The following Executory Contracts and Leases are "Assumed Contracts" under this Plan.

**8.1.1** By Order of the Court Prior to the Effective Date. Any Executory Contract and Leases which the Debtor was authorized to, and did, assume by order entered in the Case prior to the Effective Date.

**8.1.2** Upon the Effective Date. The following Executory Contracts and Leases are assumed as of the Effective Date pursuant to 365(a) and 1123 of the Bankruptcy Code in accordance with their terms, unless (a) alternative terms are agreed to by the non-Debtor party or parties to such Executory Contracts or Lease or (b) alternative terms are specified in the Plan:

8.1.2.1 all of the Reorganized Debtor's contracts with its customers, including without limitation all master service agreements;

8.1.2.2 all of the Reorganized Debtor's contracts with unions, including labor agreements and collective bargaining agreements;

8.1.2.3 all insurance policies in favor of the Debtor;

8.1.2.4 unless specifically identified as a Rejected Contract, all short and long-term contracts and leases under which the Debtor is the lessor;

8.1.2.5 unless specifically identified as a Rejected Contract, all Executory Contracts and unexpired Leases to which any of the Consolidated Subsidiary Entities (but not the Debtor) is a counter-party;

8.1.2.6 unless specifically identified as a Rejected Contract, any and all Executory Contracts and unexpired Leases entered into after the Petition Date; and

8.1.2.7 only to the extent the Debtor enters into an amendment or modification agreement acceptable to the Debtor in its sole and absolute discretion prior to the Confirmation Date [i.e., absent such an amendment it will be a Rejected Contract], the Equipment Lease Agreement, dated April 2015, between the Debtor, as lessor, and National Equipment Service, Inc., as lessee.

**8.1.3** Schedule of Assumed Contracts. All Executory Contracts and unexpired Leases listed on the Schedule of Assumed Contracts, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**8.1.4** <u>Motion to Assume</u>.  Either before or after the Effective Date, the Debtor may file a motion (a "<u>Motion to Assume</u>") and, subject to notice and opportunity for a hearing, obtain entry of an order pursuant to section 365 of the Bankruptcy Code and/or this section 8.1 of the Plan authorizing the Debtor to "assume" any Executory Contract or Lease that is not, and does not become, a Rejected Contract.

**8.2** **<u>Cure Amounts for Assumed Contracts</u>**.  Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default, as well as any nonmonetary defaults, shall be satisfied, to the extent required under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor, as applicable, upon assumption thereof, subject to the conditions provided in this Plan.  The Schedule of Assumed Contracts, a Motion to Assume and/or the Schedule of Cure Amounts may set forth the proposed Cure Amount for any particular Executory Contract or unexpired Lease.  Unless a different amount is listed, the proposed, reasonable and appropriate Cure Amount for each Executory Contract and unexpired Lease shall be zero dollars ($0).

**8.3** **<u>Determination of Cure Disputes and Deemed Consent</u>**.  If any counterparty to an executory contract or unexpired lease disputes (a) any Cure Amount, (b) the ability of the Reorganized Debtor to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, (c) whether a nonmonetary default is required to be cured, or (d) any other matter pertaining to assumption, such counterparty must file an objection with the Bankruptcy Court on or before the date and time scheduled for the hearing on confirmation of the Plan.  Such disputes shall be adjudicated by the Bankruptcy Court prior to the assumption of such executory contracts and unexpired leases becoming effective; provided that the Reorganized Debtor may reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount shall be deemed to have assented to such assumption and to the Cure Amount proposed by the Debtor (and that no nonmonetary defaults exist or that they need not be cured) and shall be forever barred, estopped, and enjoined from challenging the Cure Amount or the validity of such assumption.

**8.4** **<u>Rejection of Executory Contracts</u>.**  Except for Assumed Contracts, any and all Executory Contracts and unexpired Leases that have not been either assumed or rejected prior to the Effective Date are rejected by the Debtor (the "<u>Rejected Contracts</u>") as of the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**8.5** **<u>Rejection Damage Claims</u>**.  If the rejection of an executory contract or unexpired lease by the Debtor or the Reorganized Debtor results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before forty-five (45) days following the later of (a) the Confirmation Date or (b) the effective date of the rejection of such

executory contract or unexpired lease.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim timely are filed will be treated as Class 2 General Unsecured Claims subject to the provisions of the Plan.  The Debtor shall have the right to object to any such rejection damage claims filed in accordance with this Section.

**8.6**     **Reservation of Rights**.

    **8.6.1**  *No Admission*.  Neither the exclusion nor the inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan, in the Schedule of Assumed Contracts, in the Schedule of Rejected Contracts or in the Schedule of Cure Amounts, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is (or is not) an executory contract, unexpired lease, or true lease, or that the Debtor or the Reorganized Debtor has any liability thereunder.

    **8.6.2**  *No Waiver.*  Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease.

    **8.6.3**  *No Addition to Duties.*  Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease.

    **8.6.4**  *Right to Alter Treatment.*  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtor or Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**8.7**     **Post-Petition Agreements Unaffected By Plan**.  Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that were otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date.  The Reorganized Debtor shall be deemed to be substituted for any Debtor in such contract or agreement, as applicable, and the Reorganized Debtor shall have all right, title and interest of the Debtor under such contract or agreement as if the Reorganized Debtor had been the original contracting party thereunder.

## ARTICLE 9
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

**9.1**     **Conditions Precedent to Effectiveness**.  The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

**9.1.1**  the Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

**9.1.2**  all actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

**9.1.3**  the Court shall have entered orders (or there shall be agreements satisfactory to the Debtor) concerning Claims, any Liens asserted by holders of Claims, and any interests in the Debtor (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtor are required for the feasibility and implementation of the Plan; and

**9.1.4**  the Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

**9.2**    **Failure of Conditions Precedent**.  Notwithstanding anything in this Plan to the contrary, the conditions set forth in Section 9.1 above must be satisfied or waived on or before December 31, 2018.  In the event that the conditions set forth in Section 9.1 above are not satisfied on or before said date, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and section 11.1 of the Plan shall apply.

**9.3**    **Waiver of Conditions**.  The Debtor may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in Section 9.1 above, except that the Debtor may not waive the condition that the Estate will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date.

## ARTICLE 10
## RETENTION OF JURISDICTION; CASE CLOSURE

**10.1**    **Retention of Jurisdiction**.  After the Effective Date, the Bankruptcy Court shall have original jurisdiction of all matters arising in, arising under or related to the Bankruptcy Case or Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the following specific matters:

**10.1.1**  Executory Contracts.  The Court shall retain jurisdiction (a) to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and (b) to hear and determine any and all Claims resulting from the rejection of any executory contract or unexpired lease, and any objections to such Claims.

**10.1.2**  Compensation.  The Court shall retain jurisdiction to hear and determine all applications by Professionals and others for compensation and reimbursement of expenses for the period ending on the Effective Date.

10.1.3  <u>Distributions</u>.  The Court shall retain jurisdiction to ensure that the distributions to holders of Claims are accomplished as provided herein, provided, however, that the Bankruptcy Case may be closed prior to the completion of distributions to holders of Claims.

10.1.4  <u>Litigation</u>.  The Court shall retain jurisdiction to hear and determine any and all adversary proceedings, applications, contested matters and other litigated matters pending on the Confirmation Date or filed thereafter, including any and all claims that might be filed by the Reorganized Debtor or the Plan Administrator under chapter 5 of the Code or that are otherwise reserved under sections 6.10 and 6.11 of this Plan.

10.1.5  <u>Determine Claims Arising Post-Confirmation</u>.  The Court shall retain jurisdiction to determine any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein.

10.1.6  <u>Determination of Claims Relating to Effective Date Transactions</u>.  The Court shall retain jurisdiction to hear and decide any Claims or Litigation that arise under, arise from or relate to the transactions contemplated and approved under this Plan. To the extent that any litigation contemplated by this section is filed in any state or federal court other than the Bankruptcy Court, the Debtor, the Plan Administrator, and any other party-in-interest (a) may remove the action as permitted by 28 U.S.C. 1452, and (b) may seek to transfer venue of such action to the Bankruptcy Court in the District of Utah.

10.1.7  <u>Tax Claims</u>.  The Court shall retain jurisdiction to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

10.1.8  <u>Objections to Claims</u>.  The Court shall retain jurisdiction (a) to hear and determine any objections to Claims filed both before and after the Confirmation Date, (b) to allow or disallow any Claim in whole or in part, (c) to decide any controversies as to the classification of any Claims and/or (d) to estimate any Disputed Claim.

10.1.9  <u>Stay or Reversal of Confirmation</u>.  The Court shall retain jurisdiction to enter and implement such orders as may be appropriate in the event Confirmation of the Plan is for any reason stayed, reversed, revoked, modified or vacated.

10.1.10 <u>Plan Modification</u>.  The Court shall retain jurisdiction to hear applications, if any, to modify the Plan in accordance with § 1127 of the Bankruptcy Code.  After Confirmation of the Plan, the Reorganized Debtor and the Plan Administrator may also, so long as it does not adversely affect the interests of Creditors, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Order of Confirmation, in such manner as may be necessary to carry out the purpose and effect of the Plan.

10.1.11  <u>Plan Disputes</u>.  The Court shall retain jurisdiction to hear and determine disputes arising in connection with the Plan or its implementation, including without

limitation disputes relating to the execution of agreements, documents or instruments required to be executed pursuant to the terms of the Plan, or arising under or relating to the interpretation of agreements, documents or instruments executed in connection with the Plan.

**10.1.12** <u>Plan Implementation</u>.  The Court shall retain jurisdiction to construe and to take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan.

**10.1.13** <u>Enforce Plan Injunction</u>.  The Court shall retain jurisdiction to enforce the releases, exculpatory provisions and/or injunctions described or provided under this Plan including, without limitation, those described or summarized under Article 12. Among other things, the Court shall retain jurisdiction to enter temporary restraining orders, preliminary injunctions, permanent injunctions, contempt sanctions and other appropriate orders and remedies, including to stay and prevent litigation filed or pending before another court or tribunal.

**10.1.14** <u>Plan Corrections</u>.  The Court shall retain jurisdiction to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan.

**10.1.15** <u>Creditors' Disputes</u>.  The Court shall retain jurisdiction to take any action to resolve any disputes arising out of or relating to any Claim, to hear and determine other issues presented by or arising under the Plan, and to take any action to resolve any disputes of Creditors with respect to their Claims.

**10.1.16** <u>Other Matters</u>.  The Court shall retain jurisdiction to determine such other matters and for such other purposes as may be provided in the Order of Confirmation or that are not inconsistent with chapter 11 of the Bankruptcy Code.

**10.2** **<u>Exclusive Jurisdiction</u>.**  The retention of jurisdiction provided for in this Plan shall be exclusive with respect to all matters set forth in section 10.1 hereof so as to preserve for the Reorganized Debtor and the Plan Administrator the benefits of the Plan, subject to the Court's power under section 305 of the Bankruptcy Code or 28 U.S.C. § 1334(c) to abstain as to all or part of any proceeding.

**10.3** **<u>Effectuating Orders</u>.**  The Bankruptcy Court shall enter all judgments, partial judgments, and Orders necessary to effectuate or enforce the Plan, any term therein or as reasonably requested by any party intended as a direct beneficiary of a material provision of the Plan.  Such Orders and decrees may include a permanent injunction effectuating all actions, releases, assignments, transfers and waivers required by the Plan.

**10.4** **<u>Closure of the Case</u>.**

**10.4.1** <u>Closing the Bankruptcy Case</u>.  As soon as the Debtor and the Plan Administrator determine that there is no further need for administration of the Case by

the Bankruptcy Court, the Bankruptcy Case shall be closed pursuant to 11 U.S.C. § 350 upon (i) the filing of a final report, (ii) after twenty-eight (28) days notice to parties-in-interest, and (iii) the entry of an appropriate final decree and/or Order by the Court closing the Bankruptcy Case.  Absent an order extending the time for entry of a final decree entered after notice and opportunity for hearing, a final decree closing the Bankruptcy Case shall be entered not later than 1 year after the Confirmation Date.  The Debtor will comply with Local Rule 3022-1 in seeking entry of a final decree. Subject to the Bankruptcy Court's discretion, the Bankruptcy Case may be closed notwithstanding that adversary proceedings related to the Case may be, and remain, pending.

**10.4.2**  Post-Confirmation Payments to United States Trustee.  Until entry of an Order closing, dismissing or converting the Bankruptcy Case, any quarterly payments due to the office of the United States Trustee after the Effective Date of the Plan shall be paid in accordance with 28 U.S.C. § 1930(a)(6) by the Plan Administrator. No quarterly payments shall come due or be required after the Bankruptcy Case is closed.

**10.4.3**  Reopening Case.  At any time, the Reorganized Debtor or the Plan Administrator may obtain entry of an order reopening the Bankruptcy Case to obtain any relief or order from the Bankruptcy Court consistent with section 10.1.  Although the Reorganized Debtor or the Plan Administrator may seek such relief on an *ex parte* basis, the Reorganized Debtor or the Plan Administrator, as the case may be, shall give notice of its motion or other request to the US Trustee.

# ARTICLE 11
## MODIFICATION OF THE PLAN

**11.1**  **Revocation or Withdrawal of the Plan**.  The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estate or any other Person or to prejudice in any manner the rights of the Debtor, the Consolidated Subsidiary Entities, or any Person in any further proceedings involving the Estate.

**11.2**  **Amendments Prior to Confirmation.**  Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with Section 1125 of the Bankruptcy Code.

**11.3**  **Savings Clause; Reformation; Severability.**  Subject to section 11.5 of this Plan and section 1127 of the Bankruptcy Code, if any provision of this Plan is found to be invalid or unenforceable for any reason, such provision shall be construed and/or reformulated by the Court in such a way as to make it valid and enforceable to the maximum extent permitted by the Bankruptcy Code and other applicable law, and the Plan shall be confirmed as so modified and reformed.  Any provision of this Plan which the Court determines is prohibited or unenforceable

under the Bankruptcy Code, Bankruptcy Rules or other applicable law shall not affect or render invalid or unenforceable any other provisions of Plan.  Specifically, to the extent a particular provision, term or condition of this Plan would prevent confirmation, the Court (with the consent of the Debtor and the Committee) may strike such provision and may confirm the Plan as modified, with such term, condition or provision omitted, excluded or otherwise modified.

**11.4    Amendments After Confirmation.**  The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that (a) the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code and (b) the Bankruptcy Court approves such modifications after such notice, and under such circumstances, as the Court determines to be fair and equitable.

**11.5    Effect on Acceptance Requirements.**  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (a) such Person fails timely to object to the proposed alteration, amendment or modification, or (b) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtor or the Plan Administrator may correct any defect or omission in this Plan and any exhibit hereto without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

**11.6    Effect of Modification.**  Every modification of the Plan will supersede all previous versions of the Plan when such modification becomes effective.  Previous superseded versions of the Plan will be deemed to be in the nature of a withdrawn or rejected settlement proposal, and will be of no evidentiary or substantive effect for any purpose whatsoever.

## ARTICLE 12
## STAYS, INJUNCTIONS AND RELEASES

**12.1    Continuation of Injunctions or Stays until Effective Date**.  All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Further, unless the Plan provides otherwise, any injunctions or stays ordered by the Bankruptcy Court shall continue in effect through and after the Effective Date.

**12.2    Injunction Relating to the Plan**.  As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, its Estate, or the Reorganized Debtor on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan.  Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Further, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or

may hold Claims against the Debtor or the Consolidated Subsidiary Entities, or who have held, hold or may hold any debt or interest relating to the Debtor or the Consolidated Subsidiary Entities, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against the Reorganized Debtor or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

**12.3   Injunctions Extend to and Include the Consolidated Subsidiary Entities and their Assets.**  For the avoidance of doubt, any and all injunctions provided for under this Plan shall extended to the Consolidated Subsidiary Entities and their Assets, pursuant to their consolidation under the Plan as part of the Reorganized Debtor.

**12.4   Contingent Injunction in Favor of Certain Individual Guarantors that Voluntarily Subordinate Their Claims Against the Debtor in Favor of Class 2 Claims.**  To the extent an individual that has guaranteed obligations of the Reorganized Debtor voluntarily subordinates his or her own claims against the Reorganized Debtor to repayment of Class 2 Unsecured Claims and voluntarily accepts treatment under this Plan as a Class 35 Subordinated Claim (a "Subordinating Guarantor") then for the duration of the Plan Period (but not forever) or, if earlier, until an Early Termination Event (as defined in section 12.4.2, below), and in exchange for the voluntary subordination given by such Subordinating Guarantor pursuant to a written Subordination Agreements in favor of the Reorganized Debtor (which is anticipated to increase the distributions to the holders of Allowed Class 2 General Unsecured Claims by a substantial amount), all holders of Class 2 General Unsecured Claims shall be enjoined from taking any actions, instituting or continuing to prosecute any litigation, or otherwise pursuing collection or recovery of any claims against the Subordinating Guarantors which derive from or are related to claims against the Debtor, a Consolidated Subsidiary Entity, the Reorganized Debtor or the Estate (*i.e.*, any claims against a Subordinating Guarantor in his or her capacity as a guarantor or other co-debtor of the Reorganized Debtor).  Except in instances in which the Debtor specifically has stipulated otherwise in favor of a particular holder of a Secured Claim, the holders of Secured Claims likewise shall be enjoined from pursuing collection against or recovery from Subordinating Guarantors for the duration of the Plan Period or, if earlier, until an Early Termination Event, but only to the extent the Secured Claim is treated and paid under the Plan. To the extent the Debtor's stipulation with a particular holder of a Secured Claim requires that guarantors reaffirm or ratify their obligations as co-debtors, the injunction under this paragraph also shall be contingent upon the Subordinating Guarantors' satisfying such condition. The Debtor, the Reorganized Debtor and the Plan Administrator shall be enjoined from pursuing any claims against Subordinating Guarantors (which may, and are anticipated to, include David Paul Belcher, Paul David Belcher, Lon Stam and Vern Belcher) which could be brought under chapter 5 of the bankruptcy code, or under any fraudulent transfer law of the United States or any state thereof.

**12.4.1**  Duration of Contingent Injunction; Statutes of Limitation Tolled.  The contingent injunction described in the section 12.4 shall terminate automatically upon the occurrence an Early Termination Event (as defined in section 12.4.2).  Absent an Early Termination Event, the contingent injunction described in this section 12.4 shall remain in effect for the duration of the Plan Period, and shall expire when the Plan Period is complete.  The statutes of limitation for all such enjoined actions against Subordinating Guarantors shall be tolled from the Effective Date until thirty (30) days after the earlier of (a) an Early Termination Event, or (b) the end of the Plan Period.

**12.4.2**  Early Termination Events.  Occurrence of any of the following events or conditions shall constitute an "Early Termination Event" (as such term may be used or referenced in this section 12.4 of the Plan):

12.4.2.1   *Uncured Default in Debtor's Payment Obligations to the Holder of a Secured Claim* – a material default by the Debtor in paying its obligations to the holder of a particular Secured Claim as required under this Plan (including under a stipulation incorporated as part of this Plan) which is not timely cured after such notice and cure period as may applicable to the particular Secured Claim shall be an Early Termination Event solely as to the particular holder of the Secured Claim;

12.4.2.2   *Uncured Default in Debtor's Obligation to Contribute to the Distribution Fund* – the failure of the Debtor to make Quarterly deposits into the Distribution Account which are not cured within forty-five calendar days after written notice to the Debtor under section 5.7.4.5 of the Plan shall be an Early Termination Event with respect to the holders of Class 2 Unsecured Claims;

12.4.2.3   *Occurrence of a Plan Administrator Lien Enforcement Event* – the occurrence of a Plan Administrator Lien Enforcement Event specified in subparagraphs (a), (b) or (c) of section 5.7.4.5 of this Plan shall be an Early Termination Event with respect to all holders of Claims, including the holders of Class 2 Unsecured Claims and the holders of Secured Claims; and

12.4.2.4   *Bankruptcy of a Subordinating Guarantor* – entry of an order for relief under sections 301 or 303 of the Bankruptcy Code as to a particular Subordinating Guarantor shall be an Early Termination Event solely as to the particular Subordinating Guarantor as necessary to permit persons otherwise enjoined by section 12.4 to file a proof of claim and to participate in the bankruptcy case of that Subordinating Guarantor.

**12.5**  **Broad Injunction.**  The intent of paragraphs 12.2, 12.3 and 12.4 is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtor to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction.  The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or

continuing any such specified action or proceeding against Reorganized Debtor (including the Consolidated Subsidiary Entities) with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation:  (i) that the Debtor or any of the Consolidated Subsidiary Entities breached any contract, with, or any duty or obligation to the Creditor; (ii) that the Debtor or any of the Consolidated Subsidiary Entities were the alter ego or instrumentality of another Person; (iii) that the Debtor or any of the Consolidated Subsidiary Entities made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtor or any of the Consolidated Subsidiary Entities are liable for any act or omission.

      **12.6**   **Subrogation Rights of Guarantors**.  To the extent that any holder of any Allowed Claim receives a payment, voluntary or involuntary, from any guarantor, co-obligor, or co-debtor of an obligation of the Debtor (collectively, a "guarantor"), in any amount, such guarantor shall be subrogated in all respects as to such creditor's Allowed Claim against the Debtor (whether secured or unsecured), subject to the provisions of section 509 of the Bankruptcy Code. For purposes of section 509(b)(2), a guarantor of any Claim against the Debtor shall be deemed—as between the Debtor and the guarantor—to have not received the consideration for the Claim held by the holder of any Claim.

      **12.7**   **Exculpation.**  Neither the Reorganized Debtor, the Plan Administrator, Creditor's Committee nor any of their attorneys, accountants, officers, employees or agents shall have or incur any liability to any Creditor or other parties-in-interest for any act or omission in connection with or arising out of their administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and shall be fully protected in acting or in refraining from acting in accordance with such advice.

      **12.8**   **Release of Claims.**  Except as contemplated by the Plan, the rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtor or the Reorganized Debtor (including the Consolidated Subsidiary Entities), and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor and the Consolidated Subsidiary Entities.  Persons deemed to have released claims pursuant to this paragraph shall be forever precluded from asserting against the Debtor, the Reorganized Debtor or their respective assets any Claim, including any Claim of the type released or deemed released herein.

      **12.9**   **Setoffs**.  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

## ARTICLE 13
## DEFAULT AND REMEDIES

**13.1    Default of Plan; Notice Required.**  In the event of any material default of the provisions of this Plan, a creditor or party in interest aggrieved by such default may provide written notice to the Reorganized Debtor (a "Default Notice").  The Default Notice must describe with specificity the nature of the default alleged and the steps required of the Debtor to cure such default.

**13.2    Opportunity to Cure.**  Except only to the extent a different notice and cure period is specified as to a particular Class under this Plan (including under a stipulation incorporated as part of this Plan), the Reorganized Debtor shall have thirty (30) days after receipt of a written Default Notice to cure such default.  Except only to the extent otherwise specifically provided under this Plan (including under a stipulation incorporated as part of this Plan), the aggrieved Person shall take no further action until at least thirty (30) days have passed and the Debtor has not cured or substantially complied with the Default Notice.  Even after the thirty (30) day period has expired, the Reorganized Debtor may cure a default at any time, even after an application or motion has been filed by an aggrieved party.

**13.3    Remedies in the Event of Default.**

**13.3.1**  Plan Administrator's Right to Enforce Plan Administrator Lien.  Subject to the terms and conditions of section 5.7.4 of this Plan, if a Plan Administrator Enforcement Event shall occur and be continuing, the Plan Administrator may enforce the Plan Administrator Lien as specified in section 5.7.4.4 of this Plan.

**13.3.2**  Application to Compel Compliance.  If a material default has occurred and the Reorganized Debtor does not cure such default within thirty (30) days after receipt of a Default Notice, a creditor or party in interest aggrieved by such material default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan.  Such application must be accompanied by an affidavit or sworn declaration specifying the default, the applicant's compliance with the notice requirements, and the Reorganized Debtor's failure to cure the same as required herein.

**13.3.3**  Service of Application.  The application must be served upon (a) the Debtor, (b) the Plan Administrator, (c) Debtor's counsel, (d) the United State Trustee, (e) the holders of Class 33 Equity Interests, and (f) the Oversight Committee.

**13.3.4**  Determination and Relief by Bankruptcy Court.  The Bankruptcy Court, after notice and a hearing, shall determine whether a default occurred, whether it was and is material, and if a material default occurred, whether such default has been cured.  If the Court determines that a material default has occurred and has not been cured, the Court shall determine an appropriate remedy in light of the applicable default, including an order compelling compliance with the pertinent provisions of the Plan.  In determining an appropriate remedy, the Court should consider and impose the least severe remedy that will appropriately compensate the aggrieved party or address the default.  Neither the

section nor any other provision of this Plan, however, shall be construed to provide a Creditor or other Person with the right to recover attorneys' fees from the Debtor, in the event of a material default or otherwise.

# ARTICLE 14
## MISCELLANEOUS

**14.1** <u>**Severability**</u>.  If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtor, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

**14.2** <u>**Binding Effect**</u>.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.  Pursuant to 11 U.S.C. § 1141(a), the provisions of this Plan bind the Reorganized Debtor, any Person issuing securities under the Plan, any Person acquiring property or receiving distributions under the Plan, the counter-parties to any executory contracts or unexpired leases with the Debtor, any and all Creditors or Equity Interest holders of the Debtor, and any and all other Persons referred to or contemplated in this Plan, whether or not the Lien, Claim, Equity Interest or other right of such Person is impaired under the Plan and whether or not such Person has accepted the Plan.  To the extent the Bankruptcy Case is converted to chapter 7 or the Reorganized Debtor files a future bankruptcy case, the Claims, Liens, Equity Interests and rights of Creditors and other Persons, as determined and modified by this Plan, shall be final and shall determine the allowed amounts of such claims and interests in the subsequent chapter 7 case or future bankruptcy case.

**14.3** <u>**Further Assurances.**</u>  Each Person receiving any payment or other benefit under the Plan, including any holder of any Allowed Claim or Equity Interest, shall execute such documents and shall take such other actions (or omit to take actions) as may be necessary or reasonable in order to effectuate the Plan.

**14.4**   **Notices**.  Except as otherwise provided herein, all notices, requests and demands to or upon the Debtor shall only be effective if in writing and delivered, via registered mail or hand-delivery, to the Debtor and its counsel addressed as follows:

If to the Debtor:

MOUNTAIN CRANE SERVICE, LLC
Attn: Paul Belcher
393 South Monterey Street
Salt Lake City, UT 84104

with a copy to:

Matthew M. Boley
COHNE KINGHORN, P.C.
111 East Broadway, Suite 1100
Salt Lake City, UT  84111
E-Mail:  mboley@cohnekinghorn.com and jhasty@cohenkinghorn.com

Notice shall be deemed to have been duly given or made when actually delivered to, or received by the Debtor.

**14.5**   **Governing Law**.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, construed and enforced in accordance with, the laws of the State of Utah, without giving effect to the principles of conflicts of law of such jurisdiction.

**14.6**   **Post-Confirmation Fees, Final Decree**.  The Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. § 1930 and the filing of required post-confirmation reports, until a final decree and/or Order closing the Bankruptcy Case is entered.

**14.7**   **Filing of Additional Documents**.  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**14.8** **Inconsistency**. In the event of any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern.

DATED this 13th day of August, 2018.

MOUNTAIN CRANE SERVICE, LLC

By _____
     Paul Belcher
     Its Member/Manager

COHNE KINGHORN, P.C.

/s/ Matthew M. Boley
Matthew M. Boley
George Hofmann
Adam Reiser
Jeffrey Trousdale
*Attorneys for* debtor-in-possession
MOUNTAIN CRANE SERVICE, LLC

# Schedule 4.17
### (Galena Collateral)

1999 Grove RT860 MC Unit # RT-60-2 [Disputed Lien; Not Perfected]
1999 Grove RT860 MC Unit # RT-60-3
[Trailers Listed on Proof of Claim]

# EXHIBIT 2

**Mountain Crane Service, LLC**                                                                                                                    **Exhibit 2a**
**Chapter 11 - Plan of Reorganization**
**For Years Ending 2018 through 2028**
**Forecasted Cash Flow Statement - 10 Years**

| | Beg. 10/1/2008 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Year: | | | | | | | | | | | | |
| Year-Ending: | | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** |
| **Beginning Cash** | $ 3,000,000 | $2,026,854 | $2,510,727 | $3,243,181 | $4,366,549 | $5,362,945 | $6,299,142 | $4,702,391 | $3,501,999 | $1,876,404 | $713,957 | |
| **Cash Flows from Operations** | | | | | | | | | | | | |
| Net Income | | $623,777 | ($104,741) | $2,189,140 | $3,557,286 | $4,208,156 | $4,624,377 | $3,522,755 | $2,939,124 | $3,603,354 | $3,600,914 | $3,588,957 |
| Add: Noncash Depreciation Expense | | $0 | $5,824,880 | $3,733,495 | $2,458,883 | $1,704,045 | $1,250,347 | $977,535 | $813,403 | $714,585 | $655,034 | $619,103 |
| Add: Noncash Bad Debt Expense | | $0 | $24,110 | $24,630 | $25,162 | $25,162 | $25,162 | $25,162 | $25,162 | $25,162 | $25,162 | $25,162 |
| Add: Noncash QBI Deduction | | $0 | $0 | $547,285 | $889,321 | $1,052,039 | $1,156,094 | $1,229,056 | $1,228,731 | $0 | $0 | $0 |
| Change in Accounts Receivable | | (19,783) | (78,478) | (58,222) | (61,638) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Change in Accounts Payable | | 10,832 | 66,733 | 68,174 | 69,646 | 6,766 | 6,912 | 7,061 | 7,214 | 7,369 | 7,528 | 7,691 |
| Cash Flow from Operations | | $614,826 | $5,732,504 | $6,504,502 | $6,938,660 | $6,996,167 | $7,062,892 | $5,761,570 | $5,013,632 | $4,350,470 | $4,288,639 | $4,240,913 |
| **Cash Flows from Investing** | | | | | | | | | | | | |
| Incremental Capital Expenditures | | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) |
| Change in Notes Receivable | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Flow from Investing | | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) |
| **Cash Flow from Financing Activities** | | | | | | | | | | | | |
| Principal Payments, Secured Claims | | ($1,037,972) | ($4,284,631) | ($4,482,048) | ($4,525,292) | ($4,709,771) | ($4,836,695) | ($6,068,321) | ($4,924,024) | ($4,919,818) | ($4,951,086) | ($2,648,368) |
| Principal Payments, Unsecured Priority Claims | | $0 | ($193,055) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Principal Payments, Non-priority Unsecured Claims | | ($50,000) | ($270,945) | ($790,000) | ($790,000) | ($790,000) | ($790,000) | ($790,000) | ($790,000) | ($556,247) | $0 | $0 |
| Cash Flow from (to) Financing Activities | | ($1,087,972) | ($4,748,631) | ($5,272,048) | ($5,315,292) | ($5,499,771) | ($5,626,695) | ($6,858,321) | ($5,714,024) | ($5,476,065) | ($4,951,086) | ($2,648,368) |
| Net Cash Flow | | ($973,146) | $483,872 | $732,454 | $1,123,368 | $996,396 | $936,197 | ($1,596,751) | ($1,200,392) | ($1,625,595) | ($1,162,447) | $1,092,544 |
| **Ending Cash Balance** | | $2,026,854 | $2,510,727 | $3,243,181 | $4,366,549 | $5,362,945 | $6,299,142 | $4,702,391 | $3,501,999 | $1,876,404 | $713,957 | $1,806,502 |

**Mountain Crane Service, LLC**                                                                                                                     Exhibit 2b
**Chapter 11 - Plan of Reorganization**
**For Years Ending 2018 through 2028**
**Forecasted Income Statement - 10 Years**

| | Full Year Tax Calculation | 10/1/2018- 12/31/2018 Cash Only | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Year: | 1 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Year-Ending: | 2018 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
| **Ordinary Income/Expense** | | | | | | | | | | | | |
| Revenues, Net | $47,199,942 | $11,799,985 | $48,219,021 | $49,260,102 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 |
| **Total Income** | $47,199,942 | $11,799,985 | $48,219,021 | $49,260,102 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 | $50,323,662 |
| *Growth Rate* | *n/a* | *n/a* | *2.16%* | *2.16%* | *2.16%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* |
| **Cost of Goods Sold** | | | | | | | | | | | | |
| Total Cost of Goods Sold | $28,133,806 | $7,033,451 | $28,741,234 | $29,361,777 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 |
| **Total Cost of Goods Sold** | $28,133,806 | $7,033,451 | $28,741,234 | $29,361,777 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 | $29,995,718 |
| **Gross Profit** | $19,066,136 | $4,766,534 | $19,477,787 | $19,898,325 | $20,327,944 | $20,327,944 | $20,327,944 | $20,327,944 | $20,327,944 | $20,327,944 | $20,327,944 | $20,327,944 |
| *Gross Margin* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* | *40.39%* |
| **Expense** | | | | | | | | | | | | |
| Payroll Expenses | $5,080,000 | $1,270,000 | $5,189,681 | $5,301,729 | $5,416,197 | $5,533,137 | $5,652,601 | $5,774,645 | $5,899,323 | $6,026,694 | $6,156,814 | $6,289,744 |
| Insurance | 1,860,000 | 465,000 | 1,900,159 | 1,941,184 | 1,983,096 | 2,025,912 | 2,069,653 | 2,114,338 | 2,159,988 | 2,206,624 | 2,254,267 | 2,302,938 |
| Licenses & Permits | 401,840 | 100,460 | 410,516 | 419,380 | 428,434 | 428,434 | 428,434 | 428,434 | 428,434 | 428,434 | 428,434 | 428,434 |
| Health Care | 498,000 | 124,500 | 508,752 | 519,736 | 530,958 | 542,422 | 554,133 | 566,097 | 578,319 | 590,806 | 603,562 | 616,593 |
| Legal & Accounting Fees, Operational | 354,000 | 88,500 | 361,643 | 369,451 | 377,427 | 377,427 | 377,427 | 377,427 | 377,427 | 377,427 | 377,427 | 377,427 |
| Plan Professional Fees | 1,370,373 | 700,000 | 100,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 |
| US Trustee Fees | 413,000 | 115,000 | 236,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Truck Expense | 500,000 | 125,000 | 510,795 | 521,824 | 533,090 | 544,600 | 556,358 | 568,371 | 580,642 | 593,179 | 605,986 | 619,069 |
| Rent | 204,000 | 51,000 | 208,404 | 212,904 | 217,501 | 222,197 | 226,994 | 231,895 | 236,902 | 242,017 | 247,242 | 252,580 |
| Safety & Compliance | 144,727 | 36,182 | 147,852 | 151,044 | 154,305 | 154,305 | 154,305 | 154,305 | 154,305 | 154,305 | 154,305 | 154,305 |
| Utilities | 60,857 | 15,214 | 62,171 | 63,514 | 64,885 | 66,286 | 67,717 | 69,179 | 70,673 | 72,198 | 73,757 | 75,350 |
| Taxes | 250,464 | 62,616 | 255,871 | 261,396 | 267,040 | 267,040 | 267,040 | 267,040 | 267,040 | 267,040 | 267,040 | 267,040 |
| Travel & Entertainment | 471,999 | 118,000 | 482,190 | 492,601 | 503,237 | 503,237 | 503,237 | 503,237 | 503,237 | 503,237 | 503,237 | 503,237 |
| Telephone | 108,000 | 27,000 | 110,332 | 112,714 | 115,148 | 117,634 | 120,173 | 122,768 | 125,419 | 128,127 | 130,893 | 133,719 |
| Repairs & Maintenance - Yard | 99,120 | 24,780 | 101,260 | 103,446 | 105,680 | 105,680 | 105,680 | 105,680 | 105,680 | 105,680 | 105,680 | 105,680 |
| Uniform Expense | 34,895 | 8,724 | 35,649 | 36,418 | 37,205 | 37,205 | 37,205 | 37,205 | 37,205 | 37,205 | 37,205 | 37,205 |
| Bad Debt Write Off | 23,600 | | 24,110 | 24,630 | 25,162 | 25,162 | 25,162 | 25,162 | 25,162 | 25,162 | 25,162 | 25,162 |
| Depreciation Expense | 9,310,398 | 42,000 | 5,824,880 | 3,733,495 | 2,458,883 | 1,704,045 | 1,250,347 | 977,535 | 813,403 | 714,585 | 655,034 | 619,103 |
| Other Expenses, Fixed | 168,000 | 42,000 | 171,627 | 175,333 | 179,118 | 182,986 | 186,936 | 190,972 | 195,096 | 199,308 | 203,611 | 208,007 |
| Other Expenses, Variable | 511,722 | 127,931 | 522,770 | 534,057 | 545,588 | 545,588 | 545,588 | 545,588 | 545,588 | 545,588 | 545,588 | 545,588 |
| **Total Expense** | $21,864,996 | $3,501,906 | $17,164,662 | $14,984,857 | $13,952,954 | $13,393,295 | $13,138,991 | $13,069,878 | $13,113,842 | $13,227,614 | $13,385,243 | $13,566,180 |
| **Net Ordinary Income** | ($2,798,860) | $1,264,628 | $2,313,124 | $4,913,468 | $6,374,990 | $6,934,649 | $7,188,953 | $7,258,066 | $7,214,102 | $7,100,330 | $6,942,701 | $6,761,764 |
| *Ordinary Income Margin* | *-5.93%* | *n/m* | *4.80%* | *9.97%* | *12.67%* | *13.78%* | *14.29%* | *14.42%* | *14.34%* | *14.11%* | *13.80%* | *13.44%* |
| *Ordinary Income Margin (Cash)* | *13.85%* | *n/m* | *16.93%* | *17.60%* | *17.60%* | *17.22%* | *16.82%* | *16.42%* | *16.00%* | *15.58%* | *15.15%* | *14.72%* |
| **Other Income/(Expenses)** | | | | | | | | | | | | |
| Gain (Loss) on Sale of Assets / Recapture | $1,400,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Forgiveness of Debt Income | $2,042,689 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Interest Expense, Secured Claims | ($1,567,928) | ($640,851) | ($2,417,865) | ($2,177,043) | ($1,928,383) | ($1,674,454) | ($1,408,482) | ($1,112,784) | ($1,070,449) | ($1,074,654) | ($921,105) | ($760,163) |
| **Total Other Income/(Expenses)** | $1,874,762 | ($640,851) | ($2,417,865) | ($2,177,043) | ($1,928,383) | ($1,674,454) | ($1,408,482) | ($1,112,784) | ($1,070,449) | ($1,074,654) | ($921,105) | ($760,163) |
| **Qualified Business Income Deduction (20%)** | $0 | | $0 | ($547,285) | ($889,321) | ($1,052,039) | ($1,156,094) | ($1,229,056) | ($1,228,731) | | | |
| **Pre-Tax Net Income** | ($924,099) | $623,777 | ($104,741) | $2,189,140 | $3,557,286 | $4,208,156 | $4,624,377 | $4,916,226 | $4,914,923 | $6,025,676 | $6,021,596 | $6,001,600 |
| Income Tax Expense | $0 | n/a | $0 | $880,034 | $1,430,029 | $1,691,679 | $1,859,000 | $1,976,323 | $1,975,799 | $2,422,322 | $2,420,682 | $2,412,643 |
| NOL Income Tax (Used) Added | $924,099 | n/a | $104,741 | ($2,189,140) | ($3,557,286) | ($4,208,156) | ($4,624,377) | ($1,449,881) | $0 | $0 | $0 | $0 |
| NOL Income Tax Expense Offset | $0 | n/a | $0 | ($880,034) | ($1,430,029) | ($1,691,679) | ($1,859,000) | ($582,852) | $0 | $0 | $0 | $0 |
| **Net Income** | ($924,099) | $623,777 | ($104,741) | $2,189,140 | $3,557,286 | $4,208,156 | $4,624,377 | $3,522,755 | $2,939,124 | $3,603,354 | $3,600,914 | $3,588,957 |

**Mountain Crane Service, LLC**                                                                             **Exhibit 2c**
**Chapter 11 - Plan of Reorganization**
**For Years Ending 2018 through 2028**
**Forecasted Balance Sheet - 10 Years**

| Forecast Year:<br>Year-Ending: | Confirmation<br>Date<br>10/01/2018 | 1<br>12/31/2018 | 2<br>12/31/2019 | 3<br>12/31/2020 | 4<br>12/31/2021 | 5<br>12/31/2022 | 6<br>12/31/2023 | 7<br>12/31/2024 | 8<br>12/31/2025 | 9<br>12/31/2026 | 10<br>12/31/2027 | 11<br>12/31/2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | | | |
| Cash | $ 3,000,000 | $ 2,026,854 | $ 2,510,727 | $ 3,243,181 | $ 4,366,549 | $ 5,362,945 | $ 6,299,142 | $ 4,702,391 | $ 3,501,999 | $ 1,876,404 | $ 713,957 | $ 1,806,502 |
| Accounts receivable | 7,100,000 | 7,149,783 | 7,304,151 | 7,461,853 | 7,622,960 | 7,622,960 | 7,622,960 | 7,622,960 | 7,622,960 | 7,622,960 | 7,622,960 | 7,622,960 |
| Allowance for Doubtful Accounts | (500,000) | (530,000) | (605,890) | (705,370) | (804,838) | (804,838) | (804,838) | (804,838) | (804,838) | (804,838) | (804,838) | (804,838) |
| Prepaids | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 | 924,918 |
| **Total Current Assets** | $ 10,524,918 | $ 9,571,555 | $ 10,133,906 | $ 10,924,582 | $ 12,109,589 | $ 13,105,984 | $ 14,042,181 | $ 12,445,430 | $ 11,245,039 | $ 9,619,444 | $ 8,456,996 | $ 9,549,541 |
| | | | | | | | | | | | | |
| **Fixed Assets** | | | | | | | | | | | | |
| Property, Plant and Equipment, net | $ 52,019,397 | $ 43,208,999 | $ 37,884,120 | $ 34,650,624 | $ 32,691,741 | $ 31,487,697 | $ 30,737,350 | $ 30,259,814 | $ 29,946,412 | $ 29,731,827 | $ 29,576,793 | $ 29,457,690 |
| Intangible Assets | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 | 534,007 |
| **Total Fixed Assets** | $ 52,553,404 | $ 43,743,006 | $ 38,418,126 | $ 35,184,631 | $ 33,225,748 | $ 32,021,703 | $ 31,271,357 | $ 30,793,821 | $ 30,480,418 | $ 30,265,834 | $ 30,110,799 | $ 29,991,697 |
| | | | | | | | | | | | | |
| **Other Assets** | | | | | | | | | | | | |
| Notes Receivable | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 | 17,723,680 |
| Investments | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 | 621,088 |
| **Total Other Assets** | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 | $18,344,768 |
| | | | | | | | | | | | | |
| **TOTAL ASSETS** | $81,423,090 | $71,659,329 | $66,896,800 | $64,453,981 | $63,680,104 | $63,472,455 | $63,658,305 | $61,584,019 | $60,070,225 | $58,230,045 | $56,912,563 | $57,886,005 |
| | | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | | |
| Accounts Payable, Post Petition | $3,080,000 | $ 3,090,832 | $ 3,157,565 | $ 3,225,739 | $ 3,295,385 | $ 3,302,151 | $ 3,309,063 | $ 3,316,124 | $ 3,323,337 | $ 3,330,707 | $ 3,338,235 | $ 3,345,926 |
| Unsecured, Priority Claims | $193,055 | $193,055 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Unsecured, Non-priority Claims (Proposed) | $5,617,192 | $5,567,192 | $5,296,247 | $4,506,247 | $3,716,247 | $2,926,247 | $2,136,247 | $1,346,247 | $556,247 | ($0) | ($0) | ($0) |
| **Total Unsecured Liabilities** | $8,890,247 | $8,851,079 | $8,453,812 | $7,731,986 | $7,011,632 | $6,228,398 | $5,445,310 | $4,662,371 | $3,879,584 | $3,330,707 | $3,338,235 | $3,345,926 |
| | | | | | | | | | | | | |
| **Secured Liabilities** | | | | | | | | | | | | |
| Secured Claims | $47,283,397 | $46,245,425 | $41,960,794 | $37,478,746 | $32,953,454 | $28,243,683 | $23,406,988 | $17,338,667 | $12,414,643 | $7,494,825 | $2,543,739 | $0 |
| **Total Secured Liabilities** | $47,283,397 | $46,245,425 | $41,960,794 | $37,478,746 | $32,953,454 | $28,243,683 | $23,406,988 | $17,338,667 | $12,414,643 | $7,494,825 | $2,543,739 | $0 |
| | | | | | | | | | | | | |
| **TOTAL LIABILITITES** | $56,173,644 | $55,096,504 | $50,414,606 | $45,210,732 | $39,965,086 | $34,472,081 | $28,852,297 | $22,001,038 | $16,294,228 | $10,825,532 | $5,881,974 | $3,345,926 |
| | | | | | | | | | | | | |
| **TOTAL SHAREHOLDERS EQUITY** | $25,249,446 | $16,562,825 | $16,482,194 | $19,243,249 | $23,715,018 | $29,000,375 | $34,806,008 | $39,582,981 | $43,775,997 | $47,404,513 | $51,030,589 | $54,540,079 |
| | | | | | | | | | | | | |
| **TOTAL LIABILITIES AND SHAREHOLDERS EQUITY** | $81,423,090 | $71,659,329 | $66,896,800 | $64,453,981 | $63,680,104 | $63,472,455 | $63,658,305 | $61,584,019 | $60,070,225 | $58,230,045 | $56,912,563 | $57,886,005 |

# EXHIBIT 3

**Mountain Crane Service, LLC**                                                                                **Exhibit 3**
**Chapter 11 - Plan of Reorganization**
**Historical Consolidated Income Statements**
**2013-2017**

|  | Reviewed | Audited | Audited | Audited | Internal Unaudited [1] |
|---|---|---|---|---|---|
|  | **2013** | **2014** | **2015** | **2016** | **2017** |
| Revenues, net | $51,801,321 | $50,799,349 | $58,143,479 | $51,465,629 | $53,344,085 |
| Cost of revenues | $33,282,356 | $38,978,854 | $50,127,665 | $47,620,743 | $42,210,282 |
| Gross Profit | $18,518,965 | $11,820,495 | $8,015,814 | $3,844,886 | $11,133,803 |
| General and administrative expense | $14,832,760 | $7,503,145 | $5,790,989 | $4,844,341 | $11,937,120 |
| Income (loss) from operations | $3,686,205 | $4,317,350 | $2,224,825 | ($999,455) | ($803,317) |
| Other income (expense): |  |  |  |  |  |
| Gain on sale of property and equipment | $1,258,626 | $2,338,947 | $522,214 | $2,558,600 | $2,517,183 |
| Gain on investment, at equity | - | - | - | 18,104 | - |
| Other | 26,884 | 38,610 | 206,650 | 169,596 | 38,884 |
| Interest income | 69,069 | 11,025 | 58,502 | 59,699 | 135,625 |
| Interest expense | (2,491,929) | (2,920,044) | (2,513,544) | (3,649,394) | (2,748,610) |
| Net other expense | ($1,137,350) | ($531,462) | ($1,726,178) | ($843,395) | ($56,918) |
| Net income (loss) | $2,548,855 | $3,785,888 | $498,647 | ($1,842,850) | ($860,235) |

Footnotes:

[1] The 2017 income statement represents the best information available to the Debtor.  The Debtor is still in the process of closing and consolidating its 2017 operating results.  The Debtor's 2017 tax return and audit report have not yet been completed.  The Debtor's auditors typically group accounts differently than presented in the internal financial statements.  Any comparisons of 2017 to prior periods should consider this fact.

# EXHIBIT 4

**Mountain Crane Service, LLC**                                                                                      **Exhibit 4**
Liquidation Analysis
As of October 1, 2018

| Estimated Gross Proceeds | Projected as of 10/01/2018 | Recovery % Low | Recovery % High | Liquidation Value Low | % | Liquidation Value High | % | Chapter 11 Plan $ | Chapter 11 Plan % |
|---|---|---|---|---|---|---|---|---|---|
| Current Assets | | | | | | | | | |
| Cash | $3,000,000 | 100.0% | 100.0% | $3,000,000 | | $3,000,000 | | | |
| Accounts Receivable | $6,600,000 | 44.1% | 55.1% | $2,909,649 | | 3,637,061.10 | [1] | | |
| Related Party Receivables | $0 | | | $0 | | $0 | | | |
| Note Receivables | $0 | | | $0 | | $0 | | | |
| | | | | | | | | | |
| Fixed Assets | | | | | | | | | |
| Machinery & Equipment | 48,355,785 | 85.0% | 97.0% | $41,102,417 | | $46,905,111 | [2] | | |
| Less: Transport Costs to Auction | | -8.0% | -3.0% | ($3,288,193) | | ($1,407,153) | [3] | | |
| Less: Sales Commissions and fees | | -15.0% | -11.0% | ($6,165,363) | | ($5,159,562) | [4] | | |
| Net Machinery & Equipment | | | | $31,648,861 | | $40,338,396 | | | |
| | | | | | | | | | |
| Office Equipment | $49,000 | 40.0% | 60.0% | $19,600 | | $29,400 | | | |
| Land & Buildings | $2,890,000 | 80.0% | 90.0% | $2,312,000 | | $2,601,000 | [5] | | |
| | | | | | | | | | |
| Other Assets | | | | | | | | | |
| | | | | | | | | | |
| **Total Estimated Gross Proceeds** | **$60,894,785** | | | **$39,890,110** | | **$49,605,857** | | **N/A** | **N/A** |
| | | | | | | | | | |
| **Distribution of Proceeds** | | | | | | | | | |
| Chapter 7 Trustee Fees | | | | $250,000 | | $500,000 | | | |
| Other Chapter 7 Professional Fees | | | | $500,000 | | $750,000 | | | |
| Chapter 11 Professional Fees | | | | $500,000 | | $750,000 | | $1,555,373 | |
| | | | | | | | | | |
| Secured Claims | | | | | | | | | |
| Machinery & Equipment Secured Claims | $45,216,859 | 70.0% | 89.2% | $31,648,861 | | $40,338,396 | | $45,216,859 | 100.0% |
| Land & Buildings Secured Claims | $2,066,538 | 100.0% | 100.0% | $2,066,538 | | $2,066,538 | | $2,066,538 | 100.0% |
| | | | | | | | | | |
| **Proceeds Available for Priority Unsecured Claims** | | | | **$4,924,711** | | **$5,200,923** | | | |
| | | | | | | | | | |
| Unsecured Claims | | | | | | | | | |
| Priority Unsecured Claims | $193,055 | 100.0% | 100.0% | $193,055 | | $193,055 | | $193,055 | 100.0% |
| | | | | | | | | | |
| **Proceeds Available for General Unsecured Claims** | | | | **$4,731,656** | | **$5,007,868** | | **$5,617,192** | |
| | | | | | | | | | |
| General Unsecured Claims | | | | | | | | | |
| General Unsecured Claims | $7,660,000 | | | $9,633,003 | | $8,326,725 | [6] | $7,660,000 | |
| Additional Unsecured Deficiency Claims | | | | $13,567,998 | | $4,878,463 | [7] | $0 | |
| Union Pension - Estimated Net Withdrawal Liability | | | | $7,311,071 | | $0 | [8] | $0 | |
| Additional Unsecured Claims Due to Shutdown | | | | $4,000,000 | | $2,000,000 | [9] | $0 | |
| Total General Unsecured Claims | $7,660,000 | | | $34,512,072 | 13.7% | $15,205,188 | 32.9% | $7,660,000 | 73.3% |
| | | | | | | | | | |
| **Estimated General Unsecured Recovery Percentage** | | | | | **13.7%** | | **32.9%** | [10] | **73.3%** |
| | | | | | | | | | |
| **Total Distributions of Proceeds** | | | | **$39,390,110** | | **$48,855,857** | | **$53,093,644** | |

Notes:

[1] accounts receivable is initially estimated at $7,100,000 less a $500,000 allowance. It is then adjusted to account for customers with offsetting accounts payable and non-payment due to termination, resulting in the high scenario. The low scenario is further discounted by 20%.

[2] Machinery and equipment based on forced liquidation value, discounted by 3% (high) and 15% (low), due to the sale of a large amount of cranes and equipment at once.

[3] Costs to transport to auction were estimated by management and could exceed these estimates. The largest factor is the destination. Costs to transport cranes to the auction in February 2018 to Orlando were approximated at 10% of gross auction proceeds and were for rough terrain cranes, which are easier to transport.

[4] Commissions typically range from 10% to 15%. The February sale in Orlando resulted in 10% sales commissions, which is low per management.

[5] Initial land value estimate based on 2013 appraisal with estimate for additional land. Land is discounted by 10% and 20% based on estimated costs of sales and price discounts.

[6] High and low estimated general unsecured claims under liquidation include full insider claims (low scenario) or a portion of insider claims (high scenario). Estimated unsecured claims under the Chapter 11 Plan assume certain claims will be disallowed or reduced.

[7] Additional unsecured deficiency claims based on the difference between secured claims and estimated net proceeds from collateral (machinery, equipment & land).

[8] These liabilities could apply only if Mountain Crane withdraws from the Union pension plan, which could occur under a Chapter 7 scenario. Estimated withdrawal liability is based on filed claim number 111.

[9] These additional unsecured claims include additional estimated lessor rejection claims and potential litigation claims related to shutdown and effects on customers.

[10] Estimated recovery percentage under Chapter 11 depends on successful reduction of general unsecured claims to $7.7 million through objections. Results may differ.

[11] Estimates of professional fees (Chapter 7 and Chapter 11) do not include the costs associated with bringing avoidance actions. Similarly, estimated proceeds also do not included potential recoveries.

# EXHIBIT 5

| Vendor Name | Description | Proposed Cure Amount |
|---|---|---|
| Alliance Funding Group | TCF 5 Freightliner Semis | $0 |
| Amur Equipment | Peterbilt Service Truck & Trailer | $0 |
| Anderson Machinery | 15 ton Carry Deck & Bomag 84" Roller | $0 |
| ASCO | Multiple Pieces of Equipment | $0 |
| Big Bertha Equipment | TK-89 Volvo Semi Roll-Off Truck, TK-100 International Service Truck, 12K GEHL Forklift FL-012-01 & 12K GEHL Forklift FL-012-02 | $0 |
| Bigge Equipment | Lieberr LTM 1220 (AT-275-9) & Liebherr LTM 1220 (AT-275-10) | $0 |
| Buckner Heavylift Crane | LR1600 Luffing Jib #1 & LR1600 Luffing Jib #2 | $0 |
| CIT | Konica Printers for Office | $0 |
| Cleveland Crane & Shovel | 2015 Grove GRT8100 | $0 |
| CNH Industrial | TSK-004 & TSK-005 Skidsteers | $0 |
| CSJ Equipment | GEN-011 Generator | $0 |
| Gulf Special Services | 2014 Manitowoc 16000 | $0 |
| Komatsu Equipment | Multiple Pieces of Equipment | $0 |
| Komatsu Financial | WL-001 Loader & EX-001 Excavator | $0 |
| Mardian Equipment | Multiple Pieces of Equipment | $0 |
| Modspace | Single and Double Wide Office Trailers | $0 |
| Mountain Heavy Transport | Flex Fleet Truck Rentals | $0 |
| Park City Towing | 4x4 Rangers | $0 |
| Pawnee Leasing | Kenworth Prime Mover & Addtl Semis | $0 |
| Schuch Mountain | 2015 Liebherr LTM1200 AT-275-8 & 2009 Grove 4115 | $0 |
| Sunbelt Rentals | 12K Telescopic Handler, 80' Genie Boomlift & 185CFM Air Compressor | $0 |
| Sunstate | Multiple Pieces of Equipment | $0 |
| Triad Lifting Logistics | 4x4 Rangers | $0 |
| Utah Machine Rental | TSK-009, AUG-012, AUG-013 & AUG-014 | $0 |
| W&D Crane Rentals | LR1350 | $0 |
| William Scotsman | Single and Double Wide Office Trailers | $0 |

# EXHIBIT 6

Mountain Crane Service, LLC
Chapter 11 Reorganization
Unsecured Creditors Return %

| | $0 | $500,000 | $1,000,000 |
|---|---|---|---|
| Available Pot Amount | $8,000,000 | $8,000,000 | $8,000,000 |
| Administrative Claims | ($2,189,753) | ($2,189,753) | ($2,189,753) |
| Priority Unsecured Claims | (193,055) | ($193,055) | ($193,055) |
| General Unsecured Claims | $5,617,192 | $5,617,192 | $5,617,192 |
| | | | |
| Total General Unsecured Claims **With** Voluntary Subordinations | $6,700,846 | $7,200,846 | $7,659,881 |
| Total General Unsecured Claims **Without** Voluntary Subordinations | $8,673,849 | $9,173,849 | $9,632,884 |
| Difference | $1,973,003 | $1,973,003 | $1,973,003 |
| | | | |
| Return Percentage **With** Voluntary Subordinations | 83.83% | 78.01% | 73.33% |
| Return Percentage **Without** Voluntary Subordinations | 64.76% | 61.23% | 58.31% |
| | | | |
| Percentage Change Due to Voluntary Subordinations | -19.07% | -16.78% | -15.02% |
| | | | |
| Amount of Claims Susceptible to Possible Subordination Under § 510(b) of the Bankruptcy Code | $1,214,288 | $1,214,288 | $1,214,288 |